

11 CV 3600

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STEPHEN E. ARDIZZONE, on behalf of himself and all others similarly situated, ) ) ) | |
| Plaintiff, ) | CIVIL ACTION NO. |
| ) | **CLASS ACTION COMPLAINT** |
| v. ) | |
| PARNON ENERGY INC., ARCADIA PETROLEUM LTD, ARCADIA ENERGY (SUISSE) SA, NICHOLAS J. WILDGOOSE and JAMES T. DYER, ) ) ) ) ) | **ECF CASE** |
| Defendants. ) | |

Plaintiff Stephen E. Ardizzone, on behalf of himself and all others similarly situated,

brings this action against Parnon Energy Inc. ("Parnon"), Arcadia Petroleum Ltd. ("Arcadia

Petroleum"), Arcadia Energy (Suisse) SA ("Arcadia Suisse"), James T. Dyer ("Dyer"), and

Nicholas J. Wildgoose ("Wildgoose") (collectively, "Defendants") and alleges as follows, based

on information and belief, including an extensive three-year investigation conducted by the

Commodity Futures Trading Commission ("CFTC") and its civil complaint against Defendants:

## NATURE OF CLAIM

1.      This action arises from Defendants' scheme to intentionally and unlawfully

manipulate and attempt to manipulate derivative financial contract prices for West Texas

Intermediate crude oil ("WTI") traded on the New York Mercantile Exchange ("NYMEX")

between December 1, 2007 and May 31, 2008 (the "Class Period"), in violation of Section

22(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a)(1) and Section 2 of the

Sherman Act, 15 U.S.C. § 2.

2.      As explained below, Defendants Parnon, Arcadia Petroleum, and Arcadia Suisse (collectively "Parnon/Arcadia"), by and through their agents and employees, including but not limited to Defendants Dyer and Wildgoose, unlawfully manipulated and attempted to manipulate NYMEX WTI financial contract prices, and unlawfully monopolized and attempted to monopolize the Relevant Market (defined herein).

3.      Commercial users of crude oil regularly buy and sell physical oil for delivery in Cushing, Oklahoma, which is a major delivery point for crude oil, including WTI, in the United States.  In addition to buying and selling physical oil, crude oil market participants also sometimes hedge their risk or speculate in crude oil by trading commodity futures, swaps, and options tied to the price of WTI ("WTI Derivatives") on various exchanges, including the NYMEX.

4.      During the Class Period, WTI prices reflected a relatively low supply of crude oil including WTI at Cushing.  In an attempt to take advantage of, and exacerbate, the tight supply, Defendants Dyer and Wildgoose – who were responsible for both the physical and Derivatives trading of WTI at Parnon/Arcadia – engineered a manipulative strategy designed to affect WTI Derivatives prices starting at least by late 2007.

5.      **Overt Acts and Means of Manipulation.**  Beginning at least as early as December 1, 2007, and continuing until a date unknown to Plaintiff, but believed to extend at least until May 31, 2008,  Defendants unlawfully manipulated the prices of NYMEX WTI Derivatives contracts.  Defendants did so by, among other methods:

(a)      Dominating and controlling WTI supply, despite the fact that they had no commercial need for crude oil, by amassing a large quantity of physical WTI to be delivered the next month at Cushing;

(b)      Taking a long WTI Derivatives position on the NYMEX and IntercontinentalExchange Inc.'s ICE Futures Europe ("ICE") simultaneous with this purchasing of massive amounts of WTI, with the intent to artificially inflate the value of that position by driving WTI prices higher;

(c)      Giving other market participants the impression that the supply would remain tight, holding on to their dominant physical WTI position, and thereby artificially inflating WTI prices as they sold off their long WTI Derivatives position;

(d)      Selling short a second series of WTI Derivatives at artificially high prices;

(e)      Shocking the market with an unexpected sell-off of their WTI physical position, driving WTI prices back down and increasing the value of their short WTI Derivatives position.

6.      **Causation.**  Through the foregoing conduct, Defendants intentionally caused prices of NYMEX WTI Derivatives contracts to trade at artificial levels and increased the price of physical crude oil, derivatives, and other oil products in the United States and elsewhere.

7.      **Manipulative Intent.**  Defendants aggressively exploited their massive physical WTI position to cause artificial prices that unlawfully created profits for their trading positions and business operations.  As a result, Defendants are currently under investigation and the subject of a government civil complaint relating to their alleged manipulation of NYMEX WTI Derivatives contracts.

8.      On May 24, 2011, the CFTC filed a civil complaint in the Southern District of New York, alleging that Defendants "unlawfully manipulated and attempted to manipulate NYMEX WTI financial contract prices" in violation of the CEA. *CFTC v. Parnon Energy Inc.*, *et al.* (S.D.N.Y. May 24, 2011).

