UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: CRUDE OIL COMMODITY                    MASTER FILE NO. 11-cv-03600 (WHP)
                                                                          ECF CASE
FUTURES LITIGATION                             (Pertains to C.A. 11-cv-03769 (WHP))

This Document Relates To:  All Actions

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs complain, upon knowledge as to themselves and their own acts,

and upon information and belief[1] as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.      **Background**.  (a)  The New York Mercantile Exchange ("NYMEX"),

is located in this District, and has created and conducted trading in commodity

futures contracts, including West Texas Intermediate ("WTI") light sweet crude oil

futures contracts ("NYMEX WTI crude oil futures").

(b)      The NYMEX WTI crude oil futures contract is the world's

largest-volume futures contract trading on a physical commodity and was used by

Plaintiffs and persons throughout the United States.

---

[1] Plaintiffs' information includes the allegations in the related case *U.S. Commodity Futures Trading Commission v. Parnon Energy Inc. et al.,* 11-cv-03543 (S.D.N.Y.) (WHP); the prices for WTI crude oil; the prices for NYMEX WTI crude oil futures contracts; the NYMEX rules; and other items.

1

(c)     The price signals sent by NYMEX WTI crude oil futures trading are used to price and allocate oil and its refined products, including gasoline, among consumers and others.  These price decisions are very important.  They have a direct and immediate impact on the overall strength of the economy and the economic health of individual citizens.

(d)     Provided that these signals are the result of non-manipulated NYMEX WTI crude oil futures prices, economic theory holds that such signals will value, allocate and ration these energy resources more efficiently than commissars or other centralized planners in a command economy.

2.     **Manipulation**.  However, between at least January 1 and at least May 15, 2008 ("Class Period"), the Defendants acted to intentionally manipulate the prices of NYMEX WTI crude oil futures contracts in violation of Section 9(a) of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §13.

3.     **Means**.  (a) Defendants' manipulation of NYMEX WTI crude oil futures was implemented through diverse means—both lawful and unlawful.  For example, Defendants committed an overall "rolling" manipulation which consisted of multiple unlawful manipulations.

(b)     In January, again in March, and in April 2008, Defendants repeatedly first engaged in a manipulation upward of NYMEX WTI crude oil futures prices and WTI physical crude oil prices.  See ¶¶45-63 below.

2

(c)    Then, in January and March 2008, Defendants repeatedly engaged in a manipulation downward of NYMEX WTI crude oil futures prices and WTI physical crude oil prices.  See ¶¶45-53 below.

(d)    The April manipulation and Defendants' overall manipulation was blunted in late April 2008 by the intervention of the Commodity Futures Trading Commission ("CFTC").  Thereafter, the price artificiality in NYMEX WTI crude oil futures contracts persisted through at least May 2008 as Defendants sold out their large holdings of WTI physical crude oil.

4.    **Summary of Defendants' Overall Manipulation**.  As is alleged in detail in ¶¶45-56 below, Defendants' overall manipulation included at least the following.

A.    Defendants intentionally purchased so-called "long spread positions" in NYMEX WTI and other crude oil futures contracts expiring in the then current month and the following month.  These "long" positions would profit if prices and spreads increased to levels above what Defendants paid to purchase them.  Such increases were very likely to occur if market participants perceived that the available WTI crude oil supplies were declining to low levels.

B.    Just as they were completing their purchases of long spread positions in NYMEX and other crude oil futures, Defendants triggered "phase 2" of their manipulation.  They intentionally began to purchase large amounts of WTI

physical crude oil.  Defendants' holdings of WTI crude oil dominated and controlled WTI physical crude oil supplies and prices.  But Defendants had no commercial need for such crude oil.

C.     Defendants then took un-commercial steps with the dominant position in physical WTI crude oil that they had acquired.  See ¶¶47, 52 below. These steps falsely signaled to market participants that the WTI crude oil supplies were rapidly being committed to commercial needs and that the available WTI crude oil supplies were declining rapidly to very low levels.  Again, Defendants had no commercial needs for the large WTI crude oil supplies that they had hoarded and engrossed.  These false price signals further artificially inflated both WTI crude oil prices and NYMEX WTI crude oil futures contracts prices.

D.     At the artificially inflated prices caused by the foregoing manipulative steps, Defendants then sold out their long spread positions and sold new so-called "short positions" in NYMEX and other crude oil futures contracts expiring in later months.  These "short" positions would profit from declines in prices to levels below what Defendants received on their sales.  [Example: If a person trades on the NYMEX to establish a "short" position in crude oil futures at $50.00 per barrel, then the person will make a profit of $10.00 per barrel if the person later buys back the short position for $40.00 per barrel.]  Declines in prices

were very likely to occur if market participants perceived that WTI crude oil supplies were significantly increasing to higher levels.

E.    After completing their selling of the deferred NYMEX futures contracts, Defendants then dumped their unneeded large WTI physical crude oil on the market, as they had intentionally planned to do all along.  This directly and greatly increased supplies and also reduced prices of WTI physical oil, which in turn caused declines in NYMEX WTI crude oil futures contracts that greatly profited Defendants' deferred month short positions.

F.    In April 2008, the CFTC intervened, launching an investigation into Defendants' manipulative activities.  As a result, Defendants curtailed their activities alleged in steps "D" and "E" above to diversify their behavior to try to make it seem less illegitimate.

5.    **Effects**.  (a) Through the multiple rolling manipulations making up Defendants' overall manipulation, Defendants intentionally and directly (1) caused the level of prices of NYMEX WTI crude oil futures contracts and WTI physical crude oil to be artificial, and (2) twisted the "spreads" which caused further price artificiality in NYMEX WTI crude oil futures prices during the Class Period. NYMEX conducts trading in one WTI crude oil future contract for each month of the current year and the next four years, and a contract for each June and December of the years from six to nine years in the future.  The "spreads" are the differences

between prices of the NYMEX WTI crude oil futures contracts expiring in different months.

