**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: CRUDE OIL COMMODITY FUTURES LITIGATION | ECF CASE<br><br>Master File No.<br>11 cv 3600 (WHP) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

I.     PLAINTIFFS' ALLEGED CLAIMS FOR MONOPOLIZATION UNDER
       SHERMAN ACT § 2 SHOULD BE DISMISSED..............................................................1

       A.     Plaintiffs' Proposed Relevant Market Is Flawed And Cannot Satisfy The
              Rule 8 Pleading Standard........................................................................................1

       B.     Plaintiffs' Allegations Of Monopoly Power Are Insufficient................................5

       C.     Plaintiffs' Deficient Allegations Regarding Anticompetitive Conduct,
              Antitrust Injury And Durability Of Monopoly Power Demonstrate Why
              Defendants' Alleged Conduct Cannot Be Cast As An Antitrust Violation.............7

II.    PLAINTIFFS' ALLEGED CLAIMS UNDER THE COMMODITY EXCHANGE
       ACT SHOULD BE DISMISSED ....................................................................................10

       A.     Recent Supreme Court And Second Circuit Authority Regarding The
              Triggering Of Statutes Of Limitation In Securities Fraud Cases Do Not
              Rescue Plaintiffs' Time-Barred Claims Under The CEA......................................10

       B.     Plaintiffs' Vague Allegations Regarding Their Alleged Damages Are
              Insufficient To Establish That They Have Standing Under CEA Section 22........13

       C.     Defendants' Alleged Actions Do Not Constitute A Violation Of The CEA
              Sufficient To Support A Private Claim Under Section 22.....................................14

CONCLUSION.....................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*,
    300 F.3d 620 (5th Cir. 2002) .................................................................................4

*Apex Oil Co. v. DiMauro*,
    713 F. Supp. 587 (S.D.N.Y. 1989)........................................................................9

*Benfield v. Mocatta Metals Corp.*,
    26 F.3d 19 (2d Cir. 1994) ..............................................................................11, 12

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294, 82 S.Ct. 1502 (1962)....................................................................3, 4

*Cargill Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) ..............................................................................6

*CFTC v. Parnon Energy Inc., et al.*,
    No. 11 cv 3543 (WHP) ............................................................................... passim

*City of Pontiac Gen. Employees Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2nd Cir. 2011)........................................................................11, 12

*Conte v. Newsday, Inc.*,
    703 F. Supp. 2d 126 (E.D.N.Y. 2010) ..................................................................4

*Daniel v. American Bd. of Emergency Medicine*,
    428 F.3d 408 (2nd Cir. 2005)................................................................................9

*Dura Pharmaceuticals, Inc. v. Broudo*,
    125 S.Ct. 1627, 544 U.S. 336 (2005)..............................................................11, 14

*In re Energy Transfer Partners*,
    2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) .............................................13, 14

*In re Natural Gas Commodity Litigation*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004)................................................................12

*In re Platinum and Palladium Commodities Litigation*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)................................................................14

*Juster Associates v. City of Rutland, Vt.*,
    901 F.2d 266 (2nd Cir. 1990)................................................................................9

*Kolbeck v. LIT America, Inc.*,
 923 F. Supp. 557 (S.D.N.Y. 1996)................................................................11, 12

*Merck & Co. Inc. v. Reynolds*,
 130 S.Ct. 1784 (2010).................................................................................11, 12

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
 648 F.3d 533 (7th Cir. 2011) ...........................................................................11

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
 124 F.3d 430 (3rd Cir. 1997) .............................................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 127 S.Ct. 2499 (2007).......................................................................................12

*TV Comms. Network, Inc. v. Turner Network Television, Inc.*,
 964 F.2d 1022 (10ᵗʰ Cir. 1992) .........................................................................4

*United States v. Eastman Kodak Co.*,
 63 F.3d 95 (2nd Cir. 1995) ................................................................................4

## STATUTES

7 U.S.C. § 2(g) ...............................................................................................14, 15

7 U.S.C. § 25(a)(1)................................................................................................14

7 U.S.C. § 25(c) ............................................................................................ passim

15 U.S.C § 2 ................................................................................................. passim

## OTHER AUTHORITIES

CFTC Glossary,
 *available at* http://www.cftc.gov/Consumer
 Protection/EducationCenter/CFTCGlossary/glossary_d.html ................................6

