USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/21/12_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                            :

IN RE CRUDE OIL COMMODITY
     FUTURES LITIGATION           :     MASTER FILE NO. 11 Civ. 3600 (WHP)

                            :     MEMORANDUM & ORDER

THIS DOCUMENT RELATES TO:   :
ALL ACTIONS

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        This putative class action asserts violations of section 2 of the Sherman Act, 15

U.S.C. § 2, and the Commodities Exchange Act ("CEA"), 7 U.S.C. § 13 et seq., stemming from

the alleged manipulation of West Texas Intermediate grade ("WTI") crude oil prices in 2008.

Defendants move to dismiss the Consolidated Amended Class Action Complaint, dated May 29,

2012 (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6).  For the following

reasons, Defendants' motion to dismiss the Complaint is denied.

BACKGROUND

        The Complaint recounts substantially the same events at issue in an enforcement

action by the United States Commodity Futures Trading Commission (the "CFTC Action").  See

U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc., --- F. Supp. 2d ----, No. 11

Civ. 3543 (WHP), 2012 WL 1450443, at *1-*4 (S.D.N.Y. Apr. 26, 2012) (denying Parnon's

motion to dismiss).  Plaintiffs' factual allegations are accepted as true for the purpose of this

motion.

I.  The WTI Physical Market and the WTI Futures Market

           The Complaint identifies two closely-related markets: the "physical" or "cash" market for WTI crude oil, in which actual barrels of crude oil are bought and sold for commercial use and the WTI "futures" or "derivatives" market, in which investors trade contracts for future delivery of WTI crude oil.

           Unlike the physical WTI market, the WTI futures market rarely involves the actual delivery of crude oil. Instead, participants trade "long" and "short" positions in WTI futures contracts. WTI futures are traded on several exchanges, including the New York Mercantile Exchange ("NYMEX") (Compl. ¶ 1.) A NYMEX WTI futures contract is an agreement for the purchase or sale of WTI on a fixed date in the future in Cushing, Oklahoma. The earliest delivery month for a futures contract is the "near" month. The seller of a futures contract, i.e., the person committed to deliver the commodity in the future, is in the "short" position. (Compl. ¶ 27.) Conversely, the buyer committed to accept delivery is in the "long" position. (Compl. ¶ 27.) In theory, WTI can be actually delivered under a futures contract, but investors almost always settle futures contracts financially prior to the close of trading for a given contract, which is known as the "expiry date." The expiry date for NYMEX WTI futures contracts is the third business day prior to the twenty-fifth calendar day of the month preceding the delivery month. (Compl. ¶ 37.)

           To liquidate their holdings and realize profits on their positions, investors enter into an offsetting futures contract for the same quantity of the commodity:

> Thus, a short who does not intend to deliver the commodity must purchase an equal number of long contracts; a long must sell an equal number of short contracts. Money is made or lost in the price different[ial] between the original contract and the offsetting transaction. If the price of the future has declined,

usually because of market information indicating a drop in the price of the commodity, the short will realize a profit; if the futures price has risen, the long will realize a profit.

Leist v. Simplot, 638 F.2d 283, 286 (2d Cir. 1980). Except for price and quantity, every aspect of a NYMEX WTI futures contract is standardized, and all NYMEX WTI futures contracts trade in thousand-barrel lots. (Compl. ¶¶ 26, 34.)

A spread contract is another way investors in the WTI futures market can profit from fluctuating crude oil prices. One type of spread is a "calendar spread" consisting of alternating positions in two consecutive futures contracts. (Compl. ¶ 40.) A "long" calendar spread obligates the holder to accept delivery of WTI in a future month and sell the same quantity of WTI in the subsequent month. (Compl. ¶ 40.) Conversely, a "short" calendar spread obligates the holder to deliver WTI in a future month and accept delivery of the same quantity in the subsequent month. (Compl. ¶ 40.) Traders realize a profit on a calendar spread when they predict correctly whether the price of WTI in the second month will go up (a long spread) or down (a short spread) compared to the price in the first month. The greater the fluctuation in price between the two months, the more profit the investor realizes.

In contrast to the WTI futures market, participants in the WTI cash market purchase physical contracts under which WTI is actually delivered the following month in Cushing. Physical contracts are traded until the end of the third business day following the expiry date of the near month NYMEX WTI futures contracts. (Compl. ¶ 44.) This three-day period following the expiry date is known as the "cash window." (Compl. ¶ 44.) Most commercial users of crude oil complete their purchases or sales of crude oil needed for the following month before the cash window opens. (Compl. ¶ 45.)

-3-

II. Contango v. Backwardation

   To understand the complex price manipulation and monopolization scheme alleged in the Complaint, it is necessary to plumb two futures pricing scenarios: "contango" and "backwardation." For most commodities, the price of a futures contract includes such carrying costs as storage, insurance, financing, and other expenses the producer incurs as the commodity awaits delivery. Thus, typically, the further in the future the delivery date, the greater the purchase price of the futures contract. That relationship is known as "contango." See Virginia B. Morris and Kenneth M. Morris, Standard & Poor's Dictionary of Financial Terms 41 (2007); see also Barbara J. Etzel, Webster's New World Finance and Investment Dictionary 74 (2003) ("contango[:] A pricing situation in which the prices of futures contracts are higher the further out the maturities are. This is the normal pricing pattern because carrying charges such as storage, interest expense, and insurance have to be paid in order to hold onto a commodity.").