9.      According to CFTC Commissioner Bart Chilton, "[t]his is a very big deal in that we seldom allege that the defendants manipulated the crude oil market to the tune of $50 million in ill-gotten gains." Commissioner Chilton further explained, "[t]hat's an awful lot of money, and when we look at how consumers are suffering at the gas pump, we need to prosecute activity like this to the fullest extent of our authority under the law."

10.     Defendants' scheme to manipulate the prices of WTI Derivatives violates Section 22 of the CEA, 7 U.S.C. §25 and Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff and members of the Class suffered damages by transacting in NYMEX WTI Derivatives contracts at artificial prices during the Class Period, as more fully alleged herein.

## JURISDICTION AND VENUE

11.     This action arises under Section 2 of the Sherman Act, 15 U.S.C., § 2, Sections 4 and 16 of the Clayton Act , 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

12.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. 25, and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d). Defendants resided, transacted business, were found, or had agents in the District and/or the claims arose at least in part in the District.

## THE PARTIES

14.     Plaintiff Stephen E. Ardizzone is a resident of Staten Island, New York. During the Class Period, he transacted in WTI Derivatives contract, and was injured as a result of Defendants' anticompetitive acts and market manipulation.

15.     Defendant Parnon Energy Inc. is a corporation organized and existing under the laws of Texas with its principal place of business in Rancho Santa Fe, California. Parnon is a

subsidiary of Parnon Holdings Inc., which is a wholly owned subsidiary of Farahead Holdings Ltd., and is an affiliate of Arcadia Petroleum Ltd. and Arcadia Energy (Suisse) SA. Parnon operates as a common enterprise with Arcadia Petroleum, Ltd. and Arcadia Energy (Suisse) SA. WTI physical and WTI Derivatives trades conducted by Parnon, Arcadia Petroleum, and Arcadia Suisse comprised their collective "WTI Book."

16.     Defendant Arcadia Petroleum Ltd. is a corporation organized and existing under the laws of the United Kingdom with its office and principal place of business in London, England. Arcadia Petroleum is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Petroleum is engaged in the business of trading crude oil, crude oil products and oil derivatives for profit in various physical and financial markets throughout the world.

17.     Defendant Arcadia Energy (Suisse) SA is a corporation organized and existing under the laws of Switzerland with its office and principal place of business located in Morges, Switzerland. Arcadia Suisse is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Suisse is engaged in the business of trading crude oil derivatives for profit on various exchanges including NYMEX and ICE.

18.     Defendant James T. Dyer is an individual residing in Brisbane, Australia. During the Class Period Dyer was an experienced crude oil trader. Dyer acted on behalf of and as agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. In 2008, Dyer earned a base salary and was eligible for and received a bonus based upon the profitability of the WTI Book.

19.     Defendant Nicholas J. Wildgoose is an individual residing in Rancho Santa Fe, California. During the Class Period Wildgoose, a crude oil trader, was jointly responsible with Dyer for the strategy and trading in the WTI Book. Wildgoose acted on behalf of and as an

agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. Wildgoose received a base salary and was eligible for and received bonuses based upon the profitability of the WTI Book.

## SUBSTANTIVE ALLEGATIONS

**A.      Background**

20.      NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and option contracts for WTI.

21.      A futures contract is an agreement to buy or sell a commodity, such as WTI, at a date in the future. Every aspect of a futures contract traded on the NYMEX – including the contract for crude oil – is standardized, except the price and quantity. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States and the world.

22.      Futures contracts have two sides. The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery date. The "short" side is the seller of the contract who is obligated to make delivery of the commodity on the delivery date.

23.      An option is a contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of futures contracts at a predetermined price on or before a given data, regardless of the market price of the futures contract at the time the option is exercised.

24.      Only a small percentage of all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his

future obligation to the contract market/exchange clearing house to take delivery of crude oil by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

25.     NYMEX continually trades contracts for the delivery of WTI during the then-current calendar month (sometime called the spot month contract or spot contract) and for each consecutive month for six years into the future. Prices for all WTI contracts are quoted in 1,000 U.S. barrels (42,000 U.S. gallons) in dollars and cents per barrel.

26.     The crude-oil market involves the exchange of physical barrels of oil, trading on registered futures exchanges such as the NYMEX, and unregulated over-the-counter ("OTC") markets. Many OTC crude oil contract prices are based on NYMEX prices, including the final price for an expired NYMEX crude oil futures contract. OTC crude oil contracts that are priced off of NYMEX prices are called "NYMEX look-alikes."

27.     The United States crude oil market's infrastructure moves oil from producing regions to consuming regions. The United States is divided into five regions, referred to as "Petroleum Administration for Defense Districts," or PADDs, which were delineated during World War II. Broadly speaking, the five PADDs cover the East Coast (PADD I), the Midwest (PADD II), the Gulf Coast (PADD III), the Rocky Mountains (PADD IV), and the West Coast (PADD V). The U.S. Department of Energy's Energy Information Administration still collects and publishes oil supply data by PADD.