(b)     The prices of WTI crude oil were used by market participants as a primary reference point for valuing NYMEX WTI crude oil futures contract prices. Defendants' foregoing multiple manipulations of NYMEX WTI crude oil prices sent false signals to and greatly misled market participants in not only the WTI physical markets but also in the NYMEX WTI crude oil futures market as well.

(c)     Defendants focused their derivatives trading and manipulation in the February 2008 – June 2008 NYMEX WTI crude oil futures contracts.  However, the operation of arbitrage between and among the prices of different NYMEX expiration month prices distributed Defendants' artificial effect on prices to later NYMEX WTI crude oil futures contracts as well.  Thus, Defendants had to do enough to manipulate artificially other NYMEX contracts in order to manipulate the February 2008 - June 2008 NYMEX contracts on which Defendants focused their manipulation.

(d)     A specific, necessary and intended effect of Defendants' manipulation was to cause the settlement prices of the February 2008 – June 2008 NYMEX WTI crude oil futures contracts to be manipulated.

(e)     The operations of the NYMEX rules and the NYMEX Settlement Committee further distributed the artificial settlement prices caused by Defendants

to the settlement prices and the trading prices of other NYMEX WTI crude oil futures contracts expiring after June 2008. See ¶35 *infra*.

(f)     Through the foregoing and other artificial effects on NYMEX WTI crude oil futures contracts, Defendants' manipulations and unlawful conduct thoroughly deprived Plaintiffs and members of the Class during the Class Period of a lawfully operating market for NYMEX WTI crude oil futures contracts.

6.     Defendants' rolling manipulation caused fluctuating amounts of artificiality in the prices of NYMEX WTI crude oil futures contracts beginning at least as early as January 1, 2008 and continuing until at least April 30, 2008.

7.     As a direct and foreseeable result of Defendants' manipulation, Plaintiffs and members of the Class transacted NYMEX WTI crude oil futures contracts at artificial prices and were deprived of a lawful market during the Class Period.

## JURISDICTION AND VENUE

8.     Crude oil is a "commodity" and is the "commodity underlying" the WTI crude oil futures contracts traded on the NYMEX, as those terms are defined and used in Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

9.     The Court has jurisdiction over this action pursuant to 7 U.S.C. §25 and 28 U.S.C. §§1331 and 1337.

10.     Venue is proper in the Southern District of New York pursuant to 7 U.S.C. §25(c), 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d).  NYMEX WTI crude oil futures contracts were traded during the Class Period in this District on the NYMEX, which is located at One North End Avenue, New York, New York, and the manipulated prices occurred in this District.  Further, the Defendants transact business in the Southern District of New York.  The claims arose in the Southern District of New York, and/or a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

11.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## THE PARTIES

### Plaintiffs

12.     Plaintiff Gregory Galan is a resident of Garfield Heights, Ohio. Plaintiff Galan first transacted in NYMEX WTI crude oil futures contracts during the Class Period by purchasing long positions in the June 2008 NYMEX crude oil futures contracts after April 17, 2008 and sold all of such long position by April 30, 2008 at a net loss.  Plaintiff Galan transacted at artificial prices caused by

Defendants that were dissipating, which caused or contributed to his net losses, and is entitled to recover his actual damages.

13.     Plaintiff John Losordo, Jr. is an individual residing in Colts Neck, New Jersey.  Plaintiff Losordo transacted in NYMEX WTI crude oil futures contracts and suffered a net loss on all of his NYMEX WTI crude oil futures contract transactions from the beginning of January through April 2008.  Plaintiff Losordo is entitled to recover his actual damages.

14.     Plaintiff FTC Capital GmbH ("FTC Capital") is an asset management company based in Vienna, Austria.  Plaintiffs FTC Futures Fund SICAV and FTC Futures Fund PCC, Ltd. are managed by Plaintiff FTC Capital.  Such Plaintiff funds transacted in NYMEX WTI crude oil futures contracts at the artificial prices caused by Defendants and suffered a net loss on all of their NYMEX WTI crude oil futures contract transactions during the Class Period.

15.     Plaintiff Todd Kramer is a resident of New York, New York.  Plaintiff Kramer repeatedly transacted spread options on NYMEX WTI crude oil futures contracts at the artificial prices caused by Defendants in the February/March 2008, March/April 2008, April/May 2008, and May/June 2008 spreads and suffered net losses from trading such spreads.  Plaintiff Kramer generally held the opposite position in such spreads from Defendants' position in such spreads.  Plaintiff Kramer is entitled to recover his actual damages.

16.     Plaintiff Adams Affiliates, Inc. is a corporation organized and existing under the laws of the State of Oklahoma with its principal place of business in Tulsa, Oklahoma.  Plaintiff Adams transacted NYMEX crude oil futures contracts during May 2008 and lost in excess $360,000 in the July –December 2008 NYMEX crude oil futures contracts.  Plaintiffs Adams is entitled to recover its actual damages.

**Defendants**

17.     Defendant Parnon Energy Inc. is a corporation organized and existing under the laws of Texas with its principal place of business in Rancho Santa Fe, California.  Defendant Parnon is a subsidiary of Parnon Holdings Inc., which is a wholly owned subsidiary of Farahead Holdings Ltd., and is an affiliate of Arcadia Petroleum Ltd. and Arcadia Energy (Suisse) SA. Defendant Parnon operates as a common enterprise with Arcadia Petroleum, Ltd. and Arcadia Energy (Suisse) SA. Defendant Parnon's agents and employees buy and sell WTI physical and WTI derivative positions for profit, speculating on WTI price movements.  Defendant Parnon has never owned or operated an oil refinery and is not an end user of crude oil.