Fed. R. Civ. P. 8.................................................................................................2, 15

Fed. R. Civ. P. 12(b)(6)..........................................................................................15

I.     **PLAINTIFFS' ALLEGED CLAIMS FOR MONOPOLIZATION UNDER SHERMAN ACT § 2 SHOULD BE DISMISSED**

   A.     **Plaintiffs' Proposed Relevant Market Is Flawed And Cannot Satisfy The Rule 8 Pleading Standard**

Plaintiffs should not be permitted to proceed with a Sherman Act § 2 claim where they are unable even to articulate the proposed relevant market in a clear, unambiguous manner.  In their Opposition Memo Plaintiffs have rendered the relevant market allegations from the CCAC (¶ 70 "physical WTI" versus ¶ 73 "WTI Derivatives") even more confusing.  They now argue that the statement "'January 2008 WTI crude oil' does not, as Defendants assert, refer to physical WTI crude oil deliverable at Cushing in January 2008…. Rather, 'January 2008 WTI crude oil' refers to physical WTI crude oil contracts expiring in January 2008."  (Opp. Mem. at 8.)  Expiration is a concept applicable to futures contracts, but not to over the counter contracts for actual physical delivery of crude oil.  (*Compare* Ex. B to Carey Declaration, NYMEX Light Sweet Crude Oil (WTI) Futures (Termination of Trading)) *with* Ex C to Carey Declaration, Parnon Energy Inc. contract.)[1]  Thus, Plaintiffs' contention that the relevant market involves WTI contracts that "expire" is consistent with a relevant market definition Plaintiffs now reject ("WTI Derivatives") – but wholly ***inconsistent*** with the definition Plaintiffs now insist is accurate ("physical" crude oil deliverable at Cushing).

This new proposed definition of the relevant market also casts the allegations of the CCAC into doubt.[2]  Contrary to Plaintiffs' current position in their Opposition Memo, the CCAC

---

[1] All references to the Carey Declaration refer to the Declaration of Timothy J. Carey in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, filed on August 7, 2012 with the Motion and Memorandum in Support ("Opening Memo").

[2] All of Plaintiffs' allegations regarding Defendants' allegedly manipulative actions in 2008 parrot the allegations in the complaint filed by the CFTC in *CFTC v. Parnon Energy Inc., et al.*, No. 11 cv 3543 (WHP) ("CFTC v. Arcadia").  The CFTC plainly alleged that Defendants' purchases were of cash WTI "to be delivered the next month."  (CFTC Complaint, ¶¶ 3, 25.)

alleges that in January Defendants first purchased "physical *February* 2008 crude oil" (CCAC, ¶ 50(b) (emphasis added)), and then sold that "crude oil *deliverable in February*." (*Id.*, 52(c) (emphasis added)).  It also alleges that in April, 2008 Defendants purchased physical WTI crude oil "for *May delivery*." (CCAC, ¶ 63 (emphasis added).)  In contrast, the CCAC's allegations regarding purchases of physical WTI during the month of March, 2008 (CCAC, ¶ 57(a)) do not offer any information regarding the delivery period at all.  Nor do they specify whether Defendants' purchases were forward contracts, for delivery in a future month such as April, or spot contracts, for delivery in March.  Given the nature of Plaintiffs' claims and the operation of the futures markets where Defendants are alleged to have controlled prices, Plaintiffs must be required to allege the relevant delivery periods in unambiguous terms.  As currently pled, none of Plaintiffs' allegations regarding the definition of the relevant market or how Defendants allegedly acquired their monopolistic position in that market satisfy Rule 8.

Plaintiffs' proposed definition of the relevant product and geographic markets are also flawed.  Plaintiffs' protestations at page 9 of the Opposition Memo regarding inclusion of crude oil grades other than WTI are wholly baseless.  The crux of Plaintiffs' § 2 claim is that they purchased and sold NYMEX WTI futures contracts at inflated prices and suffered damages in connection with those transactions.  (Opp. Mem. at 3-4.)  The terms of those futures contracts, therefore, are directly at issue in this case.  The contracts are "NYMEX Light Sweet Crude Oil (WTI) Futures" contracts, the terms of which are publicly available on the NYMEX website and were attached to Defendants' Opening Memo for the Court's reference.  (*See* Exs. A and B to

---

Specifically, the CFTC alleged that Arcadia's purchases of cash WTI crude oil in January 2008 were of WTI deliverable in February 2008.  (*Id.*, ¶¶ 28, 36, 37).  The CFTC did not allege any facts regarding transactions for WTI to be delivered in January 2008 – nor do Plaintiffs. Similarly, the CFTC alleged that Defendants' purchases of cash WTI crude oil during March 2008 were of WTI to be delivered in April 2008.  (*See id.*, ¶¶ 43,46.)  The CFTC did not allege any facts regarding actual transactions for WTI to be delivered in March 2008 – nor do Plaintiffs.