   Near-term supply of crude oil is generally inelastic because supply in the near term does not increase even if prices rise significantly. Long-term supply, on the other hand, is elastic because it can usually increase to meet market prices. Thus, if there is a shortage or tightness in immediate supply, traders are willing to pay a higher premium for near-term supply relative to long-term supply. Such a market condition is the opposite of contango and is called "backwardation." See Jerry M. Rosenberg, Dictionary of Banking and Finance 41 (1982) ("backwardation: a basic pricing system in commodities futures trading. A price structure in which the nearer deliveries of a commodity cost more than contracts that are due to mature many months in the future. A backwardation price pattern occurs mainly because the demand for supplies in the near future is greater than demand for supplies at some distant time.").

III. The Parties

Plaintiffs Gregory Galan, John Losordo, Jr., FTC Capital GmbH, Todd Kramer, and Adams Affiliates, Inc. are individuals and corporate entities that traded NYMEX WTI futures contracts and calendar spreads in 2008. (Compl. ¶¶ 12-16.) Defendants Parnon Energy Inc., Arcadia Petroleum LTD, and Arcadia Energy (Suisse) SA, (collectively, "Parnon"), are wholly-owned subsidiaries of Farahead Holdings Ltd. and operate as a single enterprise to trade in physical and futures contracts for crude oil, including WTI. (Compl. ¶¶ 17-19.) Defendants Nicholas J. Wildgoose and James T. Dyer were responsible for Parnon's WTI trading strategy during the relevant period.

IV. The Alleged Manipulation

In late 2007, Defendants were aware of a low supply in physical crude oil at Cushing. Indeed, Wildgoose remarked at the time that the supply was "close to vapours." (Compl. ¶ 46.) In January 2008, Defendants allegedly executed a four-step manipulation scheme to exacerbate and profit from tightness in WTI supply.

"Manipulative Step 1" involved the acquisition of a long position in February/March 2008 NYMEX WTI calendar spreads. (Compl. ¶ 49(a).) Between January 3 and January 10, 2008, Defendants purchased a large long calendar spread position of 13,600 February/March 2008 WTI crude oil futures contracts. (Compl. ¶ 49(b).) Thus, Parnon would profit if the price of March 2008 WTI futures was lower than the February price. The greater the downward price differential between February and March, the bigger the profit Parnon could realize.

"Manipulative Step 2" involved the acquisition of a dominant position in physical WTI crude oil. (Compl. ¶ 50(b).)  On January 7, 2008, Wildgoose requested that Arcadia Petroleum's Chief Operating Officer complete credit arrangements with potential counterparties so that Parnon could begin trading physical WTI crude oil:  "Can we get this issue resolved pls. time is of the essence here, we need to trade crude with 3rd parties tomorrow as part of the feb/mar wti strategy." (Compl. ¶ 50(a).)  Between January 8 and January 18, 2008, Parnon purchased a total of approximately 4.6 million barrels of an estimated 7 million barrels of physical WTI readily available for delivery in February 2008. (Compl. ¶ 50(b).)  On January 27, 2008, Wildgoose lowered his estimate of WTI available for delivery from 7 million to 5 million barrels.  Thus, Parnon actually acquired 92% of the deliverable supply available at Cushing. (Compl. ¶ 50(b).)

Parnon's large purchase of physical WTI caused the market to perceive a scarcity of WTI.  As a result, Parnon's long position in the February/March 2008 NYMEX WTI calendar spreads began to increase in value, as the market perceived that the price of February 2008 WTI futures would be greater than March 2008 WTI futures. (Compl. ¶ 50(c).)  For example, the February/March 2008 NYMEX WTI crude oil futures spread price rose from 24 cents on January 3, 2008 to 65 cents on January 18, 2008. (Compl. ¶ 50(c).)  Though Parnon had no commercial need for the physical oil and would likely incur substantial losses by selling it during the cash window, it retained its physical position through January 22, 2008, the expiry date for the near-month NYMEX WTI futures contracts. (Compl. ¶¶ 50(d)-(e).)  Parnon then liquidated its long February/March 2008 calendar spreads at the artificially inflated prices it had created. (Compl. ¶ 50(f).)

"Manipulative Step 3" involved the acquisition of a substantial short position in March/April 2008 NYMEX WTI calendar spreads.  (Compl. ¶ 51.)  On January 23, 2008, the first day of the cash window, Parnon still held almost all of its physical WTI.  (Compl. ¶ 51.)  Between January 22, 2008 and January 25, 2008, Defendants increased their short position in March/April 2008 calendar spreads from 5.8 million barrels to 12.2 million barrels.  (Compl. ¶ 51.)

"Manipulative Step 4" involved the liquidation of Parnon's physical WTI position.  On January 25, 2008, after leading the market to believe that supply would remain tight (because it is uncommon to sell physical WTI during the cash window), Defendants dumped all 4.6 million barrels of their physical WTI on the market.  (Compl. ¶¶ 52(a),(c).)  Parnon's unexpected sale caused the cash and futures markets to abruptly shift from backwardation to contango as the February WTI cash price dropped to 32 cents below the March futures price, a total drop of 97 cents.  (Compl. ¶ 52(d).)  As a result, the value of Parnon's short calendar spreads increased.  (Compl. ¶¶ 52-53.)  On January 28, 2008, Wildgoose acknowledged in writing that Parnon's scheme had "the desired effect" on WTI spread prices.  (Compl. ¶ 52(f).)

Parnon successfully repeated the scheme in March 2008.  (Compl. ¶¶ 55-60.)  Again, the market lurched from backwardation to contango on March 25, 2008 as a result of Parnon's selling its physical position during the cash window.  (Compl. ¶ 59(c).)  Plaintiffs allege that a market move from backwardation to contango on the last day of the cash window happened only twice between January 2006 and January 2011, both times as a result of Defendants' scheme.  (Compl. ¶ 52(e).)