28.     The crude oil marketing hub in Cushing, Oklahoma ("Cushing") is the most significant marketing and trading hub for crude oil in North America, and serves as the delivery (or price settlement) point for WTI Derivatives contracts traded on the NYMEX.

29.     WTI, one of the most actively traded domestic crudes, is the U.S. benchmark grade and is the primary deliverable grade under the NYMEX WTI futures and options contracts. Through arbitrage trading, the spot price of WTI crude oil is roughly equivalent to front-month NYMEX crude oil futures contract prices. Cushing is the main trading and trans-shipment point for WTI, the convergence point of several pipelines that bring crude oil from the producing areas and send it to refineries. The market for Cushing WTI crude oil contracts is an industry wide benchmark for crude oil markets because of its liquidity and transparency. The Cushing Hub is located within PADD II

30.     NYMEX rules provide that delivery of crude oil bought or sold for future delivery on the NYMEX shall take place no earlier than the first calendar day of the delivery month and no later than the last calendar day of the delivery month.

31.     NYMEX rules also provide that it is the short's (the party that is obligated to make delivery under the contract) obligation to ensure that its crude oil receipts are available to begin flowing ratably in Cushing, Oklahoma by the first day of the delivery month, in accord with generally accepted pipeline scheduling practices. Upon receipt of payment from the long (the party that is obligated to take delivery under the contract), the short shall transfer title to the crude oil to the long.

32.     Physical WTI for delivery at Cushing in the near month is traded until the end of the third business day following the expiration of the NYMEX WTI near month futures contract. The three-day period after the near month futures contract expiry is known as the "cash window." By the time the cash window opens, commercial users of crude oil generally will have completed all or most of their purchases of physical oil needed for the following month. The cash window gives market participants the opportunity to balance their positions, offset short and

long positions, and handle logistical considerations for delivery of crude oil the following month. Trading activity during the cash window is an indicator to the market of the next month end-of-month balances of Cushing oil stocks, which in turn impacts WTI Derivatives prices.

33.     Under standard market practice, trades in physical crude oil are priced at a Calendar Merc Average ("CMA"). Physical oil priced at CMA is priced ratably at the average of each day's near month settlement price during the month of delivery. Prior to engaging in CMA transactions, physical market participants qualify for such transactions by meeting certain credit-related requirements. Parties to a CMA transaction agree on a price, either at CMA or CMA plus or minus an agreed upon sum. Only price and quantity are subject to individual negotiations, with the other material terms of a CMA transaction fixed. After parties consummate a CMA transaction, a standardized stand-by letter of credit from a third-party bank for 105% of the contract's current notional value is posted.

34.     CMA contracts are fungible between and among qualified parties. CMA contracts are traded: (1) on the "HoustonStreet" electronic trading facility; (2) directly between counterparties; and (3) through brokers. The Defendants used all three methods to purchase and sell WTI physical oil in CMA transactions.

35.     The price differential, or "spread," between WTI for delivery in the near month and WTI for delivery in the following month is generally understood to be the best representation of WTI physical supply and demand because that spread reflects near-term demand relative to near-term supply. Market participants can trade this differential via a "calendar spread," which is a pair of contracts, one for the purchase of oil deliverable in one month and one for the sale of the same quantity of oil deliverable in a subsequent month, such as the February/March 2008 spread. Market participants can trade calendar spreads in WTI

physical and WTI Derivatives.  When a person acquires a "long" calendar spread, he purchases the near month and sells the following month.  When one sells "short" a calendar spread, he sells the near month and purchases the following month.

36.     Near-term supply is generally viewed as being relatively inelastic (*i.e.* more supply cannot easily be brought into the market in response to price changes) compared to long-term supply.  Therefore, a near month price that is higher than the subsequent month price reflects that market participants are willing to pay a premium for immediate supply.  This pricing relationship is commonly referred to as "backwardation" and demonstrates supply tightness, or a shortage in immediate supply relative to demand.  When the opposite is true, and the near month price is lower than the next month price, the market is said to be in "contango."  This pricing relationship indicates that the market is well supplied relative to demand, such that the higher later month price compensates market participants for storing crude oil to sell later.

37.     WTI calendar spread prices are sensitive to the end-of-month balances of crude oil stocks at Cushing.  A market perception that the WTI supply at Cushing is tight will tend to drive near month prices higher relative to the following month; and a market perception of a WTI surplus at Cushing will tend to drive near month prices relatively lower.

**B.     Defendants' Unlawful Scheme To Manipulate The Market for NYMEX WTI Derivatives Contracts**

38.     Starting at least as early as late 2007, Defendants Dyer and Wildgoose realized that they could capitalize on (and ultimately manipulate) certain market conditions impacting the physical WTI market to the benefit of their WTI Derivatives contracts.