18.     Defendant Arcadia Petroleum Ltd. is a corporation organized and existing under the laws of the United Kingdom with its office and principal place of business in London, England.  Arcadia Petroleum is a wholly owned subsidiary

of Farahead Holdings Ltd.  Arcadia Petroleum is engaged in the business of trading crude oil, crude oil products and oil derivatives for profit in various physical and financial markets throughout the world.  During the relevant period Arcadia Petroleum officers in London supervised the WTI group's trading and the financing of its trades, and its officers and employees handled the risk management, compliance, credit, financing, mid-office and back-office functions for Parnon and Arcadia Suisse, which did not have such personnel.  One single individual was the CEO and head trader of Arcadia Petroleum, and performed the functions of CEO for Parnon and Arcadia Suisse.  Defendants Wildgoose, Dyer, and the other crude oil traders reported to this individual.

19.    Defendant Arcadia Energy (Suisse) SA is a corporation organized and existing under the laws of Switzerland with its office and principal place of business located in Morges, Switzerland.  Arcadia Suisse is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Suisse is engaged in the business of trading crude oil derivatives for profit on various exchanges including NYMEX and ICE.  During the relevant period an open, two-way communication line was maintained between the Parnon office in California and the Arcadia Suisse office in Switzerland, so that traders in one office could hear and participate in conversations among the traders at the other office.  Parnon's WTI physical position and Arcadia Suisse's WTI crude oil derivatives position were described in

daily position reports, which were transmitted via email to and reviewed by Dyer, Wildgoose and the CEO of Arcadia Petroleum.

20.    Defendant James T. Dyer is an individual residing in Brisbane, Australia.  From approximately 2005 through at least 2008, Dyer was responsible for the strategy and trading in the Defendants' WTI crude oil book.  In 2007, in the process of setting up a U.S. trading arm for Arcadia Petroleum, Dyer traveled to the U.S. to meet with and recruit Wildgoose and to negotiate with TEPPCO Partners Inc. on behalf of Arcadia Petroleum for the building of storage tanks that would demonstrate to the market Arcadia Petroleum's ability to store large quantities of physical oil.  Dyer acted on behalf of and as agent for Defendants Parnon/ Arcadia and was authorized to direct the trading of WTI physical and WTI derivatives on behalf of Parnon/ Arcadia.  In 2008, Dyer earned a base salary and was eligible for and received a bonus based upon the profitability of the WTI book.

21.    (a)    Defendant Nicholas J. Wildgoose is an individual residing in Rancho Santa Fe, California.  During the relevant period Wildgoose, a crude oil trader, was jointly responsible with Dyer for the strategy and trading in the WTI book. Wildgoose acted on behalf of and as an agent for Parnon/ Arcadia and was authorized to direct the trading of WTI physical and WTI derivatives on behalf of Parnon/Arcadia.  Wildgoose received a base salary and was eligible for and received bonuses based upon the profitability of the WTI book.

(b)     John Doe Defendants "1" – "10" are persons who worked with

Defendants or on whose behalf Defendants worked to manipulate prices.

## BACKGROUND

### The Commodity Futures Market

22.     A person may act as a futures contract exchange or board of trade

only if that person is approved and designated to do so by the CFTC.  The CFTC

approves such a designation only if the proposed exchange sufficiently

demonstrates (a) that it has rules, such as position limit rules, to prevent price

manipulation, and (b) that it has procedures to enforce such anti-manipulation

rules.

23.     The NYMEX is designated by the CFTC as a board of trade.

NYMEX is the world's largest physical commodity futures exchange.

24.     The NYMEX applies to the CFTC for permission to trade each

commodity in which the NYMEX offers a contract.  The NYMEX must establish,

among other things, that the proposed contract is not prone to price manipulation in

order to win approval to trade such contract.  NYMEX members and clearing

members have to follow the rules of the NYMEX.  This includes the most

important rules, the rules prohibiting manipulation.

25.     Also, commodity futures professionals licensed as associated persons,

futures commissions merchants, commodity trading advisors, and commodity pool

operators are required to be familiar with CFTC and exchange requirements.  This

includes the most important requirements, those prohibiting price manipulation.

26.    A commodity futures contract is an agreement to buy or sell a

commodity, such as WTI, at a date in the future. Every aspect of a futures contract

traded on the NYMEX – including the contract for crude oil – is standardized,

except the price and quantity.  Futures markets are specifically designed to

facilitate and ease trading in one central market place for traders who are located

throughout the United States and the world.

27.    Futures contracts have two sides.  The "long" side is the buyer of the

contract who is obligated to take delivery and pay for the commodity if the buyer

holds the contract until the specified delivery date.  Buyers are referred to as

"longs."  The "short" side is the seller of the contract who is obligated to make

delivery of the commodity on the delivery date.  Sellers are referred to as "shorts."

28.    One of the many differences between stock and commodity futures

trading is that the commodity exchange (here, the NYMEX) publishes the amount

of the open interest of "longs" and "shorts" at the end of each trading day.

29.    Open interest is defined as the total number of futures contracts in a

delivery month or market that has been entered into and not yet offset or cancelled.

Each open transaction has a buyer (a long) and a seller (a short).  The open interest

in commodity futures contracts tend to fluctuate from day to day.

30.     As a general rule, buying pressure in a commodity futures contract (or the commodity underlying such contract) will increase prices and selling pressure will decrease prices.

31.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly.  For example, buying pressure may increase prices and induce members of the public to buy as well.

**NYMEX WTI Crude Oil Futures**

32.     **Futures**.  One of the futures contracts created by the NYMEX and approved by the CFTC is the NYMEX light sweet crude oil (WTI) futures contract.

33.     NYMEX light sweet crude oil (WTI) futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York.  Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group.  Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

34.     The size of a NYMEX WTI crude oil futures contract is 1,000 barrels.

35.    NYMEX WTI crude oil futures contracts call for settlement by physical delivery at a variety of pipelines or storage facilities in Cushing, Oklahoma.

36.    During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of WTI crude oil in (a) consecutive months for the current year and next five years and (b) the June and December contract months for six through nine years forward.

37.    Trading in NYMEX WTI crude oil futures contracts terminates on the third business day prior to the twenty-fifth calendar day of the month preceding the delivery month.