Carey Declaration.)  The contracts themselves expressly identify multiple domestic and foreign crude grades that may be delivered to fulfill their terms.[3]  Plaintiffs' proposed relevant market improperly attempts to **exclude** grades expressly included in the contract by NYMEX.  To define the relevant product market as only one of the eleven deliverable grades identified in the contract is simply implausible.  Plaintiffs' allegation that WTI is "the **primary** deliverable grade under the NYMEX WTI crude oil futures contracts" (CCAC, ¶ 43 (emphasis added)) is insufficient to justify excluding the other ten grades.

Plaintiffs' Opposition Memo does not directly address other crude grades such as Light Louisiana Sweet or Heavy Louisiana Sweet that compete with WTI in the domestic cash crude oil markets.  Plaintiffs neither allege that there are no substitutes for WTI  (something they could not do in good faith) nor explain why WTI should be treated as a narrow market on its own, given the commercial realities of the domestic crude oil market.  Plaintiffs' failure to address this issue in the CCAC violates standards established by the U.S. Supreme Court in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 82 S.Ct. 1502 (1962), and applied consistently by federal courts since that time.  As one federal Circuit Court of Appeals explained,

> Plaintiffs have the burden of defining the relevant market.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiffs' favor, the relevant market is legally insufficient and motion to dismiss may be granted.

---

[3] Plaintiffs' assertion that any assessment whether other deliverable grades should be included in the relevant market would require an extensive factual inquiry (Opp. Mem. at 9) is a red herring. Determining whether the proposed relevant market is overly narrow because it fails to include other grades expressly deliverable under the NYMEX WTI futures contract is a simple matter of looking to the terms of the contracts at issue.

3

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997) (quoting *Brown Shoe*, 370 U.S. at 325) (collecting cases where district courts in New York have dismissed complaints for failure to meet this standard). *See also Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002); *TV Comms. Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010).

Further, Plaintiffs offer no real challenge to Defendants' argument that the proposed geographic market is too narrow.  Putting aside that it is unclear what "in ***and around***" Cushing means, to accept Plaintiffs' geographic market as limited to Cushing would require the Court to ignore commercial realities.  The selected geographic market must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37, 82 S.Ct. 1502 (1962).  Further, "the relevant geographic market is defined as the 'area of effective competition … in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2nd Cir. 1995) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 81 S.Ct. 623 (1961)).

Plaintiffs' own allegations undercut their definition of the relevant geographic market when considered in light of these standards.  Plaintiffs allege: "The crude oil marketing hub in Cushing, Oklahoma is the most significant marketing and trading hub for crude oil in North America.  Cushing serves as the delivery point for light sweet crude oil futures contracts traded on the NYMEX."  (CCAC, ¶ 42.)  To limit the geographic market for WTI to the location where it changes hands or may be temporarily stored, without accounting in any way for where it comes from, would be inappropriate.  For example, if WTI travels to Cushing on one of the

many pipelines terminating there, a geographic market wholly disregarding its starting point on that pipeline would be artificially narrow.

Merely considering the origins of the grades deliverable under the NYMEX contract confirms that the geographic market must be broad enough to include crude in transit from international locations. On the domestic side, West Texas Intermediate, Low Sweet Mix (Scurry Snyder), North Texas Sweet and South Texas Sweet all come from Texas; New Mexican Sweet comes from New Mexico; and Oklahoma Sweet comes from Oklahoma. With respect to foreign grades, the NYMEX contract expressly identifies the countries of origin: "U.K.: Brent Blend … Nigeria: Bonny Light … Nigeria: Qua Iboe ... Norway: Oseberg Blend … Columbia: Cusiana …." (Ex. A to Carey Declaration, Rule 200.12.) If NYMEX considers all of these grades to be deliverable at Cushing to satisfy the WTI futures contract, then the relevant geographic market must be at least broad enough to encompass their international points of origin. Accordingly, Plaintiffs' proposed geographic market, like their proposed product market, is overly narrow and an implausible basis on which to measure monopoly power.