Parnon attempted to execute the scheme again in April 2008 and completed the first two steps of the manipulation. (Compl. ¶ 63.) But on April 17, 2008, Parnon learned the CFTC was investigating its activities and it did not sell the entirety of its physical WTI position. (Compl. ¶ 64.) While Parnon lost over $15 million selling its physical WTI positions during the January and March 2008 cash windows, it realized profits of over $50 million as a result of its calendar spread positions. (Compl. ¶ 65.)

DISCUSSION

I. <u>Legal Standard</u>

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two pronged-approach." <u>Iqbal</u>, 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009) (internal punctuation omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" <u>Hayden v. Paterson</u>, 594 F.3d 150, 161 (2d Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 664).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678 (citation omitted). Nevertheless, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.

-8-

Fact-specific questions cannot be resolved on the pleadings.  A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (internal quotation marks omitted).

"Rather, in determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true.'" Anderson News, 680 F.3d at 185 (quoting Twombly, 550 U.S. at 555).  Even if the allegations seem doubtful, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." Twombly, 550 U.S. at 556 (internal quotation marks omitted).  Because the plausibility requirement "does not impose a probability requirement at the pleading stage, . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (internal quotation marks omitted).

II.  Monopolization

To state a claim for monopolization under section 2 of the Sherman Act, Plaintiffs must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).  In addition, Plaintiffs must also show antitrust injury in order to establish standing to assert a section 2 claim.  Antitrust injury is an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful.'" Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)); see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 122 (2d Cir. 2007).

### A. Possession of Monopoly Power

There are two ways a plaintiff can show the possession of monopoly power: (1) through direct evidence of anticompetitive effects or (2) by defining a relevant market and showing defendants' excess market share. PepsiCo, 315 F.3d at 107; see also Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000).

### 1. Direct Evidence of Monopoly Power

"The pertinent inquiry in a monopolization claim . . . is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power." PepsiCo., 315 F.3d at 108; United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). Monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition[.]" Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998).

According to Plaintiffs, one need look no further for direct evidence of the ability to control prices than the market's abrupt shift from backwardation to contango when Parnon dumped its physical WTI position. Plaintiffs contend that the power to create this anomaly, which happened only twice between January 2006 and January 2011—both times on the precise days Parnon dumped its WTI supply—is sufficient to allege the direct ability to control prices. (Compl. ¶ 52(e).) Indeed, in the CFTC Action, this Court analogized to antitrust law in finding that "Defendants' ability to change the market from backwardation to contango is . . . a 'direct

measure' of control and demonstrates ability to influence the market." <u>CFTC v. Parnon</u>, 2012
WL 1450443, at *10 (citing <u>PepsiCo.</u>, 315 F.3d at 108).

        Parnon offers extrinsic evidence and fact-based arguments to refute Plaintiffs'
allegations of market power.  First, Parnon contends that daily February NYMEX WTI futures
settlement price sheets show that the price of the February 2008 WTI futures contract did not rise
over the period in which Parnon allegedly amassed its dominant position.  While the Court can
take judicial notice of publicized commodities prices on a motion to dismiss, <u>see</u> <u>Ganino v.</u>
<u>Citizens Utils. Co.</u>, 228 F.3d 154, 166 n.8 (2d Cir. 2000), those price sheets do not render
Plaintiffs' allegations implausible.  As an initial matter, Plaintiffs allege that Parnon's dominant
physical position caused the prices of WTI calendar spreads—not the flat price of the underlying
WTI futures contracts—to rise artificially in Parnon's favor.  (Compl. ¶ 50(c).)  This is the sort
of anti-competitive behavior the antitrust laws were designed to prevent.  <u>See</u> <u>du Pont</u>, 351 U.S.
at 389 ("[A] party has monopoly power if it has . . . a power of controlling prices[.]").  And as
this Court found in response to Parnon's presentation of the same extrinsic evidence in the CFTC
Action:

> [d]espite the prices reflected in the Daily NYMEX Price Sheets, the Complaint
> describes a rare phenomenon that occurred as a result of Defendants' alleged
> conduct:  the market's abrupt shift from backwardation to contango . . . .  In an
> instant, expensive near term crude became less valuable than crude deliverable in
> later months and long spread contracts lost nearly half of their value.  These
> allegations make it at least plausible that the calendar spread prices did not reflect
> basic forces of supply and demand.

<u>CFTC v. Parnon</u>, 2012 WL 1450443, at *12.  As in the CFTC Action, this Court accepts the
allegations in the Complaint as true at this stage and does not consider whether they are probable
in light of the pricing data contained in the NYMEX settlement sheets.

-11-

Next, Parnon argues that, because the futures and physical WTI markets converge as the expiration date of a futures contract approaches, its ability to set prices must be "judged in the context of both futures and physical contracts available for purchase and sale." (Defendants' Mem. of Law in Support of Mot. to Dismiss, dated Aug. 7, 2012 ("D. Br.") at 12-13.)  As such, Parnon contends that it could not have had the ability to control prices because it did not hold a dominant position in NYMEX WTI February 2008 futures as well as in physical contracts.  To buttress its argument, Parnon offers extrinsic evidence of the "open interest" in NYMEX WTI futures contracts for the relevant period.[1]  At this stage in the proceedings, reliance on such extrinsic evidence is premature.  Ascertaining the existence of market power is "fact intense" and courts "reserve dismissal on this issue for pleadings containing only bare and conclusory allegations." CFTC v. Parnon, 2012 WL 1450443, at *10.