39.     Dyer and Wildgoose knew that physical WTI supply at this time was relatively tight.  Wildgoose referred to this tight supply by stating that the supply for physical WTO was "close to vapours."

40.    Dyer indicated to other Parnon/Arcadia traders in a September 2007 email that there was a "shitload of money to be made shorting" NYMEX WTI calendar spreads. Dyer knew, however, that the only way to make this money was to convince the rest of the market that supplies at Cushing were tight, while someone unexpectedly turned the end-of-month balance into a "surplus."

41.    With this in mind, the Defendants intentionally undertook a manipulative scheme that included the following steps:

*First*, Defendants acquired a large physical WTI position, to be delivered the next month at Cushing, which allowed them to dominate and control WTI supply even though they had no commercial need for crude oil;

*Second*, they established a long near month/next month WTI Derivatives calendar spread position on the NYMEX and ICE with the intent to artificially inflate the value of that position by driving WTI prices higher;

*Third*, they did not sell their physical WTI before the cash window opened, which led the market to believe that they had committed their oil to storage or commercial use. This caused the near month calendar spread to rise to an artificial level, which in turn maximized the value of the their long WTI Derivatives position;

*Fourth*, they established a substantial short position in the subsequent series of WTI Derivatives calendar spreads at artificially high prices, knowing they were about to surprise the market with a surplus of physical WTI;

*Finally*, Defendants suddenly dumped their physical position during the cash window, which created the surprise surplus they had planned all along and drove prices back down – all to maximize the value of their short WTI Derivatives calendar spread position.

42.    In January and March 2008, by successfully executing this scheme, Defendants generated unlawful profits on the long WTI Derivatives position they acquired before driving prices up, and from the short WTI Derivatives position they established before driving prices

back down.  In particular, Dyer and Wildgoose caused, or contributed to causing, the following NYMEX WTI calendar spread prices to be artificial on the following dates:

- The February/March 2008 spread on January 16, 17, 18 and 22, 2008;

- The March/April 2008 spread on January 23 and 24, 2008;

- The April/May 2008 spread on March 14, 17, 18 and 19, 2008; and

- The May/June 2008 spread on March 20 and 24, 2008.

43.     Defendants were able to intentionally and artificially manipulate the prices of WTI Derivatives contracts on these dates through the unlawful scheme described in detail below.

### 1.     **Defendants Hatch Their Scheme**

44.     Defendants implemented the following four-step approach to effectuate their unlawful scheme, and each step was critically vital to its success.

*Step 1:  Accumulate an Enormous Physical Position*

45.     Defendants' unlawful scheme was predicated on first obtaining a sufficiently large enough physical position to artificially impact WTI Derivatives contract prices.  In the early months of 2008, a supply crunch in the physical WTI market presented the very market conditions necessary for Defendants to obtain such a dominant position.

46.     As the below chart demonstrates, there is a strong correlation between spot prices in the physical WTI market and prices for WTI Derivatives contracts.  By hoarding the physical supplies, the Defendants led the market to believe supplies were tighter than they, in fact, were. This resulted in increased spot and future prices.



47.     On or about January 3, 2008, Dyer predicted that the February end-of-month Cushing balance would be approximately 7 million barrels of physical WTI to be delivered in February.  Dyer and Wildgoose intended to and then did acquire a dominant portion of that predicted balance, knowing that the market was already low on supply.  On January 7, 2008, Wildgoose advised Arcadia Petroleum's Chief Operating Officer to complete standard credit arrangements with potential counterparties so that they could commence trading physical

("cash") WTI: "Can we get this issue resolved pls. time is of the essence here, we need to trade cash with 3rd parties tomorrow as part of the feb/mar wti strategy."

48.     Following that request, Defendants acquired approximately 4.1 million barrels of physical February 2008 WTI over the next 11 days.  By the last day of trading of the ICE February 2008 WTI futures contract (the near month) on January 18th, Defendants had increased their long physical position to approximately 4.6 million barrels, or 66% of their predicted 7 million-barrel end-of-month balance.  Wildgoose estimated that there would be 5 million barrels of physical February 2008 WTI available at Cushing for February delivery, down from his prior estimate of 7 million barrels.  Defendants thus accomplished Step 1 and finally held a dominant position in physical WTI.

49.     Defendants refrained from unwinding their dominant position through the final day of trading for the NYMEX February 2008 WTI futures contract, January 22.  Holding on to a large physical position beyond the expiry of the near month futures contract is economically irrational for an enterprise that has no commercial need for crude oil and plans to sell the position by the end of the current month, like Defendants.  Absent a scheme to intentionally manipulate the market, such an enterprise should expect to incur substantial losses from selling off a large physical position during the cash window.  Defendants had no commercial purpose or use for the oil.