38.    Daily settlement prices of NYMEX WTI crude oil futures are settled at the volume-weighted average price ("VWAP") of all trades occurring on Globex between 2:28 and 2:30 eastern time.  The daily settlement prices of the second through sixth contract months are determined based on Globex spread data.  All other contract months are settled by NYMEX staff, in consultation with market participants, based upon traded/quoted spread relationships.

39.    Trading in NYMEX WTI crude oil futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted in U.S. dollars and cents per barrel.

40.   **Calendar Spreads**.  A so-called "calendar spread" in NYMEX WTI crude oil futures contracts is a position in two consecutive futures contracts.  For example, if a market participant held a long February/March 2008 calendar spread in NYMEX WTI crude oil futures contracts, the market participant would be long the February 2008 NYMEX WTI crude oil futures contract and short the March 2008 NYMEX WTI crude oil futures contract and hope to profit by having the February 2008 NYMEX WTI crude oil futures contract increase in price relative to the March 2008 NYMEX WTI crude oil futures contract.  If a market participant was short the same calendar spread in the foregoing example, such market participant would be short the February 2008 NYMEX WTI crude oil futures contract and long the March 2008 NYMEX WTI crude oil futures contract and hope to profit by having the February 2008 NYMEX WTI crude oil futures contract decrease in price relative to the March 2008 NYMEX WTI crude oil futures contract.

**IntercontinentalExchange ("ICE")**

41.   IntercontinentalExchange ("ICE") is a London-based derivatives exchange.  ICE offers trading in the same WTI crude oil futures contracts as NYMEX.  However, ICE WTI crude oil derivatives are financially settled to the price of the corresponding NYMEX WTI crude oil futures contract.  ICE near

month WTI crude oil derivatives expire one day prior to the expiry of the NYMEX near month WTI futures contract.

**The Cash Market For WTI Crude Oil**

42.     The crude oil marketing hub in Cushing, Oklahoma is the most significant marketing and trading hub for crude oil in North America.  Cushing serves as the delivery point for light sweet crude oil futures contracts traded on the NYMEX.

43.     WTI crude oil is one of the most actively traded domestic crude oils and is the U.S. benchmark grade and the primary deliverable grade under the NYMEX WTI crude oil futures contracts.

44.     Physical WTI crude oil for delivery at Cushing in the near month is traded until the end of the third business day following the expiration of the NYMEX WTI crude oil near month futures contract.  The three-day period after the near month futures contract expiry is known as the "cash window."

45.     Most commercial users of crude oil complete their purchases and/or sales of physical oil needed for the following month before the cash window opens.  Thus, trading in the cash window is an indicator to market participants of the next month end-of-month balances of Cushing oil stocks, which in turn impacts the prices of NYMEX WTI crude oil futures contracts.

**SUBSTANTIVE ALLEGATIONS**

**Defendants' Manipulative Scheme**

46.    As more fully set forth below, during the relevant period, Defendants (a) were aware of and in fact acknowledged the tightness (or low supply) in physical crude oil at Cushing (*e.g.*, Defendant Wildgoose remarked at the time that the supply was "close to vapours") and (b) acted to exacerbate the tightness in the market by, among other things, acquiring a dominant position in physical crude oil at Cushing.

47.    In or around September 2007, Defendant Dyer sent an e-mail to other traders that worked for Defendants and explained that there was a "shitload of money to be made shorting" NYMEX WTI crude oil calendar spreads (see above defining a calendar spread) <u>IF</u> two conditions were met:  (1) the market would have to believe that crude oil supplies at Cushing were tight (*i.e.*, supplies were low) and (2) someone would have to unexpectedly turn the end-of-month balance into a "surplus."

48.    As more fully set forth below, Defendants executed their alleged manipulative scheme multiple times throughout the Class Period including in January, March and April 2008.

**January 2008**

49.    **Manipulative Step 1—Acquire Long NYMEX WTI Futures Calendar Spread Position**.  (a) On or about January 3, 2008, Defendant Dyer

confirmed with Defendant Wildgoose their "plan" to establish a long position in the February/March 2008 WTI crude oil spread in order to profit from the artificial prices they intended to create: "our plan, as outlined y[ester]day is to get to around 15k long the WTI February contract by the start of the rolls assuming prices remain at these kin[d] of numbers."

(b)     As planned, between January 3 and January 10, 2008, Defendants purchased a large long calendar spread position of 13,600 February/March 2008 WTI crude oil futures contracts.  That is, Defendants purchased long positions in February 2008 NYMEX WTI crude oil futures contracts and short positions in March 2008 NYMEX WTI crude oil futures contracts.

50.     **Manipulative Step 2—Acquire Dominant Position in Physical WTI Crude Oil**.  (a) On January 7, 2008, Defendant Wildgoose requested that Defendant Acardia Petroleum's Chief Operating Officer complete credit arrangements with potential counterparties so that Defendants could begin trading physical WTI crude oil:  "Can we get this issue resolved pls.  time is of the essence here, we need to trade crude with 3rd parties tomorrow as part of the feb/mar wti strategy."

(b) After establishing most of their long calendar spread positions, Defendants began, between approximately January 8 and continuing until January 18, 2008, to purchase a total of approximately 4.6 million barrels of physical

February 2008 WTI crude oil. These purchases constituted approximately 66% of Defendants' own estimate of a 7 million barrel end-of-month available WTI crude oil balance. On January 27, Defendant Wildgoose revised the foregoing 7 million barrel supply estimate downward to 5 million barrels. Thus, Defendants had acquired 92% of the deliverable supply available at Cushing ("deliverable supply").

(c)     Defendants' large purchases of physical WTI crude oil referenced above caused Defendants' long positions in February/March 2008 NYMEX WTI crude oil futures to increase in price. For example, on January 3, 2008, when Defendants began to buy their long spread positions, the February/March NYMEX WTI crude oil futures spread price closed at 24 cents. But by January 18, 2008 (when Defendants had finished purchasing large amounts of physical WTI), the February/March NYMEX WTI crude oil futures spread price had increased by more than 170% to 65 cents.