### B.   Plaintiffs' Allegations Of Monopoly Power Are Insufficient

Plaintiffs' defense of their monopoly power allegations relies almost entirely on three assertions: (a) that Defendants owned 92% and 84% of the "deliverable supply" of WTI crude oil in January and March, 2008, respectively (Opp. Mem. at 6); (b) that Defendants caused a 170% increase in the January/February WTI calendar spread value between January 3 and 18, 2008 (*id.* at 11); and (c) that Defendants "caused the cash/futures market to move from backwardation … to contango" in January, 2008. (*Id.* at 10.)

The allegations regarding Defendants' supposed percentage share of the "deliverable supply" of WTI in January and March 2008 are wholly unsupported by the facts alleged in either

Plaintiffs' own CCAC or the CFTC's complaint on which the CCAC is based. Nowhere do Plaintiffs define what the "deliverable supply of WTI" is or quantify it. Plaintiffs note that this Court ruled the CFTC did not have to allege the actual supply and demand amounts of WTI available at Cushing. (*See CFTC v. Arcadia,* 4/26/12 Order at 18.) But the CFTC complaint – unlike the CCAC – never actually mentioned the "deliverable supply" or offered calculations purporting to show dominant percentages of a wholly fictional deliverable supply number. Plaintiffs have made the leap from "balances" alleged by the CFTC to the entire "deliverable supply of WTI" with no factual support whatsoever. Deliverable supply is a concept defined by the CFTC and discussed in numerous court opinions.[4] Plaintiffs' use of the term with no factual allegations to show that the volumes discussed actually meet those definitions is an irresponsible misrepresentation of the facts. Even worse, Plaintiffs define the deliverable supply solely with reference to WTI, despite the fact that NYMEX obviously considers ten other grades capable of satisfying the WTI futures contract and thus part of the deliverable supply.

The allegation that Defendants' purchasing of cash WTI allegedly caused a "170 percent increase" in the WTI calendar spread price between January 3 and January 18 is similarly flawed. The assertion ignores the fact that between January 3 and 18 the outright price of prompt month (February) WTI futures *fell* overall – by $5.76 – and the outright price of second month (March) WTI futures *fell* overall – by $6.16. Only the differential between these two prices, the calendar spread, increased during the period. Plaintiffs' assertion also ignores the fact that during the same period the spread value fell to as low as 17 cents on January 15 – a 29%

---

[4] *See, e.g.*, CFTC Glossary ("Deliverable supply" is "[t]he total supply of a commodity that meets the delivery specifications of a futures contract," http://www.cftc.gov/Consumer Protection/EducationCenter/CFTCGlossary/glossary_d.html (last visited 9/24/12)); *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1165 (8th Cir. 1971) ("The deliverable supply of a commodity is that which is readily available for delivery at a specified time, either because it is locally stored or because it is within a deliverable distance from the market.").

*decrease* in the spread value from January 3.  In fact, the spread value fell by 66% (33 cents) between January 10, when it settled at 50 cents, and January 15, when it settled at 17 cents.

The allegation that Defendants' actions caused the cash/futures market to move from backwardation to contango is also insufficient to allege monopoly power in the cash WTI market, despite this Court's findings in *CFTC v. Arcadia* regarding the ability to influence spread values as part of a CEA claim.  The referenced "flip" occurred on January 25, 2008 (*see* Ex. E to Carey Declaration), and was caused by the cash WTI price dropping when Defendants were forced to sell out their long position at a *decreased* price.  (CCAC, ¶¶ 52(d), 65.)  If the market Defendants are alleged to have monopolized was the market for cash WTI (Opp. Mem. at 7-8), and the flip from backwardation to contango was caused by a *decrease* in price in that market forcing Defendants to sell at a *loss*, it hardly serves as proof of monopoly power.  Quite the opposite – it reflects a *lack* of power in that market and an *inability* to dictate price.