Here, Plaintiffs offer detailed allegations regarding Parnon's complex scheme, including its acquisition of up to 92% of the next month's deliverable WTI supply and the market's switch from backwardation to contango.  Further, Plaintiffs allege that Parnon intentionally acquired substantial positions in WTI calendar spreads that it knew would respond favorably to its activities in the physical market.  These allegations are neither bare nor conclusory. Cf. Crosswood Magazine Inc. v. Times Books, No. 96 Civ. 4550 (SJ), 1997 WL 227998, at *2 (E.D.N.Y. May 5, 1997) (dismissing complaint where plaintiffs "have pleaded no facts indicating that [defendant] has the power to fix prices").

---

[1] "Open interest" is defined as the total number of futures contracts in a delivery month or market that have been entered into and not yet offset or cancelled. (Compl. ¶ 29.)

2.  <u>Relevant Market</u>

The second way a plaintiff can show the possession of monopoly power is by defining a relevant geographic and product market and showing a defendant's excess market share within it.  PepsiCo, 315 F.3d at 107.  "The relevant market must be defined 'as all products reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."  <u>City of New York v. Grp. Health Inc.</u>, 649 F.3d 151, 155 (2d Cir. 2011) (quoting <u>Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.</u>, 386 F.3d 485, 496 (2d Cir. 2004)); see also <u>Chapman v. N.Y. State Div. for Youth</u>, 546 F.3d 230, 238 (2d Cir. 2008) (proposed relevant market that clearly does not encompass all interchangeable substitute products, even when all factual inferences are granted in plaintiff's favor, is legally insufficient) (internal citations omitted).

At the outset, this Court notes that because Plaintiffs have pleaded the possession of monopoly power through Parnon's ability to control prices, an inadequate relevant market definition is not fatal to Plaintiffs' section 2 claim.  See <u>PepsiCo.</u>, 315 F.3d at 107 ("[T]here is authority to support [the] claim that a relevant market definition is not a necessary component of a monopolization claim."); <u>du Pont</u>, 351 U.S. at 393 ("Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under [section 2].").

Further, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 199-200 (2d Cir. 2001); see also <u>Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design</u>, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery." (citing <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 482 (1992))); <u>Queen City Pizza, Inc. v.</u>

Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers").

 The relevant geographic market is "in or around Cushing, Oklahoma." (Compl. ¶ 70.) The relevant product market is January, March, and April 2008 WTI crude oil "readily available for delivery at Cushing, Oklahoma," i.e., the physical WTI market. (Compl. ¶ 70.) But, as Parnon notes, Plaintiffs allege elsewhere that the WTI derivatives (futures) market is the relevant market. (See, e.g., Compl. ¶ 73 ("Among the questions of law and fact common to the Class are . . . .[w]hether the WTI Derivatives contracts market is an appropriate Relevant Market for the Monopolization Count[.]").) Parnon argues this inconsistency fails to provide it with adequate notice of the relevant market under Rule 8.

 Plaintiffs dismiss the deviations in their relevant market definition as "scrivener's errors." (Plaintiffs' Opp'n to Mot. to Dismiss, dated Sep. 6, 2012 ("P. Br.") at 7.) A single paragraph referring erroneously to the WTI derivatives market (as opposed to the physical market) does not render the Complaint insufficient under Rule 8, especially where Plaintiffs labeled their relevant market definition earlier in the pleading. Nevertheless, Plaintiffs' inconsistency is troubling, and it seems odd that the relevant market definition does not include the WTI derivatives market, where the bulk of the artificial prices occurred. In other words, it took two markets to contango. See, e.g., Minpeco, S.A. v. Hunt, 718 F. Supp. 168, 171 (S.D.N.Y. 1989) (relevant market for section 2 claim "consisted of [silver futures contracts] together with the supply of physical silver deliverable on those expiring contracts"). But the parties have pointed to no authority indicating that a section 2 claim cannot be sustained where

monopoly power in the relevant market enables defendants to control prices in a different but closely related market.

Parnon musters additional fact-based arguments as to why Plaintiffs' relevant product and geographic market definitions are deficient. First, Parnon contends that the product market definition excludes alternate grades of crude oil that are acceptable substitutes for WTI under the terms of the NYMEX WTI futures contract. See Bayer Schering Pharma AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (dismissing section 2 claim where relevant market definition "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor"). Parnon also argues that the geographic market should be global because physical WTI contracts provide for delivery within thirty days to Cushing, Oklahoma; thus crude oil anywhere in the world could conceivably be "readily available" at Cushing by the contract's deadline.

To survive dismissal, the relevant product market definition need only "bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes" and be "plausible." Chapman, 546 F.3d at 237. There is no heightened pleading requirement in antitrust cases. Todd, 275 F.3d at 198 ("[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." (quoting George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 554 (2d Cir. 1977))); see also Anderson News, 680 F.3d at 185 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). Plaintiffs' relevant market definition is not so implausible as to warrant dismissal, especially where they plead Parnon's

-15-

ability to control prices.  At best, Parnon identifies fruitful areas for discovery, such as the degree

to which other grades of crude oil are reasonable substitutes for WTI and whether oil on the

other side of the planet is "readily available" at Cushing.  See George Haug Co. v. Rolls Royce

Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998) ("In antitrust cases in particular, the Supreme

Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery

should be granted very sparingly.") (internal citations omitted).

      3.   Duration of the Monopoly and Structural Alteration of the Market

        Parnon cites Apex Oil Co. v. DiMauro, 713 F. Supp. 587 (S.D.N.Y. 1989), and

other cases suggesting that monopoly power is not actionable unless it causes a structural

alteration of the market, or is of a certain temporal duration.  But Parnon's reliance on these

cases is misplaced.  Parnon contends that Plaintiffs' section 2 claim fails because its ability to

control prices was short-term and sporadic, lasting only up to eighteen days at a time in three

different months with long breaks in between.  See, e.g., Apex Oil, 713 F. Supp. at 600 (specific

intent for section 2 conspiracy claim was lacking where defendants sought only to put plaintiff

"in a delivery bind for no more than a few business days"); Williamsburg Wax Museum, Inc. v.