50.     Indeed, the real motive for holding onto the oil was to create a false impression that supply would remain tight.  Defendants could then move on to Step 2 of their unlawful scheme and accumulate a long physical position with the secret intent to subsequently shock the market later by selling in the cash window.  They knew that as long as the market believed that

supply was tight and getting even tighter, there would be upward pressure on the prices of WTI for February delivery relative to March delivery, which was their goal.

### Step 2:  Purchase February/March WTI Derivatives Calendar Spreads

51.     At the same time they were planning to accumulate the physical position, Dyer and Wildgoose also planned to profit from the intended artificial prices by establishing a long position in the February/March WTI Derivatives calendar spread.  Dyer declared that "our plan, as outlined y[ester]day is to get to around 15k long the WTI February contract by the start of the rolls [*i.e.*, January 8 through 14, 2008] assuming prices remain at these kind of numbers."

52.     By January 10, 2008, Defendants had established a long February/March 2008 WTI Derivatives calendar spread position of approximately 13,600 contracts, equivalent to approximately 13.6 million barrels, on NYMEX and ICE.  Over the same period, Defendants' accumulation and holding of physical WTI caused or contributed to causing the February WTI Derivatives prices to be artificially high as compared to the March WTI Derivatives prices, and thus, as intended, unlawfully increased the value of their long February calendar spread position. On January 3, 2008, when the Defendants began accumulating a long February/March 2008 WTI Derivatives calendar spread position, for example, the NYMEX February/March WTI futures price differential closed at $0.24 (*i.e.*, the February price was $0.24 more than March).  By January 16, when prices were artificial, the spread was $0.48.  On January 17, the spread was at an artificial level of $0.56.  By January 18, the spread had undergone a four-fold increase from January 15 – to an artificial level of $0.65.

53.     Between January 16 and 18, 2008, Defendants sold the equivalent of approximately 10.7 million barrels of their long February/March WTI Derivatives calendar spread position.  On January 22, 2008, the last trading day of the NYMEX February WTI futures

contract, Dyer and Wildgoose sold the remaining 2,241,000 barrels of their long February WTI

Derivatives calendar spread position at a month-high price.

**Step 3: Short the March/April WTI Derivatives Calendar Spreads**

54.     On the first day of the January cash window, January 23, 2008, the February

futures contract had expired, and March had become the new near month.  Defendants still held

nearly all of their 4.6 million-barrel physical WTI position for delivery in February 2008.  Dyer

and Wildgoose knew that the March/April 2008 calendar spread would and did trade at

artificially high prices, which they had caused or contributed to causing by accumulating and

holding a dominant physical position.  They secretly planned to suddenly sell-off their large

physical position in the cash window, which they expected would drive down the price of March

WTI Derivatives relative to April.  They plotted to take advantage of that intended price drop by

taking a short position in March/April WTI Derivatives calendar spreads in advance of the sell-

off.  Their scheme worked as follows:

- On January 22, 2008, Defendants held a short position equivalent to approximately 5.8
  million barrels of the March/April 2008 WTI Derivatives calendar spreads.

- On January 24, they increased this short position to approximately 9.8 million barrels.

- On January 25, they increased their short position again to approximately 12.2 million
  barrels, and began to offset that short exposure on the same day after they dumped their
  long physical February position.

55.     Over this period, Defendants' accumulation and holding of physical WTI caused

or contributed to causing the March WTI Derivatives prices to be artificially high as compared to

the April WTI Derivatives prices.  For example, on January 23, the NYMEX March/April 2008

WTI futures calendar spread was artificially high, at $0.37.   The following day, that price

differential increased to an artificial high of $0.42. Defendants' manipulative cycle, at least for January, was nearly complete.

**Step 4: Sell Off or "Puke" Their Physical Position**

56.     After leading the market to believe supply would remain tight, it was time for the Defendants to dump their dominant physical position during the cash window. This would turn the tight supply into an unexpected surplus. Dyer and Wildgoose knew and intended that once they dumped their February 2008 physical position – which Wildgoose referred to as the "inevitable puking" of the position – the market would be surprised and realize there was far more physical WTI available at Cushing than previously was evident. As Wildgoose wrote in a January 24, 2008 email, "this time tomorrow those balances will be much more apparent."

57.     On Friday, January 25th, the final day of the cash window, Defendants dumped approximately 4.6 million barrels of their remaining physical WTI deliverable in February.

58.     As Defendants dumped the physical position on January 25, 2008, the cash/futures market dropped to $0.32 below the March futures price, a $0.97 movement from where it had just stood. This type of price movement on the last day of the cash window, a market "flip" from backwardation to contango, happened only *twice* between January 2006 and January 2011 – in January 2008 and then again in March 2008- the exact months in which Defendants successfully manipulated the market.