(d)     Defendants did not sell their foregoing dominant position through January 22, the expiration day for the February 2008 NYMEX WTI crude oil futures contract.

(e)     Defendants' refusal to sell their large physical WTI position prior to expiry of the near month futures contract was uneconomic, absent a manipulation, because Defendants had no commercial need for WTI crude oil. Moreover,

Defendants knew that selling such a large position during the cash window would result in substantial losses (absent a manipulation).

(f)     Defendants sold back (liquidated) their long February/March spread positions at the artificially inflated prices that they had caused.

51.     **Manipulative Step 3—Acquire Short NYMEX WTI Futures Calendar Spread Position**.  On January 23, 2008, the first day of the cash window, Defendants still held almost all of their large physical WTI positions.  As set forth above, most commercial users of crude oil complete their purchases and/or sales of physical oil needed for the following month before the cash window opens.  Between January 22, 2008 and January 25, 2008, Defendants increased their large short position in the March/April 2008 calendar spread from approximately 5.8 million barrels to approximately 12.2 million barrels.  The foregoing short positions were established at the artificially high prices that Defendants' large purchases of physical WTI had caused.

52.     **Manipulative Step No. 4—Dump Dominant Physical WTI Crude Oil During Cash Window**.  (a) After having led the market to believe that supply would remain tight and after having established their large short positions at the artificially high prices they had caused, Defendants began what Defendant Wildgoose referred to as the "inevitable puking" of Defendants' WTI physical position.  That is, Defendants began to sell their unneeded physical position.

(b)     On January 24, Defendant Wildgoose predicted what would happen the next day when Defendants "puked" their physical crude oil position on the final day of the cash window:  "this time tomorrow those balances will be much more apparent."

(c)     Accordingly, on January 25, the final day of the cash window, Defendants dumped approximately 4.6 million barrels of physical WTI crude oil deliverable in February.

(d)     Defendants' large sales on January 25 caused the cash/futures market to move from backwardation (*i.e.*, a market condition wherein the price of a futures contract is trading below the present cash or spot price) to contango (*i.e.*, a market condition wherein the futures price is above the present cash or spot price) as the February WTI cash price dropped to 32 cents **below** the March futures price, a drop of 97 cents in the February WTI cash price.

(e)     A market move from backwardation to contango on the last day of the cash window only happened **twice** between January 2006 and January 2011.  **Both** of these times occurred as a result of Defendants' manipulative scheme alleged herein.  See ¶¶48-63(d).

(f)     On January 28, 2008, Defendant Wildgoose acknowledged in writing that Defendants' manipulative scheme had "the desired effect" on WTI spread

prices.  Thus, Defendant Wildgoose himself—an experienced crude oil trader—believed that Defendants' manipulative scheme had succeeded.

53.     Thus, as set forth above, Defendants maneuvered their NYMEX WTI crude oil futures contract positions in such a way so as to profit from the anticipated artificial effects of Defendants' building, holding and dumping of their physical WTI crude oil positions.

54.     Thereby, Defendants' market power caused artificial price trends in which prices repeatedly moved the opposite direction of or different from how they would have moved but for the manipulation.  These changes in not only the price artificiality but the price trends to become artificial price trends that Defendants caused, exacerbated the changes in and amounts of price artificiality.

**March 2008**

55.     Defendants intended to repeat the manipulative scheme in February of 2008 and did have effects on prices then.  In March 2008 Defendants repeated the same manipulative scheme they had successfully executed in January of 2008.

56.     **Manipulative Step 1 —Acquire Long NYMEX WTI Futures Calendar Spread Position**.  Between February 27 and March 13, 2008 Defendants increased their long position in NYMEX WTI crude oil April/May calendar spread futures and derivatives to approximately 14.4 million barrels.

57.   **Manipulative Step 2 —Acquire Dominant Position in Physical**

**WTI Crude Oil**.  (a) Between March 4 and March 19, 2008, Defendants acquired

a dominant position of 6.3 million barrels of physical WTI—approximately 84% of

the 7.5 million barrel end-of-month balance that Defendants had predicted.

(b)    Defendants' large purchases of physical WTI resulted in artificially

high prices of the April/May 2008 calendar spreads.  For example, on March 4,

2008 the price of the April/May spread was 55 cents.  However, by March 14,

2008, the April/May spread price had increased by almost 300% to $1.47.

(c)    Between March 14 and March 19, 2009, Defendants sold their entire

foregoing April/May calendar spread position at the artificially high prices that

their large purchases of physical WTI had caused.

58.   **Manipulative Step 3 —Acquire Short NYMEX WTI Futures**

**Calendar Spread Position**.  (a) On March 20 2008, the first day of the cash

window, Defendants still un-commercially held almost all of their large physical

WTI position.  Defendants' refusal to sell their large physical WTI position prior to

expiry of the near month futures contract was uneconomic, absent a manipulation,

because Defendants had no commercial need for WTI crude oil.  Moreover,

Defendants knew that selling such a large position during the cash window would

result in substantial losses (absent a manipulation).

(b)     On March 20, 2008, Defendant Wildgoose acknowledged that the artificially high prices of the WTI calendar spreads were only "temporary" because Defendants planned again to dump their physical crude oil during the cash window.

(c)     In order to profit from the planned dump, prior to March 20, 2008 Defendants had established a short position in the May/June 2008 calendar spread of approximately 13.5 million barrels.  Also, on March 20, 2008, the first day of the cash window, Defendants (before they dumped their physical position), increased their short position to approximately 19 million barrels.  Again, on March 24, the second day of the cash window, Defendants again increased their May/June short position to approximately 21.5 million barrels.

59.     **Manipulative Step 4 —Acquire Short NYMEX WTI Futures Calendar Spread Position**.  (a) On March 23, 2008, Defendant Wildgoose said he planned to "sell hard tomorrow starting first thing" and that he expected prices would be "much lower on the final day of cash."  Accordingly, on March 24, 2008 (the last day of the cash window), Defendants dumped approximately 4.6 million of their 6.3 million barrel physical WTI position.