C.      **Plaintiffs' Deficient Allegations Regarding Anticompetitive Conduct, Antitrust Injury And Durability Of Monopoly Power Demonstrate Why Defendants' Alleged Conduct Cannot Be Cast As An Antitrust Violation**

Finally, Plaintiffs' arguments in their Opposition Memo are unable to overcome their failure to plead that: (a) Defendants engaged in willful or anticompetitive conduct; (b) Plaintiffs suffered an antitrust injury; and (c) Defendants' monopoly power "alter[ed] the market's nature or structure."  (*See* Opening Memo at 15-17, 3-5, and 14-15.)  The pleading deficiencies on all three of these points stem from the fact that Plaintiffs are wrongly attempting to transform Defendants' alleged actions into a violation of § 2 of the Sherman Act.  With respect to the market for cash WTI, Defendants are alleged merely to have purchased, held and sold large cash WTI positions.  They are *not* alleged to have violated any law or regulation, including any applicable position limit, in doing so.  Conspicuously absent from the CCAC are any allegations

7

that Defendants "withheld" cash WTI from the market or that any market participant who wanted to purchase cash WTI in the period January - April of 2008 was unable to do so. Even the intent allegations in the CCAC stop short of claiming that Defendants intended to corner or squeeze the market. Thus, no "unjustifiable means" are alleged – *i.e.*, there are no factual allegations describing anticompetitive ***conduct***, only conclusory allegations of anticompetitive intent. The allegations do not plausibly support an inference that Defendants' alleged actions ***decreased competition*** or ***restrained trade*** in either the cash WTI market or the WTI futures market.

Accepting all of the allegations in the CCAC as true, the most the CCAC alleges is that Defendants' purchases during January and March, 2008 of substantial long positions in cash WTI, which they then held past expiration of the WTI futures contracts in those months, created a false impression in the market that the supply of cash WTI in the respective delivery months would be tighter than it actually was – an impression which allegedly led market participants to change their view of near-term versus long-term supply/demand fundamentals and pay more for WTI, artificially driving up the price.[5]

Plaintiffs' alleged losses in the futures market are not proper antitrust injuries, since their damages stemmed from the market's reaction to perceived changes in supply/demand fundamentals in an allegedly tight cash WTI market. In *CFTC v. Arcadia* this Court described the alleged effect on the market from Defendants' actions as follows:

> …[I]f there is a shortage or tightness in immediate supply, traders are willing to pay a high premium for near-term supply relative to long-term supply…. [A] market perception that the physical supply of crude oil is

---

[5] Plaintiffs' claims parrot the allegations in the CFTC complaint, which also refrains from alleging that Defendants restricted the supply of cash WTI from any market participant. Rather, the CFTC alleges that Defendants created certain market "perceptions" regarding near-term versus short-term supply of WTI, thereby affecting calendar spread values. The CFTC does not allege that Defendants manipulated outright WTI futures prices or cash WTI prices. (*See* CFTC Complaint, ¶¶ 22; *CFTC v. Arcadia*, 4/26/12 Order at 4.)

> low will drive near term prices higher relative to long-term prices, *i.e.*, into a pattern of backwardation.  (Compl. ¶ 22.)
>
> \*　　　　　\*　　　　　\*
>
> …[T]he Commission alleges that Defendants refrained from selling their long physical position in a tight market, leading other market participants to conclude that the supplies associated with such a position were committed to commercial use and therefore unavailable.  (Compl. ¶ 25.) That conduct, the Commission alleges, sent pricing signals to the futures market, causing the front month of the relevant calendar spreads to increase in value relative to the next month.

(*CFTC v. Arcadia*, 4/26/12 Order at 23-24.)  Thus, Plaintiffs here did not suffer damages because Defendants themselves directly bought up the supply of WTI and charged excessive prices to shorts.  Rather, Plaintiffs' alleged injuries, if any, stemmed from operation of the market in reaction to alleged pricing signals created by Defendants' trading.  Plaintiffs simply have not alleged an antitrust injury and this is not a § 2 monopolization case.  *See, e.g., Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408 (2nd Cir. 2005) (emergency room doctors who were ineligible for accreditation exam did not suffer antitrust injury; rather, their alleged injury stemmed from being denied the opportunity to charge the same super-competitive pay as their certified colleagues); *Juster Associates v. City of Rutland, Vt.*, 901 F.2d 266 (2nd Cir. 1990) (shopping mall owner who sued city and prospective developer of new shopping center receiving subsidies from the city did not allege an antitrust injury; the alleged injury stemmed solely from the threat of increased competition, where subsidization would increase the attractiveness of the new mall and  allow it to compete more effectively with the existing mall).