Historic Figures, Inc., 810 F.2d 243, 252 (D.C. Cir. 1987) (monopoly lasting less than twelve

months not actionable because competitor would soon enter the market); Colo. Interstate Gas Co.

v. Natural Gas Pipeline Co. of Am., 885 F.2d 683, 695 (10th Cir. 1989) ("One measure of the

degree of market power is the persistence of a firm's ability to profitably charge monopoly

prices."); C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus. Inc., 884 F.2d 209, 211 (5th

Cir. 1989) (defendant "unlikely . . . to control prices for any meaningful period, because other

competitors easily can enter the market").

While the duration of a monopoly may be "one measure" in determining whether a defendant possessed monopoly power, it is not dispositive. See Colo. Interstate Gas Co., 885 F.2d at 695. Aside from Apex Oil, the authorities cited by Parnon involve situations where the short duration of the monopoly was indicative of the purported monopolizer's inability to restrict competition or maintain market power. By contrast, the short duration of Parnon's dominant market share in physical WTI directly furthered the alleged price manipulation scheme by design.

Further, courts have recognized the potential for monopolization of month-long commodities markets in factually similar actions. See Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc., 691 F. Supp. 2d 860, 867 (N.D. Ill. 2010) (sustaining section 2 claim alleging acquisition of 88% of the physical supply of propane deliverable in specific month); Pollock v. Citrus Assocs. of N.Y. Cotton Exch., 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981) (plaintiffs pleaded monopoly of futures contracts for specific month); Minpeco, 718 F. Supp. at 171-72 (same); Peto v. Howell, 101 F.2d 353, 356 (7th Cir. 1938) ("[I]t is not to be conceived that a monopoly . . . for one day is any less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year."). Commodities markets are often organized around short time intervals. For example, only WTI deliverable in specific months could satisfy the physical contracts at issue. Therefore, a month-long monopolization could be of sufficient duration to cause anti-competitive effects. See Thompson's Gas & Elec. Serv., 691 F. Supp. 2d at 867 ("Even assuming that 'lasting structural change' and durability are necessary elements for a monopolization claim, Plaintiffs have adequately pled them" where relevant market was defined as propane market for a specific month).

-17-

The manipulative conduct in <u>Apex Oil</u> was a "squeeze." The "long" defendants agreed collectively to nominate heating oil futures contracts for early delivery, thereby extracting a premium price from the "short" plaintiff, which found itself in a delivery bind. <u>Apex Oil</u>, 713 F. Supp. at 593. Considering a full record on summary judgment, Judge Walker noted a lack of evidence that "the markets for futures and cash products would be structurally altered" by the defendants' conduct. Accordingly, he found that defendants lacked the specific intent to monopolize either the cash or futures market. <u>Apex Oil</u>, 713 F. Supp. at 600. But structural alteration of the market, like temporal duration, is just one measure that may be considered in evaluating market power. The heart of a section 2 claim remains "whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices . . . ." <u>PepsiCo.</u>, 315 F.3d at 108. The Complaint's allegations are sufficient. If temporal duration and structural alteration were rigid requirements, many commodities market manipulations would be beyond the reach of the Sherman Act. <u>Cf.</u> <u>Strobl v. N.Y. Mercantile Exch.</u>, 768 F.2d 22, 28 (2d Cir. 1985) ("[P]rice manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws."); <u>Pollock</u>, 512 F. Supp. at 717 ("In sum, the legislative history of the CFTCA indicates that Congress intended that antitrust claims be allowed against brokers and traders operating in the commodity futures markets.").

B. <u>Willful Acquisition of Monopoly Power</u>

Monopoly power alone is insufficient to sustain a section 2 violation. A plaintiff must also show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>PepsiCo.</u>, 315 F.3d at 105 (quoting <u>Grinnell Corp.</u>, 384 U.S. at 570-571); <u>Trans Sport,</u>

Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (plaintiff must prove

monopolist "willfully acquired or maintained its power . . . thereby causing unreasonable

exclusionary or anticompetitive effects") (internal quotation marks omitted); see also Verizon

Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) ("To safeguard

the incentive to innovate, the possession of monopoly power will not be found unlawful unless it

is accompanied by an element of anticompetitive conduct." (emphasis in original)).

   Parnon argues unconvincingly that the Complaint offers only conclusory

allegations regarding the willful acquisition of monopoly power. "[I]n determining whether a

complaint states a claims that is plausible, the court is required to proceed 'on the assumption

that all the [factual] allegations in the complaint are true.'" Anderson News, 680 F.3d at 185

(quoting Twombly, 550 U.S. at 555). The Complaint, taken as a whole, alleges anticompetitive

conduct. It describes in detail a willful scheme in which Defendants acquired a dominant

position in physical WTI for the purpose of manipulating the prices of WTI derivatives. (Compl.

¶¶ 46-64.) It references communications between Wildgoose and Dyer regarding the alleged

scheme, including Wildgoose's acknowledgement that the scheme had "the desired effect" on

WTI spread prices. (Compl. ¶¶ 46, 47, 49, 52, 59.) And the Complaint alleges that Parnon

acquired its dominant share of physical WTI despite having no commercial need for it, only to

sell it at an uneconomic time. (Compl. ¶ 50.) This supports an inference of anticompetitive

conduct. See, e.g., Advanced Health-Care Servs. v. Radford Cmty. Hosp., 910 F.2d 139, 148

(4th Cir. 1990) ("[S]hort term sacrifice in order to further [defendant's] exclusive, anti-

competitive objectives [shows] predation by that defendant."); Concord Boat Corp. v. Brunswick

Corp., 207 F.3d 1039, 1062 (8th Cir. 2000) ("[I]f the conduct 'has no rational business purpose

other than its adverse effects on competitors, an inference that it is exclusionary is supported.'"