59.     On January 25, the March/April 2008 NYMEX futures spread also dropped nearly in half, from $0.42 (on the previous day) to $0.24. While this resulted in Parnon/Arcadia taking a significant loss from simultaneously selling their February 2008 WTI physical position and buying a March 2008 WTI physical position in the cash window, the profits they gained on their WTI Derivatives positions far exceeded these losses, as alleged below.

60.     Defendants' actions cannot be attributed to rational economic profit maximization. They held large physical positions and sustained large financial losses by selling their positions at the most inopportune, and economically irrational time. As crude oil speculators, Defendants have no commercial need for crude oil. Speculating, by taking positions in financial derivatives for crude oil, does not require taking a physical position. Financial positions can be settled through cash settlements, or more commonly, by taking offsetting positions. One does not need to buy or sell physical crude oil to make or take physical delivery as a means to settle a financial position.

61.     Defendants' decision to dump their physical portfolio in the cash window at large financial losses is thus economically irrational. The market understands that the cash window is used to balance positions, offset positions, and for hand delivery considerations. Understandably, market participants would not expect traders to offload large quantities of oil during this period because it would significantly depress prices and harm sellers in the market. Defendants' singular motive for taking large financial losses in the physical market was to depress prices of physical WTI for the express purpose of reaping larger offsetting profits in their WTI Derivatives contracts.

62.     Defendants' unlawful scheme to artificially manipulate the market was a success. On Monday, January 28, 2008, Wildgoose observed in an email that the dumping had "the desired effect" on their short position in March/April WTI Derivatives calendar spreads. The January manipulative cycle was complete.

### 2.     Defendants Attempt To Repeat Their Scheme In February 2008

63.     Although Dyer and Wildgoose intended to repeat the manipulative scheme in February 2008, unresolved credit issues did not allow them to implement it.

### 3.  Defendants Successfully Repeat Their Scheme In March 2008

64.    By March 2008, however, Dyer and Wildgoose were in a position to repeat the same manipulative scheme they successfully executed in January 2008.  As in January, Dyer and Wildgoose intended to and did: (i) predict the quantity necessary and acquire a position in physical WTI to dominate and control the end-of-month Cushing WTI balance, when they knew that supply was already tight, thereby exacerbating the supply situation; (ii) establish a large long position in near month WTI Derivatives calendar spreads; (iii) refrain from selling their WTI physical position until after the near month WTI Derivatives contracts expired and the cash window opened, to push the near month WTI Derivatives calendar spread to an artificially higher value and sell their long WTI Derivatives position at these higher values; (iv) substantially increase their short position in the second WTI Derivatives spread at artificially high prices; and (v) surprise the market by dumping their dominant physical position, driving prices back down, as intended.

65.    In March 2008, Dyer and Wildgoose predicted that the April end-of-month Cushing balance would be approximately 7.5 million barrels of physical WTI to be delivered in April.  From March 4 to March 14, Defendants amassed a position of approximately 2.8 million barrels of physical WTI for delivery in April.  From March 17 to 18, Defendants increased that position to approximately 4.1 million barrels.  On March 19, the expiration date for the NYMEX April WTI futures contracts, Defendants increased their physical position to approximately 6.3 million barrels, or 84% of the end-of-month balance that they predicted, and again acquired a dominant physical position.

66.    From February 27 to March 4, 2008, Defendants established a long April/May 2008 WTI Derivatives calendar spread position equivalent to approximately 13.3 million barrels. On March 13, they increased their position to approximately 14.4 million barrels.  From March

14 to 19 (the expiry date of the NYMEX April 2008 futures contract), they sold the entire

calendar spread position.

      67.     In March, Defendants' accumulation and holding of physical WTI caused or

contributed to causing April WTI Derivatives prices to be artificially high as compared to the

May WTI Derivatives prices.  For example, on March 4, 2008 the price spread for the NYMEX

April/May 2008 WTI futures calendar spread contract was $0.55 (April was $0.55 higher than

May).  On March 14, the spread settled at an artificial level of $1.47.  On March 17, the spread

settled at an artificial level of $1.45.  On March 18, the spread settled on the NYMEX (and

expired on ICE) at an artificial value of $0.92.  On March 19, the NYMEX April/May 2008

spread expired after soaring to an artificial value of $1.94.  Meanwhile, the Defendants built a

short exposure in the next WTI Derivatives calendar spreads, *i.e.*, the May/June 2008 calendar

spread.  On March 20, the first day of the cash window but before they dumped their physical

position, they increased their short May/June 2008 WTI Derivatives position by about 5.5

million barrels, for a total net short position equivalent to approximately 19 million barrels.  On

March 24, which was the second day of the cash window (after a 3-day weekend), Defendants

again increased their May/June short position, to approximately 21.5 million barrels.