(b)     As predicted by Defendant Wildgoose, Defendants' large sales during the cash window caused the May/June 2008 spread price to drop 50%---from 78 cents on March 20 to almost 39 cents on March 25.

(c)     Similar to January, Defendants' foregoing conduct resulted in the market moving from backwardation to contango on March 25, 2008 (the last day of the cash window).

(d)     On March 25, 2008 Defendant Wildgoose again (as he did in January, see ¶51(f) *supra*) acknowledged in writing that Defendants' manipulative scheme had impacted WTI crude oil spreads:  "spreads came off with may/june but not as much as hoped."

60.     Thus, as they had done in January, Defendants again maneuvered their NYMEX WTI crude oil futures contract positions in such a way so as to profit from the anticipated artificial effects of Defendants' building, holding and dumping of their physical WTI crude oil positions.

61.     Thereby, Defendants' market power caused artificial price trends in which prices repeatedly moved the opposite direction of or different from how they would have moved but for the manipulation.  These changes in not only the price artificiality but the price trends to become artificial price trends that Defendants caused, exacerbated the changes in and amounts of price artificiality.

**<u>April 2008</u>**

62.     In April 2008 Defendants again repeated the same manipulative scheme they had executed in January and March.

63.     In early April 2008, Defendants again established a substantial long May/June WTI futures position equal to approximately 16 million barrels and also acquired a substantial long position in physical WTI crude oil (nearly 8 million barrels for May delivery, which, upon information and belief, was more than 84% of the deliverable supply).

64.     After Defendants' first two manipulative steps had artificially inflated the level of May and June NYMEX WTI crude oil futures contract prices and artificially widened spreads, Defendants learned on or about April 17, 2008 that the CFTC was investigating Defendants' manipulative activities.  With this knowledge, Defendants did not execute the sales portion of their manipulation as they had done in January and March.  Instead, Defendants diversified their WTI physical crude oil activities, including storing approximately 2.5 million barrels until after the cash window had closed.  Thereafter, the price artificiality in NYMEX WTI crude oil futures that Defendants had caused persisted until after the time in May 2008 when Defendants' released their manipulative holding of the 2.5 million barrels of WTI crude oil to the market.

**Defendants' Manipulative Profits**

65.     Although Defendants' uneconomic conduct of selling physical WTI crude oil for a loss during the cash window resulted in a loss of over $15,000,000,

such uneconomic conduct also resulted in **profits** of over $50,000,000 in Defendants' NYMEX WTI crude oil futures positions.

**Defendants' Monopoly Power**

66.     Defendants attempted and conspired to monopolize and did monopolize the Relevant Market (see ¶¶45-63 below) by, *inter alia*, acquiring and then holding dominant positions in physical crude oil available at Cushing between (a) January 8 and January 25, 2008; (b) March 14 and March 24, 2008 and (c) early April 2008.  See ¶¶45-63.

67.     Defendants did so through restrictive and collusive means, including by acquiring dominant positions in physical crude oil available at Cushing (even though Defendants had no commercial need for such physical crude oil) and then uneconomically waiting to sell such dominant position during the "cash window" in January 2008 and again in March 2008.  See ¶¶51-53, 57-60.

68.     Thereby, Defendants uneconomically and restrictively excluded competitors and came to own as much as: (a) 92% of the deliverable supply of physical crude oil available at Cushing in January 2008 and (b) 84% of the deliverable supply of physical crude oil available at Cushing in March 2008.  See ¶¶49(b), 56(a).

69.     Defendants' price control during the Class Period reflects monopoly power and collusion.

## RELEVANT MARKET

70.     The Relevant Market is the market for:  (a) January 2008 WTI crude oil readily available for delivery at Cushing, Oklahoma; (b) March 2008 WTI crude oil readily available for delivery at Cushing, Oklahoma; and/or (c) April 2008 WTI crude oil readily available for delivery at Cushing, Oklahoma.   The relevant geographical market is in or around Cushing, Oklahoma.

## CLASS ALLEGATIONS

71.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following classes:

**The Commodities Class**

> All persons or entities that purchased and/or sold during the period from at least January 1, 2008 through at least May 15, 2008 ("Class Period") a light sweet crude oil (WTI) futures contract or an option on such light sweet crude oil (WTI) futures contract traded on the NYMEX ("Commodities Class").[2] Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

**The Monopolization Class**

> All persons or entities that purchased and/or sold during the period from at least January 1, 2008 through at least May 15, 2008 ("Class Period") WTI Derivatives contracts ("Monopolization Class"). Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

---

[2] Plaintiffs reserve their rights to amend the definition of the Class in the class motion or otherwise.

72.     The Classes are so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Classes are geographically dispersed throughout the United States.  The number and identity of the Commodities and Monopolization Class members is unknown to the Plaintiff, but can be ascertained from readily available information. Plaintiffs believe that there are hundreds or perhaps thousands or more members of the Class.

73.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Class are:

> A. whether Defendants manipulated NYMEX WTI crude oil futures contracts in violation of the CEA;
>
> B. whether such manipulation caused NYMEX WTI crude oil futures contracts to be artificial;
>
> C. whether such manipulation caused cognizable legal injury under the CEA;
>
> D. whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

E.  whether Defendants unlawful actions violate Section 2 of the Sherman Act;

F.  Whether the WTI Derivatives contracts market is an appropriate Relevant Market for the Monopolization Count;

G.  Whether the Defendants possessed monopoly power in the WTI Derivatives contracts market;

H.  Whether through the conduct alleged herein, Defendants willfully acquired, maintained, and enhanced their monopoly power in the Relevant Market; and

I.  the operative time period and extent of Defendants' foregoing violations.

74.    Plaintiffs' claims are typical of the claims of the other members of the Classes they seek to represent.  Plaintiffs and members of the Classes were injured by the same course of manipulative and unlawful conduct and make the same legal claims.

75.    Plaintiffs will fully and adequately protect the interests of all members of the Classes.  Plaintiffs have retained counsel experienced in commodity futures manipulation class actions and monopolization class actions.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Classes.