Finally, the alleged duration of Defendants' alleged monopoly power during January, March and April 2008 is insufficient to support a § 2 claim.  Plaintiffs are unable to distinguish *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989), which held that monopoly power must be of sufficient duration to allow the alleged monopolist to raise prices or exclude

competition without being undercut.[6]   (Opening Memo at 14.)  Even assuming, *arguendo*, it is

possible as a matter of law to monopolize a market for days at a time while allowing competition

to resume unrestrained during long breaks in between – a proposition with which Defendants

strongly disagree – it is not possible for Defendants to have dictated prices or excluded

competition under the allegations of the CCAC.  The CCAC alleges that Defendants controlled

the market for cash WTI only from January 8-25, March 14-24, and "early April," 2008 (CCAC,

¶ 66) – leaving market participants four subsequent trading days in January, five subsequent

trading days in March, and at least nine subsequent trading days in April to purchase WTI on the

spot market at prices Defendants ***did not*** control (not to mention the early days of February,

April and May, assuming that Defendants actually intend to allege monopoly power over cash

WTI deliverable in those months).

Plaintiffs strain to transform the allegations from the CFTC's complaint against

Defendants into an antitrust claim, but do not succeed.  Their claim for § 2 monopolization, as

well as their unsupported claims for attempted monopolization and conspiracy to monopolize,

should be dismissed.

## II.     PLAINTIFFS' ALLEGED CLAIMS UNDER THE COMMODITY EXCHANGE ACT SHOULD BE DISMISSED

### A.     Recent Supreme Court And Second Circuit Authority Regarding The Triggering Of Statutes Of Limitation In Securities Fraud Cases Do Not Rescue Plaintiffs' Time-Barred Claims Under The CEA

Plaintiffs attempt to rescue their time-barred claims under the Commodity Exchange Act

by citing the Second Circuit's decision in *City of Pontiac Gen. Employees Ret. Sys. v. MBIA,*

---

[6] The cases cited by Plaintiffs in footnote 7 of the Opposition Memo are distinguishable, since all three involved attempts to squeeze or corner the market at issue.  Here Plaintiffs do not allege either an attempted corner or an attempted squeeze.  This Court has already held in *CFTC v. Arcadia* that similar allegations did not describe an attempted squeeze.  (4/26/12 Order at 19.)

*Inc.*, 637 F.3d 169 (2nd Cir. 2011).  In *City of Pontiac*, the Second Circuit was applying a new standard for accrual of securities fraud claims articulated by the U.S. Supreme Court in *Merck & Co. Inc. v. Reynolds*, 130 S.Ct. 1784 (2010).  It is unclear whether *Merck* has any application to claims brought under the CEA.[7]  In *Merck* the Supreme Court was asked to construe specific language from the statute of limitations created by § 804 of the Sarbanes–Oxley Act, codified at 28 U.S.C. § 1658(b).  That section provides that a claim for securities fraud "may be brought not later than the earlier of —  (1) 2 years *after the discovery of the facts constituting the violation*; or (2) 5 years after such violation."  28 U.S.C. § 1658(b) (emphasis added).  The Supreme Court discussed at some length the significance of Congress's adoption of the "discovery of the facts" standard, finding that it had intended courts to interpret the standard in accordance with prior Supreme Court and Court of Appeals precedent construing the language.  *See Merck*, 130 S.Ct. at 1793-96.  In contrast, private manipulation claims such as Plaintiffs', brought under the Commodity Exchange Act, "shall be brought not later than two years *after the date the cause of action arises*."  CEA Section 22(c), 7 U.S.C. § 25(c) (emphasis added).  Given the different statutory language at issue in *Merck* and *City of Pontiac*, Defendants maintain that *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19 (2d Cir. 1994), and *Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557 (S.D.N.Y. 1996), are still controlling precedent in this jurisdiction regarding the accrual of claims under the CEA.[8]  Those cases hold that a claim arises under the CEA when the plaintiffs are put on "inquiry notice" of a potential claim.  (Opening Memo at 18-19.)

---

[7] Notably, despite describing *City of Pontiac* as "controlling" precedent (Opp. Mem. at 19), Plaintiffs just a few pages later assert that decisions construing language from statutes in the securities context (*e.g., Dura Pharmaceuticals*) should not be applied in the commodities context.  (*Id.* at 31.)