(quoting Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999)).  Taking

the allegations in the Complaint as true and drawing all reasonable inferences in Plaintiffs' favor,

Plaintiffs plausibly allege Parnon's willful intent to acquire monopoly power.

    C.  Antitrust Injury

        To have standing for a section 2 claim, Plaintiffs must show antitrust injury.

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent . . . flow[ing]

from that which makes defendants' acts unlawful." Atl. Richfield Co., 495 U.S. at 334.  To

establish antitrust injury, "a plaintiff must show (1) an injury-in-fact; (2) that has been caused by

the violation; and (3) that is the type of injury contemplated by the statute." Blue Tree Hotels

Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 220 (2d Cir.

2004) (quoting Pueblo Bowl-O-Mat, 429 U.S. at 489).

        Noting again the physical/futures market dichotomy, Parnon argues that Plaintiffs

cannot establish antitrust injury because they did not trade in the physical market Parnon

allegedly monopolized.  But Parnon cites no authority for the proposition that an antitrust injury

cannot extend beyond the bounds of the monopolized market.  And all the parties acknowledge

the close relationship between the cash and futures markets to advance certain arguments on this

motion.  Plaintiffs allege losses in the WTI derivatives market, caused by artificial market

conditions that were spawned by Parnon's dominant share of the physical WTI market.  As such,

Plaintiffs' alleged loss "stems from a competition-reducing aspect or effect of the defendant's

behavior." Atl. Richfield, 495 U.S. at 344.  Plaintiffs are therefore "within the target area of the

defendants' alleged anticompetitive behavior; that is, their anticompetitive behavior was aimed at

the plaintiffs" thus supporting antitrust standing for their claims. <u>Pollock</u>, 512 F. Supp. at 719

(finding antitrust standing where Plaintiffs' alleged injuries stemmed from purchase of long

futures contracts at inflated prices, even though they had not purchased contracts directly from

defendants) (internal citations omitted).

   Further, Plaintiffs' alleged injury—losses from transacting in a market tainted by

price manipulation—is "of the type antitrust laws were intended to prevent." <u>Spectrum Sports,</u>

<u>Inc. v. McQuillan</u>, 506 U.S. 447, 458 (1993) ("The purpose of [section 2] is not to protect

businesses from the working of the market; it is to protect the public from the failure of the

market."). The antitrust standing requirement weeds out claims by jilted competitors against

firms that legitimately outperform them or choose not to partner with them. <u>See, e.g.</u>, <u>Pueblo</u>

<u>Bowl-O-Mat</u>, 429 U.S. at 488 ("[A]ntitrust laws . . . were enacted for 'the protection of

competition, not competitors[.]'") (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320

(1962)). But Plaintiffs do not seek a handout stemming from Parnon's superior performance in

the WTI markets. Rather, they allege a quintessential antitrust injury—losses stemming from

artificial prices caused by anticompetitive conduct.

 D. <u>Attempt and Conspiracy to Monopolize</u>

   A claim for attempted monopolization requires a showing of (1) anticompetitive

or exclusionary conduct; (2) specific intent to monopolize; and (3) a "dangerous probability" of

success. <u>Int'l Distrib. Ctrs. Inc. v. Walsh Trucking Co.</u>, 812 F.2d 786, 790 (2d Cir. 1987). A

claim for conspiracy to monopolize under section 2 requires a showing of "(1) proof of a

concerted action deliberately entered into with the specific intent to achieve an unlawful

monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." <u>Int'l</u>

Distrib. Ctrs., 812 F.2d at 795.  Parnon urges the Court to dismiss the attempted monopolization and conspiracy to monopolize claims because Plaintiffs fail to recite their specific elements.  But Plaintiffs' detailed allegations regarding the manipulative scheme are sufficient even though they do not include a recital of each element of these causes of action.  See Iqbal, 556 U.S. at 678 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era[.]").

As for the attempted monopolization claim, Plaintiffs allege anticompetitive conduct, including Parnon's acquisition of a dominant position in physical WTI for the purpose of manipulating WTI calendar spread prices in its favor.  (Compl. ¶ 50.)  Specific intent can be plausibly inferred from Wildgoose and Dyer's conversations regarding "the plan" and its "desired effect" on WTI calendar spreads, as well as Parnon's uneconomic decision to hold its physical WTI through the cash window.  (Compl. ¶¶ 49, 52.)  And the allegations that Parnon acquired between 84% and 92% of the deliverable supply at Cushing in the relevant months show a "dangerous probability of success."  (Compl. ¶¶ 50, 57.)

With respect to the conspiracy claim, Plaintiffs allege the existence of an agreement to carry out the manipulative scheme through Wildgoose and Dyer's communications.  (Compl. ¶¶ 46, 47, 49, 52, 59.)  Plaintiffs also allege that Parnon actually effectuated the "manipulative steps" of the scheme, thus satisfying the overt act requirement.  (Compl. ¶ 4.)  As such, Parnon's motion to dismiss Plaintiffs' attempt and conspiracy to monopolize claims is denied.

III. <u>CEA Claims</u>

A. <u>Statute of Limitations</u>

Private actions for violations of the CEA must be brought within two years after the cause of action "arises." 7 U.S.C. § 25(c). The Court and the parties now agree[2] that "[a] claim under the CEA arises . . . . when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded," at which point "the investor assumes a duty of inquiry[.]" <u>Kolbeck v. LIT Am., Inc.</u>, 923 F. Supp. 557, 564 (S.D.N.Y. 1996) (applying inquiry notice standard articulated in <u>Benfield v. Mocatta Metals Corp.</u>, 26 F.3d 19, 22 (2d Cir. 1994)).