      68.     On March 20, 2008, Wildgoose observed that high prices of the calendar spreads

were only "temporary."  He knew, of course, that the prices were at an artificial high prior to

their impending secretly planned dump of their physical position.  During the March cash

window, Defendants sold their entire 6.3 million-barrel physical April WTI position, most of

which was sold on the final cash window day.  On the second day of the cash window,

Wildgoose observed that their physical sales were driving prices down, as intended, and

predicted that prices would be "much lower on the final day of cash."  Wildgoose said he was

planning to "sell hard tomorrow starting first thing." On the final day of the March cash

window, Dyer and Wildgoose did "sell hard," selling approximately 4.6 million barrels of their

April physical WTI position. As Wildgoose then observed, as a result of their selling activity

"spreads came off with may/june but not as much as hoped."

69.     On March 20 and 24, 2008, the May/June 2008 WTI futures calendar spread

prices were artificial. On March 20, that spread settled on NYMEX at $0.78. On March 24, that

spread settled on NYMEX at $0.62. On March 25, the May/June spread fell to $0.39. As a

result of the market moving into contango, Parnon/Arcadia took a significant loss from

simultaneously selling their April 2008 WTI physical position and buying a May 2008 WTI

physical position in the March cash window. As with prior iterations of their unlawful scheme,

however, Parnon/Arcadia's losses in the physical position were far exceeded by the profits they

gained on the WTI Derivatives positions.

### 4.     Defendants Again Attempt To Repeat Their Scheme In April 2008

70.     Dyer and Wildgoose intended to execute the manipulative scheme and attempted

to manipulate the prices of WTI Derivatives on NYMEX and ICE in April 2008.

71.     As they had done at least twice before, Dyer and Wildgoose intended to obtain a

dominant and controlling position of physical WTI supply for delivery in May, for the purpose of

inflating WTI Derivatives spread prices to artificial levels and in their favor, and took steps in

furtherance of that plan. They therefore (1) acquired a substantial long WTI physical position,

(2) obtained nearly 8 million barrels of physical WTI for delivery in May, and (3) established a

long May/June WTI Derivatives calendar spread position equivalent to nearly 16 million barrels.

72.     An internal investigation by the CFTC thwarted Defendant's attempt to execute

the latest iteration of the scheme. On or about April 17, 2008, Parnon/Arcadia received the

CFTC's request for documents relating to their trading activities. Rather than liquidate their

entire physical position as they had done in January and March 2008, Defendants sold only approximately 2.8 million barrels of their May physical WTI position during the cash window, stored approximately 2.5 million barrels, and sold the remaining balance in the following month, *i.e.*, after the cash window had closed.

## C.   **Motive and Intent**

73.   Defendants had an extraordinary financial motive to exercise their ability to manipulate the prices of WTI Derivatives contracts.

74.   Defendants stood to gain large profits from their dealings in crude oil by manipulating prices of crude oil to obtain trading profits on their NYMEX crude oil futures and options contract positions, OTC crude oil financial contracts that were priced off the exchange traded futures and options contracts (*e.g.*, NYMEX look alike OTC swaps), and their sale of physical crude oil.

75.   Defendants' unlawful manipulation was successful, and the CFTC has estimated that Defendants netted $50 million in profits.

76.   Defendants therefore had the ability, as well as the motive, to manipulate NYMEX WTI Derivatives contracts.

**EFFECTS**

77.   As a result of aforesaid unlawful acts,

(a)   the prices of NYMEX WTI Derivatives contracts have been manipulated to artificial levels, and

(b)   Plaintiff and other members of the Classes have been damaged by entering into transactions in WTI Derivatives at prices made artificial by Defendants' unlawful conduct.

78.     Determination of the specific amount of damages will require further discovery, including discovery that is in the sole possession of Defendants.

## RELEVANT MARKET

79.     The Relevant Market is the market for WTI Derivatives contracts traded on the NYMEX, ICE or any other exchange or platform that trades WTI Derivatives contracts.

80.     WTI Derivatives contracts are commodity products.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes (the "Classes"):

**The Commodities Class**

> All persons, other than Defendants and their employees, affiliates, parents, or subsidiaries (whether or not named in this complaint), who transacted in NYMEX WTI Derivatives contracts between December 1, 2007 and continuing until a date unknown to Plaintiff, but believed to extend at least until May 31, 2008 (the "Class Period").

**The Monopolization Class**

> All persons, other than Defendants and their employees, affiliates, parents, or subsidiaries (whether or not named in this complaint), who transacted in WTI Derivatives contracts on the NYMEX, ICE, or any other exchange or platform that trades WTI Derivatives contracts between December 1, 2007 and continuing until a date unknown to Plaintiff, but believed to extend at least until May 31, 2008 (the "Class Period").

82.     The Classes are each so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members for each of the Classes is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed members of each Class traded qualifying WTI Derivatives contracts during the Class Period.