76.     The questions of law and fact common to the members of the Classes predominate over any questions which may affect only individual members.

77.     A class action is superior to other available methods (if any) for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

78.     The interest of members of the Classes in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Classes have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The damages suffered by the individual members of the Classes may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## <u>INJURY TO PLAINTIFFS AND MEMBERS OF THE CLASS</u>

79.     During the Class Period, Plaintiffs and the other members of the
Classes transacted WTI Derivatives contracts at artificial prices and were deprived
of a lawfully operating market.

80.     Further, by reason of the alleged extensive violations of the CEA and
Section 2 of the Sherman Antitrust Act, Plaintiffs and the other members of the
Class paid prices that were not what they would have paid in the absence of the
extensive unlawful conduct.  As a result, Plaintiffs and all members of the Class
have suffered a legally cognizable injury due to Defendants' violations.

81.     Defendants' rolling manipulation caused fluctuating amounts of
artificiality in the prices of NYMEX WTI crude oil futures contracts beginning at
least as early as January 1, 2008 and continuing until at least May 1, 2008 and
likely continuing until May 15, 2008.

82.     Similarly, the specific amounts of actual damages under the CEA
have not yet been determined because such determination will also require
discovery of Defendants' conduct, the NYMEX, as well as non-parties.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

83.     By its very nature, the unlawful activity alleged herein that
Defendants engaged in was self-concealing.  At no time did Defendants disclose
publicly their intent to manipulate the market for NYMEX WTI crude oil futures.

Instead, Defendants kept the existence of their scheme hidden from the public, including Plaintiffs.

84.    Plaintiffs neither knew, nor, in the exercise of reasonable diligence, could have known of the violations on which their claims are based until approximately three and one-half years **after** the violations alleged herein began.

85.    The running of any statutes of limitations has been suspended with respect to any claims which Plaintiffs and other members of the Class have.  This is by virtue of the federal doctrines of fraudulent concealment and equitable tolling.   As a result, all statutes of limitations otherwise applicable to the allegations herein have been tolled until May 24, 2011 (*i.e.*, the date of the CFTC Complaint against Defendants).

## CAUSATION OF ARTIFICIAL PRICES AND ARTIFICIAL PRICE TRENDS

86.    Defendants' large physical, NYMEX futures, and ICE crude oil swaps positions were illegitimate and manipulative parts of the supply-demand equation for NYMEX crude oil futures prices.

87.    Defendants calculated and intended their illegitimate and manipulative positions to impact NYMEX crude oil futures prices, and such positions did impact prices.

88.    Because Defendants' positions were illegitimate and manipulative parts of the supply-demand equation for NYMEX crude oil futures prices,

Defendants' impact on NYMEX prices were necessarily an artificial one that caused artificial prices.

89.     On information and belief, Defendants' largest impact on NYMEX WTI futures prices was caused by Defendants' large purchases of the deliverable supply.  Defendants' purchases constituted as much as 92% of the deliverable supply during January 2008, as much as 84% of the deliverable supply during March 2008, and in excess of 84% during April 2008.  Each of these purchases and holdings of monopolistic positions in the deliverable supply, had an upward impact on NYMEX WTI futures prices.

90.     Making even one large purchase on an exchange market of 0.16 percent of the total amount of the subject item, may cause a permanent increase of 4.7 percent in the price of the item.  *In re Initial Public Offerings Sec. Litig.*, 227 F.R.D. 65, 113 (S.D.N.Y. 2004) ("To explain how such purchases might inflate prices, Fischel notes that 'Keim and Madhavan ... find that a buyer-initiated trade of only 0.16 percent of a company's outstanding stock is associated with a permanent price increase of 4.7 percent in the stock price").

91.     Defendants held positions in NYMEX WTI crude oil futures contracts that were greater than 0.16 percent of such contract's open interest, including in excess of 8.35% of the open interest of such contract.

92.     In the customs and standards of the industry, it is recognized that trades or positions that are greater in size than the reporting limit can manipulate prices.  During the Class Period, the reporting limit for NYMEX WTI crude oil futures contracts was 350 contracts.  *See* NYMEX Rulebook, Rule 561.

93.     At different times during the Class Period, Defendants held positions in NYMEX WTI crude oil futures contracts that were far in excess of 350 contracts.  This includes **as much as eleven times** the size of the 350 contract reporting limit.

94.     Defendants also artificially impacted prices by making large purchases of ICE WTI crude oil swaps.  Defendants' positions on ICE included crude oil swaps positions in excess of 15,000 contracts during the last week of March 2008.

95.     Plaintiffs do not have the NYMEX street book and other documents from NYMEX that are necessary to perform an empirical analysis.  But Plaintiffs have good grounds to believe and do allege as set forth below.

96.     Between January 8 - 22, 2008, March 4 – March 19, 2008 and April 1 – April 17, 2008, Defendants' unlawful conduct caused NYMEX crude oil prices to be higher than they otherwise would have been.  Defendants, by injecting unlawful factors into the supply-demand equation for NYMEX crude oil prices, intended to cause and did cause artificially high NYMEX crude oil prices.

97.     In addition to causing prices to be higher than they otherwise would have been, Defendants caused NYEMX crude oil prices to increase during March 4 to March 19, 2008 as alleged below.

98.     From March 4 through March 14, the price of the April '08 contract increased from $99.52 to $110.21.

99.     From March 4 through March 19, the price of the April '08 contract increased from $99.52 to $104.48.

100.   From March 4 through March 14, the price of the May '08 contract increased from $98.97 to $108.74.

101.   From March 4 through March 19, the price of the May '08 contract increased from $98.97 to $102.54.

102.   From March 4 through March 14, the price of the June '08 contract increased from $98.47 to $107.53.

103.   From March 4 through March 19, the price of the June '08 contract increased from $98.47 to $101.63

104.    In fact, Defendants caused crude oil prices to increase to the extent that, by March 18, 2008, for the first time in more than two years, the cost of crude oil exceeded the value of gasoline.