[8] *But cf. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 536 (7th Cir. 2011) (noting that "[t]he language of § 1658(b) that postpones accrual until the victim discovers (or using diligence could have discovered) that the defendant acted with scienter is hard to

Plaintiffs' suggestion that their claim did not arise until they knew *all* of the facts regarding Defendants' alleged multiple-part/multiple-market activities, including proof of Defendants' intent, is not supported by *Benfield* or *Kolbeck*.  Claims for securities fraud, like those in both *Merck* and *City of Pontiac*, require a plaintiff to plead all elements, including scienter, with particularity under Fed. R. Civ. P. 9(b).  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504 (2007) (the Private Securities Litigation Reform Act of 1995 "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'").  In contrast, Plaintiffs' claim for manipulation in the present case does not allege fraud, and this Court has already ruled that a similar claim brought against Defendants by the CFTC did not require pleading of all elements with the particularity required by Rule 9(b).  (*See CFTC v. Arcadia*, 4/26/12 Order at 16-17.)

Given Plaintiffs' allegations in the CCAC, Plaintiffs were on inquiry notice of their claims well before May 26, 2009.  (Opening Memo at 19-20.)  Further, Plaintiffs' arguments in the Opposition Memo, including that the "flip" from backwardation to contango in January 2008 was so unusual an event that it is sufficient on its own to establish monopoly power, also undermine Plaintiffs' contention that they could not have known of the existence of their claims prior to May 26, 2009.[9]  *See In re Natural Gas Commodity Litigation*, 337 F. Supp. 2d 498, 514

---

impute to [CEA] § 25(c)," but "indulging" in the "assumption" that *Merck* applies to CEA claims because "if [the plaintiff] loses under *Merck*, he loses under any possible understanding of § 25(c).").

[9] Defendants' attachment of Platts Crude Oil Marketwire from January 25 to their Opening Memo was merely to counteract Plaintiffs' bald assertion in the CCAC that "Plaintiffs neither knew, nor in the exercise of reasonable diligence, could have known of the violations on which their claims are based." (CCAC, ¶ 84.)  The identity of the entity selling off its physical position on January 25 was not a secret.  Even if Plaintiffs did not see the Platts article, its publication to the market meant that due diligence by Plaintiffs in the market would have revealed the name.

(S.D.N.Y. 2004) ("[I]f facts in the complaint conclusively indicate that a plaintiff did or should have had knowledge of the violation within the statute of limitations, even when read in the light most favorable to the plaintiff, the limitations period should not be tolled).  The CCAC is devoid of allegations describing ***any*** actions Plaintiffs took to investigate their claims once they were on notice of Defendants' alleged actions, the alleged run-up in prices, the flip from backwardation to contango and the alleged losses on their WTI positions.  Further, Plaintiffs offer no response at all regarding this Court's prior finding in *CFTC v. Arcadia* that Defendants' alleged actions were not fraudulent, rendering the doctrine of fraudulent concealment inapplicable.

    **B.**    **Plaintiffs' Vague Allegations Regarding Their Alleged Damages Are Insufficient To Establish That They Have Standing Under CEA Section 22**

Plaintiffs' numerous arguments regarding loss causation do not explain why they cannot or choose not to allege sufficiently detailed facts to establish that they suffered actual damages on WTI positions during the relevant period so as to meet the requirements of CEA Section 22, 7 U.S.C. § 25(c).  Plaintiffs' assertion that the CEA omits any loss causation requirement is wrong.  Section 22 expressly creates private liability only where the plaintiff incurred "actual damages" "caused by" a violation of the Act.  7 U.S.C. § 25(c).  Regardless of the label used, a plaintiff asserting claims under Section 22 must offer plausible allegations that it incurred "actual damages" that were "caused by" the defendant's violation.  Merely alleging net losses from having "transacted in an artificial market" is insufficient to plead a private cause of action under the CEA.  *See In re Energy Transfer Partners*, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) (applying *Dura Pharmaceuticals* to claims brought under the CEA).  Given the fluctuating and sporadic nature of the alleged manipulation at issue here, which Plaintiffs claim caused artificial prices on just thirty-nine days during the four and one-half month Class Period (CCAC, ¶¶ 2, 96,

13

105), Plaintiffs' vague allegations of "net losses" over the entire period are even more insufficient than those in *Energy Transfer Partners*.