Parnon argues that Plaintiffs were put on notice of the conduct constituting their CEA claims at the time it occurred. If the switch from backwardation to contango was sufficient to show Parnon's ability to manipulate prices, <u>see</u> <u>CFTC v. Parnon</u>, 2012 WL 1450443, at *10, Parnon argues it must also have been remarkable enough to put Plaintiffs on inquiry notice of a potential manipulation claim. Because all the actions alleged in the Complaint took place more than two years before Plaintiffs' first private action was filed on May 26, 2011, Parnon argues the Complaint is time-barred.

The statute of limitations is an affirmative defense. Dismissing claims on statute of limitations grounds at the complaint stage "is appropriate only if a complaint clearly shows the claim is out of time." <u>Harris v. City of New York</u>, 186 F.3d 243, 250 (2d Cir. 1999). Because the Complaint alleges a complex series of steps taken across different markets to

---

[2] Initially, Plaintiffs argued that a CEA claim accrues only after "a reasonably diligent plaintiff would have sufficient information about [the facts supporting the claim] to adequately plead [them] in a complaint." <u>See</u> <u>City of Pontiac Gen Emps. Ret. Sys. v. MBIA, Inc.</u>, 637 F.3d 169, 174-176 (2d Cir.

intentionally manipulate prices, there are questions of fact as to when Plaintiffs' claim arose. Plaintiffs contend that the market switch from backwardation to contango alone was not enough to put them on inquiry notice because "[m]arkets are surprised all the time." (P. Br. at 23.) And the parties dispute when or if additional information would have alerted Plaintiffs to the probability that a manipulation was afoot. Whether Plaintiffs' claims arose on the day the market shifted from backwardation to contango, the day the CFTC filed its complaint, or any day in between, the Complaint does not clearly show that Plaintiffs' claim is out of time. Rather, the fact-based arguments presented by the parties underscore that dismissal on statute of limitations grounds is not warranted at the pleading stage. See, e.g., Newman v. Warnaco Grp., Inc., 335 F.3d 187, 194-95 (2d Cir. 2003) ("[D]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the . . . conduct.") (quoting Nivram Corp. v. Harcourt Brace Jovanovich, Inc., 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).

   Even if Plaintiffs' claims are time-barred, they argue that the statute of limitations has been equitably tolled to May 24, 2011, the date the CFTC filed its complaint. Under the doctrine of fraudulent concealment, the statute of limitations is equitably tolled if a plaintiff pleads with particularity (1) wrongful concealment by the defendant; (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period; and (3) due diligence in pursuing discovery of the claim. Butala v. Agashiwala, 916 F. Supp. 314, 319 (S.D.N.Y. 1996). The first element may be satisfied by showing that a defendant took

2011) (articulating standard for accrual of securities fraud claims after Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010)). But Plaintiffs now concede Benfield is the proper standard.

"affirmative steps to prevent the discovery of the plaintiff's injury, or [that] the nature of the wrong itself may have been self-concealing." Butala, 916 F. Supp. at 319. Plaintiffs argue that Parnon's manipulation was "self-concealing" because of the confidential nature of commodities trading and the complex series of maneuvers implemented across WTI markets. But conduct cannot be "self-concealing" simply because a defendant did not disclose it to others. The fraudulent concealment doctrine may be used to toll the limitations period for non-fraud claims like Plaintiffs' only "where the plaintiff is able to establish that the defendant took affirmative steps beyond the allegedly wrongful activity itself to conceal her activity from the plaintiff." SEC v. Gabelli, 653 F.3d 49, 59-60 (2d Cir. 2011).

Plaintiffs do not plead the elements of fraudulent concealment with particularity, nor do they show how they were diligent in their discovery of a claim. They make no allegations regarding any affirmative steps Parnon took to conceal its scheme, or why any lack of diligence on their part is excusable. See Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (to invoke equitable tolling, plaintiff must plead with particularity "that his continuing ignorance was not the result of lack of diligence"). Plaintiffs also make no allegations regarding their due diligence in pursuing discovery of the claim beyond the conclusory statement that they "neither knew, nor, in the exercise of reasonable diligence, could have known of the violations . . . until approximately three and one-half years after the violations." (Compl. ¶ 84.) Accordingly, while Plaintiffs' CEA claims cannot be dismissed as time-barred at this juncture, they do not adequately plead fraudulent concealment.

-25-

B. Loss Causation

Under section 25(a) of the CEA, a person or entity that engages in price manipulation "shall be liable for actual damages resulting from" the manipulation.  Parnon argues that Plaintiffs lack standing because they fail to plead "actual injury" in accord with the principles of loss causation applicable in certain federal securities cases.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (for securities fraud claims alleging material misrepresentations, plaintiffs must plead "loss causation, i.e. a causal connection between the material misrepresentation and the loss").  Under Dura's loss causation principles, general allegations that a plaintiff traded at artificial prices or suffered a net loss would not be sufficient to show "actual injury."  See Dura Pharm., Inc., 544 U.S. at 346-47.  Accordingly, Parnon argues that Plaintiffs must allege the date and price of the specific WTI derivatives they bought and sold, and specific losses from those transactions.  (D. Br. at 26-27.)