83.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions that affect only individual members of the Classes.  These common questions of law and fact include, without limitation:

(a)     Whether the alleged manipulation of the WTI crude oil market based on Defendants' unlawful conduct violates the CEA and/or Section 2 of the Sherman Act;

(b)     Whether Defendants' conduct had an effect on the prices of NYMEX WTI Derivatives contracts purchased or sold by Plaintiff and the Commodities Class during the Class Period; and

(c)     Whether the WTI Derivatives contracts market is an appropriate Relevant Market for Count II;

(d)     Whether Defendants possessed monopoly power in the WTI Derivatives contracts market;

(e)     Whether through the conduct alleged herein, Defendants willfully acquired, maintained,  and enhanced its monopoly power in the Relevant Market;

(f)     The appropriate measure of damages sustained by Plaintiff and the other members of the Classes.

84.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of both Classes sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Classes were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

85.     Plaintiff will fairly and adequately protect the interests of the members of each Class.  Plaintiff is an adequate representatives of both Classes and has no interests that are

adverse to the interests of absent members of either Class. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and antitrust class action litigation.

86.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

87.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

88.     The running of any statute of limitations has been suspended with respect to any claims that the Plaintiff and the other members of the Class have sustained as a result of the federal doctrine of fraudulent concealment. Defendants through various devices and techniques of secrecy affirmatively and fraudulently concealed the existence of the unlawful acts alleged herein. Plaintiffs and the members of the Classes herein could not have discovered Defendants' unlawful conduct earlier than May 24, 2011, the date the CFTC publicly filed its complaint against Defendants.

## COUNT I

## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
### (7 U.S.C. § 1 *et seq.*)

89.     Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

90.     Plaintiff and members of the Commodities Class transacted in one or more NYMEX WTI Derivatives contracts during the Class Period, and were injured as a result of Defendants' manipulation of the price of those contracts, and/or the price of the crude oil underlying those contracts, in violation of the CEA, 7 U.S.C. § 1 *et seq.*

91.     Defendants' activities alleged herein constitute manipulation of the price of NYMEX WTI Derivatives contracts, and/or the price of the crude oil underlying those contracts, during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

92.     Plaintiff and members of the Commodities Class are entitled to damages for the violations of the CEA alleged herein.

## COUNT II

## MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHEARMAN ACT
### (15 U.S.C. § 2 *et seq.*)

93.     Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

94.     Defendants acquired, willfully maintained, and unlawfully exercised monopoly power in the Relevant Market through the anticompetitive scheme set forth above, including, but not limited to:

(a)     Acquiring large and commercially unnecessary positions in physical WTI;

(b)     Establishing long near month/next month WTI Derivatives calendar spread positions on the NYMEX and ICE;

(c)     Lulling the market into believing that they had committed their large physical inventory of WTI to storage or commercial use;

(d)     Establishing short positions in the subsequent series of WTI Derivatives calendar spreads at artificial prices; and

(e)     Dumping their physical position during the cash window in order to create a surprise surplus of WTI in order to maximize the value of the short WTI Derivatives positions.

(f)     Through the unlawful scheme, as alleged herein, Defendants had the power to, and did in fact, set the price of WTI Derivatives contracts.

95.     There is no legitimate business justification for Defendants' actions and the conduct through which they acquired and maintained monopoly power in the Relevant Market.

96.     The anticompetitive effects of Defendants' conduct far outweigh any possible procompetitive benefits or justifications.

97.     Plaintiff and members of the Monopolization Class have been injured in their business or property by Defendants' monopolization of the Relevant Market.  Without limiting the generality of the foregoing, Plaintiff and members of the Monopolization Class have paid artificially inflated prices for WTI Derivatives contracts as a result of Defendants' anticompetitive conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the representative for the Classes and his counsel as counsel for the Classes;

(B)     For a judgment awarding Plaintiff and the Classes damages against Defendants

for their violations of the CEA and Section 2 of the Sherman Act, together with prejudgment

interest at the maximum rate allowable by law;

(C)     For an award to Plaintiff and the Classes of their costs of suit, including

reasonable attorneys' and experts' fees and expenses; and

(D)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff respectfully

demands a trial by jury.

Dated: May 26, 2011                                          Respectfully submitted,

By:     _____
                                                            Bernard Persky (BP-1072)
                                                            Kellie Lerner
                                                            Seth R Gassman
                                                            LABATON SUCHAROW LLP
                                                            140 Broadway, 34th Floor
                                                            New York, NY 10005
                                                            Telephone:  (212) 907-0700
                                                            bpersky@labaton.com
                                                            klerner@labaton.com
                                                            sgassman@labaton.com

                                                            Steven R. Goldberg
                                                            1 North End Avenue
                                                            World Financial Center
                                                            Suite 1201
                                                            New York, NY  10282

                                                            *Counsel for Plaintiff and the Proposed
                                                            Classes*