105.    Having intentionally caused NYEMX crude oil prices to be higher than they otherwise would have been between January 8 - 22, 2008, March 4 –

March 19, 2008 and April 1 – April 17, 2008, Defendants then exerted an opposite effect on NYMEX prices between January 23-24, 2008 and March 20-24, 2008. Defendants intended to cause and, at a minimum, then did cause reductions in the amount by which NYMEX crude oil prices were higher than they otherwise would have been.  Defendants further caused artificial prices and artificial price trends.

106.    The amount by which Defendants had caused NYMEX crude oil prices to be higher than they otherwise would have been, dissipated between April 18 and at least May 1, 2008.  During this time, Defendants sold out one-half of their manipulative or illegitimate positions.

107.    During February 2008, Defendants again began to inject illegitimate factors into prices but then stopped.

108.    Defendants created price trends in which prices intra-day and at the end of the day were different and in a different trend than non-manipulated prices would have been but for Defendants' conduct.

## AS AND FOR A FIRST CLAIM

### AGAINST ALL DEFENDANTS

**(Manipulation In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq*.)**

109.   Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

110.   Plaintiffs and members of the Commodities Class purchased and/or sold one or more NYMEX WTI crude oil futures contracts during the Class Period and were injured as a result of Defendants' manipulation of the prices of those contracts in violation of the CEA, 7 U.S.C. §1 *et seq*.

111.   Defendants' undisclosed conduct and trading activity alleged herein constituted a manipulation of NYMEX WTI crude oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

112.   As result of Defendants' unlawful conduct, Plaintiffs and members of the Commodities Class have suffered damages due to artificial prices to which they would not have been subject but for the unlawful conduct of Defendants as alleged herein.

113.   Plaintiffs and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM

### AGAINST DEFENDANTS PARNON ENERGY INC., ARCADIA PETROLEUM LTD, AND ARCADIA ENERGY (SUISSE) SA

### (Principal-Agent Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq.*)

114.   Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

115.   Defendant Dyer acted on behalf of and as agent for Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA and, as agent or other person acting on behalf of the foregoing Defendants, engaged in the manipulative scheme alleged herein on their behalf and with their authorization.

116.   Defendant Wildgoose acted on behalf of and as agent for Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA and, as agent or other person acting on behalf of the foregoing Defendants, engaged in the manipulative scheme alleged herein on their behalf and with their authorization.

117.   Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA paid for the manipulative trades that were part of the manipulative scheme alleged herein.

118.   Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), each of the aforementioned Defendants is liable for the acts of its agents.

119.    Plaintiffs and members of the Commodities Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A THIRD CLAIM

## AGAINST ALL DEFENDANTS

**(Aiding and Abetting Liability In Violation Of The Commodity Exchange Act 7 U.S.C. §1 *et seq*.)**

41

120.   Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

121.   Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

122.   Under Section 13c(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

123.   Plaintiffs and members of the Commodities Class are each entitled to damages for the violations alleged herein.

## AS AND FOR A THIRD CLAIM

### AGAINST ALL DEFENDANTS

**(Monopolization In Violation Of Section 2 Of The Sherman Antitrust Act 15 U.S.C. §2 *et seq*.)**

124.   Plaintiffs repeat and reallege the previous allegations as if fully set forth herein.

125.   Defendants acquired, willfully maintained, and unlawfully exercised monopoly power in the Relevant Market by purchasing 92%, 84%, and in excess of 84% of the supplies therein, as previously alleged.

126.   Defendants had the power to and did in fact set the price of the deliverable supply of physical WTI crude oil.  There is no legitimate business

justification for Defendants' actions and the conduct through which they acquired and maintained monopoly power in the Relevant Market.

127. The anticompetitive effects of Defendants' conduct far outweigh any possible procompetitive benefits or justifications.

128. Defendants also attempted and conspired to monopolize the Relevant Market, and artificially impacted prices through this conduct as well. As previously alleges herein, Defendants' conduct in the deliverable supplies and Relevant Market artificially impacted and directly affected NYMEX WTI futures contracts and options prices, and other instruments.

129. Plaintiffs and members of the Monopolization Class have been injured in their business or property by Defendants' monopolization of the Relevant Market. Without limiting the generality of the foregoing, Plaintiffs and members of the Monopolization Class have paid artificially inflated prices for WTI Derivatives contracts as a result of Defendants' anticompetitive conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for relief as follows:

A. for a declaratory judgment that all Defendants manipulated NYMEX WTI crude oil futures prices in violation of the CEA Section 9(a), 7 U.S.C. Section 13(b);

B.  for a declaratory judgment that Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA are liable for the acts of Defendants Dyer and Wildgoose pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

C.  for a declaratory judgment that Defendants aided and abetted the manipulation alleged herein in violation of Section 13c(a) of the CEA, 7 U.S.C. Section 13;

D.  for an order certifying the CEA and Sherman Act claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as the Class representatives and their counsel as Class counsel;

E.  for a judgment awarding the Plaintiffs and the Class damages against Defendants for Defendants' violations of the CEA and the Sherman Antitrust Act, together with prejudgment interest at the maximum rate allowable by law;

F.  for an award to Plaintiffs and the Class for their costs of suit, including reasonable attorneys' fees and expert fees and expenses; and

G.  for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury.

Dated:      New York, New York
            May 29, 2012

Respectfully submitted,

*/S/ CHRISTOPHER LOVELL*
Christopher Lovell (CL-2595)
Christopher M. McGrath (CM-4983)
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900
Facsimile:   (212) 719-4775

Stephen D. Susman
**SUSMAN GODFREY LLP**
560 Lexington Avenue, 15th Floor
New York, New York 10022-6828
Telephone:  212-336-8330
Fax:  212-336-8340

Warren T. Burns
Terrell W. Oxford
Daniel H. Charest
**SUSMAN GODFREY LLP**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: 214-754-1900
Fax: 214-754-1933

*Interim Co-Lead Counsel*