Defendants respectfully suggest that this Court's decision in *In re Platinum and Palladium Commodities Litigation*, 828 F. Supp. 2d 588 (S.D.N.Y. 2011), is distinguishable. There the Court held that the loss causation principles articulated by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 544 U.S. 336 (2005), were inapplicable to the type of manipulative conduct at issue: "The trading scheme described in the Complaint relied on large trades in an illiquid market in the final seconds of the close. Their effect could have been dissipated depending on the timing of both Defendants' trades and Plaintiffs' transactions in the market." 828 F. Supp. 2d at 601. In contrast, Plaintiffs' allegations here do not permit an assumption that the manipulation created an artificially high purchase price that promptly dissipated in normal trading. Instead, Plaintiffs allege that (a) Defendants manipulated prices both up and down at different times during the nearly five-month class period (CCAC, ¶¶ 73(b)-(c), 81); and (b) the price artificiality lasted for months after Defendants' alleged misconduct ended (*id.*, ¶ 5(c)), rather than naturally dissipating promptly thereafter.

### C. Defendants' Alleged Actions Do Not Constitute A Violation Of The CEA Sufficient To Support A Private Claim Under Section 22

Plaintiffs also lack standing because they fail to offer any theory under which Defendants' alleged conduct violated the CEA as contemplated by CEA Section 22(a)(1), 7 U.S.C. § 25(a)(1). Defendants continue to respectfully disagree with this Court's prior decision in *CFTC v. Arcadia* (4/26/12 Order), and maintain that (a) Section 2(g) bars all of Plaintiffs' manipulation claims based on Defendants' alleged purchases and sales of cash WTI (Opening Memo at 30-31); and (b) none of Plaintiffs' allegations regarding manipulation of calendar spreads describe a violation of the CEA that is actionable under Section 22. (*Id.* at 31-33.)

14

In their Opposition Memo Plaintiffs fail to offer any meritorious argument regarding the effect of CEA Section 2(g), 7 U.S.C. § 2(g), on their manipulation claims. While this Court found that Section 2(g) does not bar the manipulation claims in *CFTC v. Arcadia*, Plaintiffs' CCAC alleges manipulation of cash WTI prices, distinguishing it from the CFTC's complaint in that regard and triggering the Section 2(g) exemption for those allegations even under the Court's prior decision. (*CFTC v. Arcadia*, 4/26/12 Order at 14.) Likewise, this case is distinguishable from *CFTC v. Arcadia* with respect to whether the alleged manipulation of calendar spreads constitutes an actionable violation within the language of CEA Section 22(a)(1). While this Court found that the CFTC may proceed with a claim of manipulation of calendar spreads, that ruling did not consider the more restrictive language of Section 22(a)(1)(D) because that Section does not apply to the CFTC. Defendants maintain that the language of Section 22(a)(1) does not authorize a private action for alleged manipulation of calendar spreads; therefore, that portion of Plaintiffs' manipulation claim should be dismissed.

Thus, Plaintiffs' CEA manipulation claim suffers from two fatal flaws; namely, that it is time-barred according to Plaintiffs' own allegations in the CCAC, and that Plaintiffs lack standing because they fail adequately to allege either that they suffered actual damages or that Defendants' actions constituted a violation of the CEA as contemplated by Section 22. Because Plaintiffs' primary CEA claim fails, their claims for principal-agent liability and aiding and abetting manipulation also must fail.

## CONCLUSION

For all of the foregoing reasons and those stated in Defendants' Memorandum in Support of Their Motion to Dismiss, the Consolidated Amended Class Action Complaint should be dismissed pursuant to Fed. R. Civ. P. 8 and 12(b)(6).

Dated: September 26, 2012                    Respectfully submitted,

                                             By:   /s/ Timothy J. Carey
                                             Timothy J. Carey
                                             Elizabeth M. Bradshaw
                                             Brigitte T. Kocheny
                                             WINSTON & STRAWN LLP
                                             35 West Wacker Drive
                                             Chicago, Illinois 60601
                                             (312) 558-5600

                                             Thomas J. Quigley
                                             WINSTON & STRAWN LLP
                                             200 Park Avenue
                                             New York, New York 10166
                                             (212) 294-6700

                                             Fred F. Fielding
                                             Mark R. Haskell
                                             Levi McAllister
                                             MORGAN LEWIS
                                             1111 Pennsylvania Ave., NW
                                             Washington, DC 20004
                                             (202) 739-3000

                                             *Attorneys for Defendants*