There is no bright line rule regarding the application of loss causation principles under the CEA.  See, e.g., In re Energy Transfer Partners Natural Gas Litig., No. 4:07 Civ. 3349 (KPE), 2009 WL 2633781, at *9 (S.D. Tex. Aug. 29, 2009) ("Courts have inconsistently applied Dura outside the private securities context.").  Indeed, Parnon fails to cite a single case where a court required a CEA plaintiff to plead loss causation under Dura.  To the contrary, courts have observed that loss causation is not a statutory element of proof under the CEA.  See Kohen v. Pac. Inv. Mgmt. Co. LLC, 244 F.R.D. 469, 475 (N.D. Ill. 2007) (Dura was not controlling in analyzing "actual injury" requirement for class certification under the CEA because it was "not a securities fraud case and, thus, the elements of proof [were] different"); see also In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) (in context of CEA

class certification, "case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed").

In In re Platinum and Palladium Commodities Litigation, 828 F. Supp. 2d 588, 600-01 (S.D.N.Y. 2011), this Court concluded that Dura's loss causation principles were not applicable to a CEA claim involving a manipulative "bang the close"[3] trading strategy. Citing In re Initial Public Offering Securities Litigation, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003), this Court reasoned that manipulation claims are different from misrepresentation claims because once the manipulation ceases, the price of the derivative will gradually return to its actual value. Platinum and Palladium, 828 F. Supp. 2d at 600-01. "In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate" thus dispensing with the obligation to plead loss causation. In re Initial Public Offering Sec. Litig., 297 F. Supp. 2d at 674.

Further, a securities fraud plaintiff purchasing or selling stock before a corrective disclosure occurs cannot plausibly allege injury from the fraud. Thus, a loss causation requirement can dispose of such a securities fraud claim at the pleading stage. However, in the context of a CEA manipulation claim, there is no similar bright line indicating when losses begin or cease to accrue. And the period during which the manipulative activity occurs is not necessarily a proxy for the period when losses attributable to artificial prices occur. See, e.g., In re Initial Public Offering Sec. Litig., 297 F. Supp. 2d at 674-75 ("The spectre of [manipulative conduct] may continue to affect the stock price for some time . . . over time, however, the

---

[3] A "bang the close" strategy involves high volume trading in a security minutes before the close of trading in an effort to inflate the price of the security.

security will fall back to its true investment value."). The issue of "actual damages" thus becomes a complex factual inquiry.

Parnon argues that Platinum and Palladium is distinguishable because the "bang the close" manipulation in that case involved an "artificially high purchase price that promptly dissipated in normal trading," whereas the manipulation alleged here increased and decreased prices at different times, and the artificiality lasted for months after the alleged misconduct ended. (Defendants' Reply in Support of Mot. to Dismiss, dated Sep. 26, 2012, at 14.) But it is the inevitability of the dissipation that is critical to the analysis, not its speed. See In re Initial Public Offering Sec. Litig., 297 F. Supp. 2d at 674-75 ("[P]laintiffs' allegations of artificial inflation are sufficient . . . because it is fair to infer that the inflationary effect must inevitably diminish over time.") (emphasis added). If anything, the analysis in Platinum and Palladium and In re Initial Public Offering Securities Litigation bears directly on Plaintiffs' allegations of multiple upward and downward manipulations over a period of five months. For these reasons, the Court finds that Dura's loss causation requirement does not apply to the manipulation claims at issue here. While Plaintiffs may have a difficult time proving "actual damages," that is a fact-intensive inquiry for another day.

C. Standing to Assert CEA Claims

Finally, Parnon argues that Plaintiffs lack standing to assert their substantive CEA claims because section 22 of the CEA authorizes private actions only against "any person . . . who violates this chapter . . . . " 7 U.S.C. § 25(a)(1). According to Parnon, its actions did not violate the CEA because (1) CEA section 2(g) excludes its conduct from application of the CEA and (2) CEA sections 22 and 9(a)(2) do not apply to the manipulation of calendar spreads.

Though Parnon acknowledges that it is repeating arguments this Court rejected in the CFTC Action, see CFTC v. Parnon, 2012 WL 1450443, at *5-*8, it argues that subtle differences between the CFTC's and the private Plaintiffs' claims warrant a different result. First, Parnon argues that Plaintiffs' CEA claim, unlike the CFTC's, alleges the manipulation of physical WTI as well as WTI derivatives. But while the artificial inflation of physical WTI was part of Parnon's overall scheme, Plaintiffs appear to seek damages under the CEA only for the manipulation of WTI derivatives. (See Compl. ¶ 111; P. Br. at 33.)

Next, Parnon argues that section 22 adds a "statutory hurdle" to standing for private litigants. (D. Br. at 33.) This argument is unavailing. Section 22 permits a private right of action for the manipulation of "the price of [any contract of sale of any commodity for future delivery (or option on such contract or any commodity)] or the price of the commodity underlying such contract." 7 U.S.C. § 25(a). That is exactly what Plaintiffs allege in their Complaint. (See, e.g., Compl. ¶¶ 110-111 (Plaintiffs injured as a result of Defendants' manipulation of the prices of NYMEX WTI crude oil futures contracts).) Further, because a calendar spread is "two constituent commodities contracts," see CFTC v. Parnon, 2012 WL 1450443, at *6, Plaintiffs' allegations regarding the manipulation of calendar spreads are also actionable under section 22(a). Accordingly, this Court declines Parnon's invitation to hold differently on CEA standing this time around. Parnon's motion to dismiss Plaintiffs' CEA claims for lack of standing is denied, as is Parnon's motion to dismiss Plaintiffs' additional CEA claims for principal-agent liability (7 U.S.C. § 2(a)(1)(b)) and aiding and abetting manipulation (7 U.S.C. § 13c(a)).

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied.  The Clerk of

the Court is directed to terminate the motion pending at ECF No. 69.


Dated: December 21, 2012
       New York, New York                    SO ORDERED:



                                             _____
                                             WILLIAM H. PAULEY III
                                             U.S.D.J.

*All Counsel of Record*