**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: CRUDE OIL COMMODITY FUTURES LITIGATION | ECF CASE<br><br>Master File No.<br>11 cv 3600 (KBF) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

**MEMORANDUM IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

I.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR MANIPULATION UNDER THE COMMODITY EXCHANGE ACT ................................................................................................ 1

    A.  Defendants Did Not Have The Ability To Influence NYMEX WTI Futures Prices Or Spread Values ................................................................................ 1

        1.  Defendants Never Possessed Physical WTI Crude Oil Other Than Tank Bottoms ................................................................................................ 2

        2.  Defendants' WTI Forward Contract Positions Were Smaller Than Other Market Participants ....................................................................... 3

        3.  Defendants' WTI Forward Contract Positions Were A Small Fraction Of All Forward Contracts Traded During January And March 2008 .................................................................................................. 4

        4.  Defendants' Combined WTI Futures And Forward Contract Positions Should Be Compared To All Futures And Forwards Traded In The Relevant Months ................................................................ 6

        5.  Plaintiffs' Comparison of Defendants' WTI Forward Contracts to EnSys's "Deliverable Supply" Estimate is Misleading ............................ 7

        6.  There Was Ample Supply Of WTI For All Shorts To Meet Their Obligations ............................................................................................... 9

    B.  Plaintiffs Have Adduced No Objective Evidence That NYMEX WTI Futures Prices Or Spread Values Were Artificial ....................................... 11

        1.  Plaintiffs Offer No Evidence That WTI Futures Prices Or Spreads Were "Artificial" .................................................................................... 11

        2.  Plaintiffs Cannot Prove Artificiality By Assuming Intent ...................... 14

        3.  Price Action In The WTI Market Was Inconsistent With Plaintiffs' Theory Of Artificiality ............................................................................ 17

    C.  Defendants Did Not Cause Artificial Prices ............................................... 18

    D.  Based On Undisputed Facts, Plaintiffs Cannot Establish That Defendants Had Manipulative Intent ............................................................................. 22

        1.  Plaintiffs Cannot Establish Manipulative Intent By Misinterpreting Defendants' Communications ............................................................... 22

            a.  September 2007 Email/"money to be made" .............................. 23

            b.  January 27, 2008 Email/"inevitable puking" ............................. 24

            c.  January 28, 2008 Email/"desired effect" ..................................... 26

|  | 2. | Defendants Relied Upon The Advice of Counsel Regarding The Legality Of Their Trading | 28 |
|---|---|---|---|
|  | 3. | Defendants' Decision To Hold Out Until The Last Day For Higher Prices Appears "Uneconomic" Only In Hindsight | 30 |
|  | 4. | There Is No Evidence That Defendants Assembled Their Long Cash Forward Positions With The Intent To Be Dominant | 31 |
|  | 5. | Defendants Did Not Close Out Their Short Futures Spread Positions When Prices Allegedly Were Artificially Low | 33 |
|  | E. | Plaintiffs Cannot Succeed On Their Secondary CEA Claims | 33 |
| II. | | DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR MONOPOLIZATION UNDER THE SHERMAN ACT | 34 |
|  | A. | Defendants' Share of the Relevant Market Defined By Plaintiffs Was Zero | 34 |
|  | B. | Plaintiffs Have Not Properly Defined The Relevant Market Or Established Defendants' Dominance Of That Market | 35 |
|  | | 1. The Term "Deliverable Supply" Does Not Define An Actual Market For Antitrust Purposes | 36 |
|  | | 2. The Relevant Market Must Include Other Grades of Crude Oil Utilized by Domestic Refiners | 37 |
|  | | 3. Defendants Never Possessed A Dominant Market Share Of, Or Otherwise Controlled, the WTI Crude Oil Market | 39 |
|  | C. | Plaintiffs Have Adduced No Direct Evidence of Defendants' Control Over NYMEX Futures Prices | 40 |
|  | | 1. Defendants' Trading Activity Had No Effect On Competition | 41 |
|  | | 2. Defendants Did Not Control Prices | 42 |
|  | D. | There Is No Evidence That Defendants Willfully Obtained or Maintained Monopoly Power | 44 |
|  | E. | Plaintiffs Cannot Demonstrate That They Suffered Antitrust Injury | 46 |
|  | F. | The Record Is Devoid Of Evidentiary Support For An Attempted Monopolization Claim | 47 |
|  | G. | Defendants Are Unable To Conspire With Each Other As A Matter of Law | 48 |
| III. | | DEFENDANT ARCADIA PETROLEUM LTD IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS AGAINST IT | 49 |
| CONCLUSION | | | 50 |

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AD/SAT v. Associated Press,*
181 F.3d 216 (2d Cir. 1999)................................................................34, 38, 42

*Advanced Health-Care Services, Inc. v. Radford Community Hospital,*
910 F.2d 139 (4th Cir. 1990) ........................................................................49

*All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund,*
887 F. Supp. 2d 448 (E.D.N.Y. 2012) ......................................................42, 48

*American Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010)......................................................................................48

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................1

*Apex Oil Co. v. DiMauro,*
713 F. Supp. 587 (S.D.N.Y. 1989)................................................................43

*Bath & Body Works Brand Mgmt. v. Summit Entertainment,*
2013 WL 3479418 (S.D.N.Y. 2013)..............................................................28

*Broadway Delivery Corp. v. United Parcel Serv. of America,*
651 F.2d 122 (2d Cir. 1981)......................................................................39, 40

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)......................................................................................46

*Cargill, Inc. v. Hardin,*
452 F.2d 1154 (8th Cir. 1971), *cert. denied,* 406 U.S. 932, 92 S. Ct. 1770 (1972)......... passim

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................................1

*CFTC v. Parnon Energy Inc.,*
875 F. Supp. 2d 233 (S.D.N.Y. 2012)..........................................................1, 7

*CFTC v. Wilson,*
2014 WL 2884680 (S.D.N.Y. June 26, 2014) ..............................................11

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.,*
885 F.2d 683 (10th Cir. 1989) ..................................................................43, 48

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)......................................................................................48

*Daubert v. Merrell Dow Pharms., Inc.,*
  43 F.3d 1311 (9th Cir. 1995) ............................................................16

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
  504 U.S. 451, 112 S. Ct. 2072 (1992)................................................42

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
  711 F.3d 68 (2d Cir. 2013)................................................................46

*General Foods Corp. v. Brannan,*
  170 F.2d 220 (7th Cir. 1948) ..............................................................9

*GH Miller & Co. v. United States,*
  260 F. 2d 286 (7th Cir. 1958) ....................................................12, 18

*Great Western Food Distributors, Inc. v. Brannan,*
  201 F 2d. 476 (7th Cir. 1953) ....................................................12, 18

*Gucci v. Gucci Shops, Inc.,*
  651 F. Supp. 194 (S.D.N.Y. 1986)....................................................49

*Hottenroth v. Vill. of Slinger,*
  388 F.3d 1015 (7th Cir. 2004) ............................................................1

*In re Aluminum Warehousing Antitrust Litig.,*
  2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)...............................42, 46

*In re Commodity Exchange, Inc., Silver Futures and Options Trading Litigation,*
  2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ...............................11, 12

*In re Cox,*
  [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786, WL 106789
  (CFTC July 15, 1987). ............................................................. passim

*In re DiPlacido,*
  Comm. Fut. L. Rep. (CCH) ¶30,970, 2008 WL 4831204 (CFTC Nov. 5 2008), *aff'd,*
  *DiPlacido v. CFTC*, 364 Fed. Appx. 657 (2d Cir. 2009)........................12

*In re Hohenberg Brothers,*
  [1975-77 Transfer binder] Comm. Fut. L. Rep. (CCH) ¶10,271 (CFTC Feb. 18,
  1977). ..............................................................................................31

*In re Indiana Farm Bureau Cooperative Ass'n, Inc.,*
  [1982-84 Transfer binder] Comm. Fut. L. Rep. (CCH) ¶21,796, 1982 WL 30249
  (CFTC December 17, 1982) ...................................................... passim

*In re Reserve Fund Secur. and Deriv. Litig.,*
  2012 WL 4774834 (S.D.N.Y. 2012)..............................................28, 29

*In re Soybean Futures Litigation,*
    892 F. Supp. 1025 (N.D. Ill. 1995) ........................................................11, 17

*In re Term Commodities Cotton Futures Litig.,*
    2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014)........................................49

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,*
    812 F.2d 786 (2d Cir. 1987)...............................................................48, 49

*Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.,*
    748 F.3d 160 (4th Cir. 2014) ....................................................................43

*Morris Communications Corp. v. PGA Tour, Inc.,*
    364 F.3d 1288 (11th Cir. 2004) ................................................................45

*Pepsico, Inc. v. The Coca-Cola Co.,*
    315 F.3d 101 (2d Cir. 2002).........................................................34, 41, 44

*Rome Ambulatory Surgical Center v. Rome Memorial Hospital, Inc.,*
    349 F. Supp. 2d 389 (N.D.N.Y. 2004) .....................................................42

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993).............................................................................45, 47

*Tatum v. Legg Mason Wood Walker, Inc.,*
    83 F.3d 121 (5th Cir. 1996) ......................................................................34

*Times-Picayune v. United States,*
    345 U.S. 594 (1953).....................................................................................39

*Tops Mkts, Inc. v. Quality Mkts, Inc.,*
    142 F.3d 90 (2d Cir. 1998)..................................................................34, 40

*United States Football League v. National Football League,*
    842 F.2d 1335 (2d Cir. 1988)..........................................................40, 45, 46

*United States v. E.I. duPont de Nemours & Co.,*
    351 U.S. 377, 76 S.Ct. 994 (1956).................................................34, 37, 40

*United States v. Eastman Kodak Co.,*
    63 F.3d 95 (2d Cir. 1995) .........................................................................42

*United States v. Grinnell Corp.,*
    384 U.S. 563, 86 S.Ct. 1698 (1966)....................................................34, 37

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,*
    540 U.S. 398 (2004).....................................................................................45

*Xerox Corp. v. Media Sciences, Inc.*,
   660 F. Supp. 2d 535 (S.D.N.Y. 2009) ................................................................41

**STATUTES**

7 U.S.C. §2(a)(1)(B) ....................................................................................................33

7 U.S.C. §13 .................................................................................................................33

7 U.S.C. § 25(a)(1) .......................................................................................................49

**OTHER AUTHORITIES**

Benjamin E. Kozinn, *The Great Copper Caper: Is Market Manipulation Really A*
   *Problem In The Wake Of the Sumitomo Debacle*, 69 Fordham L. Rev. 243, 261-62
   (2000) ......................................................................................................................12

Fed. R. Civ. P. 56 .........................................................................................................50

Fed. R. Civ. P. 702 .......................................................................................................16

Johnson and Hazen, Derivatives Regulation §5.03(1) (3d ed. 2004) ............................6

NYMEX Rule 200 ...............................................................................................36, 37, 39

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is also proper when the party who bears the burden of proof "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Bare allegations or argument unsupported by specific facts cannot defeat a motion for summary judgment. *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004).

I.   **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR MANIPULATION UNDER THE COMMODITY EXCHANGE ACT**

To establish their claim for manipulation, Plaintiffs must prove that (1) Defendants possessed the ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial price; and (4) Defendants specifically intended to cause the artificial price. *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786 at 34,061,1987 WL 106789, *4 (CFTC July 15, 1987). Plaintiffs cannot establish any of these elements.

A.   **Defendants Did Not Have The Ability To Influence NYMEX WTI Futures Prices Or Spread Values**

The predicate of Plaintiffs' claims is that during January and March 2008, Defendants acquired dominant positions in "physical WTI crude oil," giving them market power and the

ability to manipulate NYMEX WTI futures prices and spread values.[1]  (Consolidated Amended Class Action Complaint ("Comp."), ¶¶4, 46, 50, 54, 57, 61)  Plaintiffs' allegations of dominance are false as a matter of undisputed fact.

### 1.    Defendants Never Possessed Physical WTI Crude Oil Other Than Tank Bottoms

During the periods at issue, Defendants never possessed physical WTI crude oil in the amounts alleged in the Complaint.  (Defendants' Rule 56.1 Statement of Material Facts ("DSF"), ¶80)  The positions alleged by Plaintiffs and their experts[2] to be "physical WTI crude oil" in fact were WTI forward contract positions.  A WTI forward contract is a derivative, just as a WTI futures contract is a derivative.  (*Id.*, ¶35)  A forward contract is a "[a] cash transaction … in which a commercial buyer and seller agree upon delivery of a specified quality and quantity of goods at a specified future date…."  (*Id.*, ¶¶33, 37)  Like a futures contract, a forward contract does not immediately result in the movement of oil and does not pass title to oil.  (*Id.*, ¶38)  Although forward contracts (like futures contracts) may lead to possession of the physical commodity, they may also be financially settled or otherwise offset so that no physical delivery occurs.  (*Id.*, ¶¶36, 44, 45, 47)  Market participants do *not* view forward contracts as the same as physical oil.  (*Id.*, ¶¶39-41)

The volume of WTI forward contracts traded is not limited by the volume of physical WTI available for delivery; hence, the volume traded for delivery in a given month is many times larger than the volume of physical barrels actually delivered.  (DSF, ¶49)  As Plaintiffs'

---

[1] Plaintiffs seek damages related to manipulation of NYMEX Light Sweet Crude Oil (WTI) futures contracts.  For ease of reference, these futures contracts are referred to as "WTI futures."  Similarly, forward contracts for light sweet crude oil such as those bought and sold by Defendants are referred to as "WTI forward contracts," regardless of whether the contract contemplated delivery of a grade deliverable under the WTI futures contract or otherwise.

[2] Plaintiffs' proposed experts include Joseph Mason, Gary Ellis, and EnSys Energy & Systems, Inc., the latter represented by Martin Tallett, Robert Luckner, and Kenneth Zito.

expert, Tallett of EnSys, conceded, a single barrel of oil "may pass 25 times from one owner to another." (*Id.*, ¶73)  In other words, the majority of forward contracts will not result in delivery of physical oil.

Given that Defendants ***never took delivery of any physical barrels*** on the forward contracts they purchased during the periods at issue, Plaintiffs' allegations regarding Defendants' "holdings of WTI crude oil" (Comp, ¶4(B)), "hoard[ing]" of "WTI crude oil supplies" (*id.*, ¶4(C)), and "dump[ing]" of "WTI physical crude oil" (*id.*, ¶4(E)) are wrong.  Mason, a purported "expert," adopts a similarly inaccurate and misleading lexicon throughout his reports and deposition testimony.  (*E.g.*, Ex. 1[3], Mason Expert Report ("Mason Report"), ¶¶38, 42, 50, 53; DSF, ¶183 (Mason claims that "[D]efendants...possessed over 6 million barrels of physical" and held "inventories" which they "released" causing a "shock to deliverable supply"))  As discussed below, the distinction between forward contracts and physical oil in inventory vitiates Plaintiffs' claims that Defendants dominated the supply of physical WTI crude oil deliverable at Cushing during February and April 2008.

> **2.  Defendants' WTI Forward Contract Positions Were Smaller Than Other Market Participants**

If WTI forward contracts are considered "physical WTI crude oil" for purposes of Plaintiffs' so-called "deliverable supply" analysis, then Defendants' alleged dominance must be measured against the total volume of WTI forward contracts traded for delivery in the same month.  Plaintiffs offer no evidence in this regard.  EnSys never considered the total volume of WTI forward contracts or the volume traded by any other market participant.  (DSF, ¶98)  Mason did nothing but rely on EnSys.  (*Id.*, ¶185)  In fact, Defendants' WTI forward contract positions represented a small percentage of the aggregate positions of other market participants whose data

---

[3] Exhibits referenced in this Memorandum correspond to exhibits to the Declaration of Elizabeth Bradshaw in Support of Defendants' Motion for Summary Judgment, dated January 30, 2015.

was produced during discovery, even when the comparison is limited to just three other traders. Exhibit 2 to the Bradshaw Declaration reflects the size of Defendants' prompt month forward contract spread positions (DSF, ¶21) on dates relevant to this dispute, and the contemporaneous positions of RE████████REDACTED████████.  (*Id.*, ¶¶82-84)  As Exhibit 2 reflects, on all January trading days but one (01/18/08), at least one of the three selected market participants held a larger position than Defendants – and even on that day Defendants' position was dwarfed by the combined positions of the other three traders.  Thus, *Defendants' WTI forward contract position in January was not dominant*.  Likewise, on every trading day during March, at least one of the three market participants highlighted held a larger cash forward WTI position than Defendants. (*Id.*)  *Defendants' WTI forward contract position in March was not dominant.*

### 3.     Defendants' WTI Forward Contract Positions Were A Small Fraction Of All Forward Contracts Traded During January And March 2008

Defendants' WTI forward contract positions were an even smaller part of the total volume of all forward contracts traded for delivery in the months at issue.  The total volume must be estimated because (unlike futures exchanges, where each transaction is recorded) there is no centralized repository reflecting all WTI forward contract transactions.[4]  (Ex. 3, Evans Expert Report ("Evans Report"), ¶31)  Plaintiffs' experts concede that they do not know the total volume of forward contracts traded in January or March 2008.  (DSF, ¶¶67-68)

The minimum volume of WTI forward contracts can be estimated based on the volume of WTI "intratank transfers" recorded at the TEPPCO Partners LP (n/k/a Enterprise) ("TEPPCO") terminal during the periods at issue.  TEPPCO owns and operates a large storage and pipeline terminal at Cushing and, pursuant to CFTC subpoena, produced records reflecting the volumes,

---

[4] Defendants' expert Matthew Evans analyzed multiple data sources that may be used to estimate the total volume of forward contracts.  In each case, the result was that Defendants' share of that volume was small.  (*See* Ex. 3, Evans Report, ¶¶31-34)

contract months, and counterparties of intratank transfers at its Cushing storage terminal during 2008.  (DSF, ¶¶69-70)  Intratank transfers are accounting entries that reflect title transfers between counterparties pursuant to purchases and sales of WTI forward contracts.  (*Id.*, ¶46)  Market participants who purchase but later sell the same volume of WTI forward contracts can effectively offset the respective transactions through the intratank transfer process.  As a result, numerous purchases and sales of the same volume of oil are documented without any physical oil moving.  Only a purchaser who wishes to take delivery will receive physical oil; the remainder of the purchases and sales are cancelled out via the many corresponding title transfers.  (*Id.*, ¶71)  TEPPCO is not the only facility handling such transfers, and not all forward contracts result in intratank transfers; therefore, the volume of intratank transfers of prompt month delivery oil handled by TEPPCO in a particular period reflects the *minimum* volume of prompt month WTI forward contracts bought and/or sold.  (*Id.*; Ex. 3, Evans Report, ¶ 34)

According to the TEPPCO data, the volume of intratank transfers of February 2008 crude oil totaled REDACTED barrels.  (DSF, ¶74)  The volume of intratank transfers of April 2008 crude oil totaled REDACTED barrels.  (*Id.*, ¶75)  Accordingly, Defendants' maximum 4,611,000 barrel WTI forward contract position for February oil, and 6,268,000 barrel WTI forward contract position for April oil (*id.*, ¶¶74-75), were just REDACTED , respectively, of the total intratank transfer volumes at TEPPCO.  Further, as reflected in Evans Exhibit 20, Defendants' largest positions were surpassed by the positions of at least REDACTED other participants in both months.  Plainly, Defendants' WTI forward positions, even at their largest, were not dominant when viewed against even this partial measure of the total volume of WTI forward contracts.

    4.    **Defendants' Combined WTI Futures And Forward Contract Positions Should Be Compared To All Futures And Forwards Traded In The Relevant Months**

Plaintiffs and their proposed experts seek to define dominance without any reference to the futures contracts traded by Defendants and other market participants.  This approach contradicts consistent testimony in this case from Defendants, non-party traders, and Plaintiffs' proposed experts that WTI futures contracts and forward contracts are considered interchangeable prior to expiry of the prompt month futures contract.  (DSF, ¶¶57-63; *see also* Ex. 3, Evans Report, ¶¶25, 63)  Given this interchangeability, any attempt to analyze Defendants' alleged market power should assess Defendants' total position – both WTI forward contracts and WTI futures contracts – against the total of those contracts for the respective periods.  Indeed, the CFTC has made clear that dominance sufficient to allow a party to influence market prices requires controlling interests in both the cash and futures markets:

> When analyzing the ability of the accused to influence market prices, we must recognize that there are two ways to satisfy futures obligations: offset in the futures market or delivery of the underlying commodity.  The accused lacks the ability to influence prices if other market participants can bypass his demands and extinguish their obligations elsewhere.

*Cox*, 1987 WL 106879, at *4; *see also In re Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-84 Transfer binder] Comm. Fut. L. Rep. (CCH) ¶21,796, 1982 WL 30249, *10 (CFTC December 17, 1982); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1164-65 (8th Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S. Ct. 1770 (1972).  As former CFTC Chairman Philip McBride Johnson wrote, "[A] successful manipulation of the futures market requires control of both means of contract satisfaction: (1) delivery of the cash commodity, and (2) offset of positions in the futures markets."  Johnson and Hazen, Derivatives Regulation §5.03(1) (3d ed. 2004).

As discussed above, Defendants did not take delivery of physical crude at any time relevant here, and their WTI forward contract positions were a small portion of all WTI forward

contracts traded.  Defendants' WTI futures positions in the relevant months were even tinier relative to total volumes traded.  Exhibit 4 to the Bradshaw Declaration compares Defendants' WTI futures positions on both NYMEX and the Intercontinental Exchange ("ICE") to NYMEX and ICE combined open interest[5] during January and March 2008.  (DSF, ¶¶64-66)  As Exhibit 4 reflects, Defendants' combined NYMEX and ICE positions never rose to more than 8.02% of the open interests of the relevant contracts in January, and 8.76% in March.  Thus, Defendants did not dominate any part of the WTI market – physical, futures, or forward contracts – at any time.

### 5.    Plaintiffs' Comparison of Defendants' WTI Forward Contracts to EnSys's "Deliverable Supply" Estimate is Misleading

Plaintiffs' assertions of dominance are based on a meaningless and misleading comparison between Defendants' forward contract positions and an estimate of actual, physical barrels of oil that Plaintiffs call "deliverable supply."  (DSF, ¶92)  Deliverable supply of a commodity is defined as: "supply that is readily available for delivery at a specified time, either because it is stored locally or because it is located within a deliverable distance from the market. *See Cargill*, 452 F.2d at 1165; *Parnon*, 875 F. Supp. 2d at 245.  EnSys oversteps its qualifications by interpreting case law to define the meaning and components of "deliverable supply."  (DSF, ¶90)  Defendants dispute EnSys' qualification for that purpose, its definitions, and its estimates of deliverable supply based on those definitions.[6]  Regardless of whether EnSys's calculation is accurate, however, it is used for only one purpose: as the denominator for Plaintiffs' dominance calculation.  The numerator is Defendants' WTI forward contract positions.  (Ex. 5, EnSys Expert Report ("EnSys Report") at 11-17, 143-146)

---

[5] Open interest refers to the number of open futures contracts on any given day.  (DSF, ¶18)

[6] Apart from the manner in which it is used by Mason, EnSys's calculation of deliverable supply is irrelevant because the concept of deliverable supply is meaningful only in the context of a manipulation via a squeeze or corner.  *E.g., Cargill*, 452 F.2d 1154; *Indiana Farm Bureau*, 1982 WL 30249, at *9-10.

This proposed comparison of forward contracts to physical is grounded on a false predicate; namely, that Defendants' alleged dominance over physical WTI can be proven by comparing their' forward contract positions to EnSys's estimates of physical barrels that were actually delivered.  As EnSys head Martin Tallett ***admitted, however, comparing Defendants' forward contract positions to the physical molecules of oil constituting deliverable supply is like comparing "apples to pears."*** (DSF, ¶93)  Indeed, the methodology EnSys used to measure "actual" deliverable supply for February and April 2008 highlights the "apples to pears" nature of Plaintiffs' volume comparisons.  (*See* DSF, ¶91)  EnSys measured inventory at Cushing at the beginning of the delivery month and then added inflows to Cushing during the delivery month. (Ex. 5, EnSys Report at 14, 16)  It is undisputed that Defendants had no inventory in storage at Cushing at the beginning of either February or March 2008 (other than tank bottoms[7]) and did not take delivery of any physical WTI at Cushing during those months.  (DSF, ¶80) Accordingly, Defendants' position represented ***zero*** percent of the estimated volume of "actual" deliverable supply calculated by EnSys for the relevant months.[8]

While the EnSys Report repeatedly cites Defendants' supposed percentage shares of deliverable supply (Ex. 5, EnSys Report at 11-17, 60, 86, 114-115, 143-146), the individual EnSys experts were quick to distance themselves from this calculation during their depositions. Tallett and Luckner testified that EnSys is not offering any opinion regarding Defendants' share

---

[7] The only physical oil to which Defendants held title during the period January-May 2008 was 400,000 barrels of tank bottoms (345,000 barrels of sweet and 55,000 of sour) pursuant to a lease of storage tanks at Cushing.  (DSF, ¶80)  Because EnSys has excluded tank bottoms from their calculation of deliverable supply (DSF, ¶¶81, 97), the crude has no impact on the analysis of alleged dominance in this matter.

[8] Plaintiffs' experts cannot even agree when Defendants supposedly achieved a dominant position.  EnSys asserts that Defendants' positions were large enough only beginning on January 16 and March 14.  (DSF, ¶100)  Mason, in contrast, claims manipulative impact beginning on January 4 and March 3.  (Ex. 1, Mason Report, ¶2)  Because even Plaintiffs' experts cannot agree that Defendants were dominant prior to January 16 and March 14, Plaintiffs should be prohibited from seeking damages for artificially high prices on any prior dates.

of deliverable supply or their ability to influence WTI prices.  (DSF, ¶99)  In short, Plaintiffs'

purported market share calculation is meaningless and misleading.

### 6.   There Was Ample Supply Of WTI For All Shorts To Meet Their Obligations

Regardless of its flawed findings, EnSys itself found no shortage of deliverable supply to

meet the needs of the market.  In prior cases addressing a defendant's ability to manipulate prices

via market power, courts have evaluated whether the deliverable supply of the underlying

commodity was adequate to allow shorts to fulfill their contractual obligations without having to

transact with the accused manipulator.  As the *Cargill* court explained:

> The next essential element of the Government's case is to establish that
> there were not adequate supplies of wheat other than those controlled by
> Cargill from which the shorts could fulfill their delivery requirements on the
> future.  Obviously, if there were adequate supplies of deliverable grade
> wheat available to the shorts to deliver to the longs on the future, Cargill
> would not be able to exact artificial prices in settlement of its contracts, for
> rather than paying those prices, shorts would instead procure the wheat and
> deliver it.

*Cargill*, 452 F.2d at 1164-65.  Where deliverable supply was adequate, courts have found no

ability to manipulate prices.  *See*, *e.g.*, *Cox*, 1987 WL 106879, at *4-8; *Indiana Farm Bureau*,

1982 WL 30249, at *12; *General Foods Corp. v. Brannan*, 170 F.2d 220, 223 (7th Cir. 1948).

Plaintiffs' experts concede that the purpose of assessing the deliverable supply of WTI is to

determine whether there are sufficient barrels available for delivery to satisfy short futures

contracts.  (DSF, ¶107)  In other words, the relevant demand which the deliverable supply must

be adequate to meet is the volume of short futures contracts satisfied by *delivery of the*

*underlying commodity* rather than by offset in the futures market.

Here, there is no evidence that the deliverable supply of WTI was inadequate to meet the

demand of short futures holders.  EnSys performed no analysis of short futures demand, and

never determined whether, or how many, February or April 2008 WTI futures contracts were

taken to delivery.  (DSF, ¶108)  Exhibit 6 to the Bradshaw Declaration reflects that for the

delivery month of February 2008, 238 contracts (238,000 barrels) remained open as of the close

of trading on January 23; for the delivery month of April, 7 contracts (7,000 barrels) remained

open as of the close of trading on March 20.  (DSF, ¶¶111-113)  These *de minimus* volumes are

the maximum number of futures that may have been taken to delivery in these months.

Although EnSys did not specifically "undertake an analysis of the market in terms of

tightness" (*id.*, ¶¶109, 114), it did observe market conditions indicating that supply was adequate

to meet demand:

- US Domestic sweet crude produced on the Gulf Coast was not drawn inland on pipelines to Cushing during the periods at issue.  Luckner testified, "[T]here was essentially no LLS during the first half of [2008] that flowed to Cushing."  (DSF, ¶114)

- Foreign sweet crude sitting uncommitted on vessels off the Gulf Coast was not drawn to Cushing on available pipeline space during the periods at issue.  Tallett testified that there was not enough demand to dictate a price to make it attractive: "Fundamentally … the pricing economics did not justify the movement."  (*Id.*)

- EnSys did not see evidence that any refinery was unable to obtain the WTI it wanted during the months at issue.  (*Id.*)

- Luckner testified that during the relevant months "the actual price that existed represented a balance of supply and demand."  (*Id.*)

EnSys's observations were echoed by other market participants.  (DSF, ¶115)  Mason evaluated

neither the demand for February 2008 crude oil nor the supply/demand balance for February

2008 crude oil.  (DSF, ¶¶186-187)  He testified, however, that he was not aware of any failures

to deliver on February 2008 or April 2008 WTI futures contracts.  (*Id.*)

The absence of any evidence that the deliverable supply of WTI (however calculated)

was inadequate to meet demand during the delivery months at issue further demonstrates that

Defendants did not have market power or the ability to dominate and control WTI futures prices.

Accordingly, Defendants are entitled to a judgment that they did not have the ability to manipulate WTI futures prices in the manner alleged in Plaintiffs' Complaint.

**B.     Plaintiffs Have Adduced No Objective Evidence That NYMEX WTI Futures Prices Or Spread Values Were Artificial**

Proof of artificiality is a "crucial element" of a manipulation claim, without which Defendants cannot be found liable for manipulation regardless of their ability to influence prices. *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1053 (N.D. Ill. 1995). "If Plaintiffs cannot establish that the prices were artificial, then Defendants' motion for summary judgment must be granted ...." *Id.* An artificial price is one that does not reflect basic forces of supply and demand. *CFTC v. Wilson*, 2014 WL 2884680, at *13 (S.D.N.Y. June 26, 2014); *Cargill*, 452 F.2d at 1163. Whether a price is artificial is based upon objective data including "the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *In re Commodity Exchange, Inc., Silver Futures and Options Trading Litigation*, 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012). s*ee also Cox*, 1987 WL 106879, at *8 ("Price artificiality traditionally has been studied by relating the price in question to other relevant economic data. Proof of artificiality generally has focused on significant deviations from normal historical futures market patterns and from related contemporaneous markets.")

**1.     Plaintiffs Offer No Evidence That WTI Futures Prices Or Spreads Were "Artificial"**

Plaintiffs offer no *facts* to support their claim that futures prices and spreads were artificial during January and March 2008. Instead, Mason assumes that all allegations of the Complaint are true, converts correlation coefficients from his regression model into impact on price, and then labels the price artificial. Plaintiffs' "evidence" is neither objective nor substantive, and is insufficient to establish artificiality.

In each of the three cases in which market power manipulation charges under the Commodity Exchange Act have been sustained the courts have evaluated the plaintiffs' comparisons of allegedly manipulated futures prices to objective historical and contemporaneous data. *See Great Western Food Distributors, Inc. v. Brannan*, 201 F 2d. 476, 482-83 (7th Cir. 1953); *GH Miller & Co. v. United States*, 260 F. 2d 286, 289 (7th Cir. 1958), and *Cargill,* 452 F. 2d at 1167-69.[9]  Thus, courts have looked to analyses based on: (a) price movements on the suspect days compared to movements in other periods, (b) spread value changes on the suspect days compared to changes in other periods, (c) the relationship between different historical spreads, and (d) changes in futures prices compared to changes in cash market prices.[10]  *Id.* Courts have also found it significant if "the futures price rose to the [limit price allowed by the Exchange for] each day…," *G.H. Miller*, 260 F.2d at 289, and if shorts in the market were forced to deal directly with the alleged manipulator, who was in a position to charge an excessive price. *Great Western*, 201 F.2d at 481-82; *G.H. Miller*, 260 F.2d at 289; *Cargill*, 452 F.2d at 1171.[11]

Plaintiffs here make no effort to evaluate either historical or contemporaneous pricing data to ascertain whether WTI futures prices were artificial.  EnSys disclaims any attempt to determine the existence of artificiality.  (DSF, ¶101)  Mason, though unqualified to do so, concludes that WTI futures prices were artificial on each day from January 4-25 and March 3-25 *because he assumes Defendants were engaged in manipulation*.  *See* Section I.B.2 *infra*.  Yet

---

[9] Courts have considered different analyses in cases alleging other forms of manipulation, *e.g.* trade practice abuse like "banging the close."  *In re DiPlacido*,  Comm. Fut. L. Rep. (CCH) ¶30,970, 2008 WL 4831204 (CFTC Nov. 5, 2008), *aff'd, DiPlacido v. CFTC*, 364 Fed. Appx. 657 (2d Cir. 2009).

[10] *See* Benjamin E. Kozinn, *The Great Copper Caper: Is Market Manipulation Really A Problem In The Wake Of the Sumitomo Debacle*, 69 Fordham L. Rev. 243, 261-62 (2000).

[11] *Compare* to *Indiana Farm Bureau*, 1982 WL 30249, at *10-11 (affirming finding that prices were not artificial where factors influencing price were legitimate), and *Cox*, 1987 WL 106879, at*12 (reversing finding of artificiality because price fluctuations were within daily limits).  *See also In re Commodity Exchange, Inc., Silver Futures and Options Trading Litigation*, 2012 WL 6700236, at *12-16 (S.D.N.Y. 2012) (finding proposed proof of artificiality insufficient even at motion to dismiss stage).

none of Mason's five reports compares the WTI futures prices and spreads at issue to (a) WTI futures prices or spreads during the same months in 2004-2007, (b) WTI forward contract prices or spreads, or (c) prices of other grades of crude oil on the same dates.  (DSF, ¶188)  In contrast, Defendants' expert Matthew Evans examined this issue in detail.  (*See* Ex. 3, Evans Report at 8, 57-79; Ex. 9, Evans Response at 2-23 (demonstrating that the WTI futures prices and spreads at issue were all within typical ranges))

Plaintiffs repeatedly argue that the move from backwardation to contango (DSF, ¶20) in the February/March and April/May cash-to-futures spreads on January 25 and March 25 is objective evidence of artificiality.  (Comp. ¶¶52(d), 52(e), 59(c))  But their characterization of this move as significant is disingenuous for several reasons.  First, in the roughly 5-year period highlighted by Plaintiffs, the market was in a state of contango almost 80% of the time (all of 2006, the first half of 2007, and mid-2008 through 2011).  (Ex. 3, Evans Report, ¶157; DSF, ¶143)  Only in the period from mid-2007 through mid-2008 was it even possible to flip from backwardation to contango.

Second, the spread moving from backwardation to contango on its own is unremarkable. This was acknowledged by plaintiff Galan in his deposition:

> Q.    Which of those two changes, the 40-cent change or the 20-cent change from backwardated 10 cents to contango of minus 10 or the move from a dollar backwardated to 30-cent backwardated gives you a better idea of where the market is going?
>
> A.    It doesn't.  It tells me that it is reversing direction.  That is all it tells me.
>
> Q.    That would be true if you are going from backwardation to contango or you are going from a dollar to 30 cents?
>
> A.    Correct.
>
> Q.    It is the same amount of information, correct?
>
> A.    Basically.

13

(DSF, ¶145)  The testimony of a non-party trader is consistent:  "Q. If it's the last day of the cash period, does the fact that it moved from plus 5 cents to minus 5 cents give you any information? … A. Nothing specific. It's … sort of meaningless. Plus 5, minus 5, kind of like balanced, zero, not a big move."  (*Id.*, ¶144)  In other words, a move from backwardation to contango is no different from a move of similar scale within a backwardated market.

Third, Plaintiffs' proposed expert Ellis testified that when a market participant is "puking" a position, as Defendants are alleged to have done on January 25 and March 25, it is the buyers who are dictating the price.  (DSF, ¶159)  Accordingly, moves from backwardation to contango as occurred on January 25 and March 25 are driven by the pricing power commanded by buyers of WTI forward contracts – not by sellers like Defendants.

Fourth, the prompt futures contract expires three business days prior to the 25th of the month (in this case, January 22 for the February WTI futures contract and March 19 for the April contract) assuming the 25th is a business day.  (DSF, ¶14)  Under no circumstances, therefore, could the move from backwardation to contango three days after the prompt month futures expiry have caused that expired futures contract to be artificially high as Plaintiffs allege.  For all of these reasons, Mason's "analysis" of the move from backwardation to contango is uninformative and irrelevant.

## 2.    Plaintiffs Cannot Prove Artificiality By Assuming Intent

Unable to marshal objective facts and data, Plaintiffs offer the outputs of a regression model designed by Mason.  The foundation of Mason's model, however, is his assumption that all of the allegations of the Complaint, including Defendants' alleged intent to manipulate, are true.  (DSF, ¶184)  Under that premise, Mason's model treats Defendants – and only Defendants – as manipulators in order to "prove" that Defendants are manipulators.  The foundation of the model is designed to guarantee its desired outcome.  As a result, Mason's analytical process is

14

flawed and unreliable.  By assuming manipulative intent Mason concludes that each of

Defendants' trades was "artificial."  (Ex. 7, Mason Rebuttal Report ("Mason Rebuttal"), ¶22)

Since each of Defendants' trades was "artificial," Mason concludes that any price movement

correlated with Defendants' trading necessarily "resulted from" such artificial trades and

therefore was "artificial."  (*Id.* at 19; DSF, ¶194)  In other words, Mason does not prove

artificiality, he assumes it.[12]  This exercise in circular reasoning cannot substitute for proof.

  Mason's flawed foundation is exposed throughout his analysis.  For example, his model

isolated Defendants' daily net changes in WTI forward contract positions for purposes of

ascertaining whether there was a correlation between Defendants' purchases and increases in the

WTI spread value.  (Ex. 1, Mason Report, ¶¶68-69)  Mason identified other market participants,

some of whom routinely had larger positions and engaged in bigger transactions than

Defendants, but he *aggregated* the trading of all but one of those traders as a control variable.

(*See id.*, ¶¶71-73; DSF, ¶190)  Mason did not test whether the trading activities of those other

market participants individually were associated with price impacts similar to or even more

significant than impacts he attributed to Defendants.  (DSF, ¶189)  For example, if Mason's

model demonstrated a correlation between Defendants' trading and a change in the WTI futures

spread of $0.30, Mason labeled the totality of that spread change "artificial" merely because

Defendants have been accused of manipulation.  He ignored any portion of the price change that

might be attributable to other traders merely because the latter were not accused of manipulation.

Mason testified, "I know of no charges against ▮▮▮.  So I have no reason to test…whether ▮▮▮▮

trades were manipulative."  (*Id.*)

---

[12] Just one of the perverse outcomes is that Mason identifies "artificiality" from Defendants' very first
trade on January 4, 2008.  The trade involved a forward contract for only 116,000 barrels of WTI and
allegedly caused 7 tenths of one cent ($.007) of artificiality.  (The settlement price of the February futures
contract on that day, in contrast, was $95.09. (DSF, ¶¶28, 139))

The fallacy of Mason's model is brought into stark relief when other market participants' trading activity is input to his model in the same ways as Defendants' trades.  For example, REDACTED positions and trading activities were frequently larger than Defendants'.  (DSF, ¶83)  When REDACTED data is entered into Mason's model in the same way as Defendants', the total estimated "impact" on futures and options allegedly caused by Defendants' "artificial" trades is more than halved.  (*Compare* Ex. 1, Mason Report, Appendix G at 21-22 (showing total estimated impact on futures and options of approximately $1.052 billion), with Appendix H at 21-22, (showing total estimated impact on futures and options of approximately $511 million))  Although Mason failed to input the data for other large market participants in the same way as Defendants, he acknowledged during his deposition that doing so could reduce the artificiality he attributes to Defendants.  (DSF, ¶191)

Thus, in Mason's "expert" opinion, all a plaintiff has to do is allege an intent to manipulate and then establish a temporal correlation between a defendant's trading and a change in price.  In doing so, the elements of ability to influence price, existence of an artificial price, and causation are all subsumed in the single assumption – not proof – of intent.  Mason's rationale is not "the product of reliable principles and methods."  Fed. R. Civ. P. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995).

Proof of artificiality requires more than an assumption of intent:

> Price artificiality is an essential ingredient of a completed manipulation…. ***As the most objective of the three ingredients of a manipulation*** and the one wherein is found the damage, artificiality is the logical starting point for the analysis of any specific case.  ***The test for artificiality should be workable, direct, and conceptually distinct from the questions of intent or causality that will require evaluation at a later stage of each case.*** … A test subject to documentation and evidence is required if the concept of price artificiality is to have judicial meaning.

16

*Indiana Farm Bureau*, 1982 WL 30249m at *25 -26 (Chairman Stone, concurring) (emphasis added); *see also id*. at, *15 ("This issue [of artificiality] does not go to the culpability of any person, but merely relates the examined price to other relevant economic data.") (Chairman Johnson, concurring).  The court in *In re Soybean Futures Litigation*, rejected a similar approach, explaining: "***[T]he court is unwilling to find as a matter of law that misconduct alone is sufficient proof of price artificiality…. Plaintiffs have cited no case in which artificiality and conduct have been collapsed into a single element***, as Plaintiffs (and [their expert]) are attempting to do."  892 F. Supp. at 1057-58.

### 3.    Price Action In The WTI Market Was Inconsistent With Plaintiffs' Theory Of Artificiality

Plaintiffs allege in the Complaint that Defendants caused NYMEX crude oil prices to increase artificially across January 8-22 and March 4-19, and then to decrease artificially across January 23-24 and March 20-24 (not January 25 or March 25).[13]  (Comp. ¶¶ 96, 105 (*but see* footnote 7, *supra*))  As reflected in Exhibit 8 to the Bradshaw Declaration, however, outright NYMEX WTI futures prices, whether the prompt February contract or deferred contracts such as March and April, fell overall across the relevant dates in January.[14]  (DSF, ¶¶139-142)  From settlement on January 7 through settlement on January 22, the outright price of the February futures contract *fell* by $5.24 – $0.72 on expiration day alone.  The March and April futures contracts fell $5.69 and $5.77, respectively, over the same period.  (*Id*.) The price action of the outright April futures contract over the period March 3-19 is informative in a different way.

---

[13] In contrast to Mason's approach, Defendants' expert Matthew Evans compared price moves of both the prompt and deferred WTI futures spreads across multiple analyses.  These analyses demonstrate that fluctuations in WTI futures spread values during the months at issue were unremarkable when compared to objective data.  (Ex. 3, Evans Report, 119-179, Exs. 42-60).  Unable to refute these simple, obvious, and compelling facts, Plaintiffs had to resort to a complex regression model.

[14] "Outright" or "flat" price refers to the price of a single futures contract (*e.g.*, February at $99), rather than a spread which is valued at the difference between two contracts.  (DSF, ¶26)

Over that period the April contract first rose by $7.88, and then *fell* by $5.85, including a $4.94 decline on expiration day[15] – all while Defendants were supposedly manipulating the price upward.  (*Id.*)  The May and June futures contracts moved in similar fashion.  (*Id.*)  These price moves are inconsistent with previous CEA market power manipulation cases.  *See Great Western*, 201 F.2d 476; *G.H. Miller*, 260 F.2d 286; and *Cargill*, 452 F.2d 1154.

For all of these reasons, Plaintiffs cannot establish that WTI futures prices or spread values were artificial during 2008 and Defendants are entitled to summary judgment.

### C.      Defendants Did Not Cause Artificial Prices

Plaintiffs cannot establish that Defendants caused artificial WTI prices or spreads during January or March 2008 for the reasons discussed above; namely, prices were not artificial and Defendants did not have the dominant position required to cause artificiality under Plaintiffs' theory.  In addition, there is no evidence establishing a factual connection between Defendants' actions and allegedly artificial WTI futures prices or spreads.  The seminal cases affirming findings of manipulation via market power, as Plaintiffs have alleged here, have tied specific actions by the defendants to a rise in prices, most often because the defendants themselves directly charged excessive prices to counterparties who had no other recourse but to trade with the alleged manipulator.  *See, e.g., Great Western*, 201 F.2d 476; *G.H. Miller*, 260 F.2d 286; *Cargill,* 452 F.2d 1154.  Here, in contrast, no evidence exists: 1) that prior to, or after, NYMEX expiration, Defendants charged prices for WTI that deviated from the prevailing market price; 2) that Defendants controlled either WTI futures or WTI forward contracts needed by shorts in the futures market to meet their contractual obligations; or 3) that any short was forced to deal

---

[15] Changes in WTI futures prices were all well within the Exchange's $10 Maximum Price Limitation. (DSF, ¶17)  Sometimes referred to as "limit up" or "limit down," the Maximum Price Limitation, if bid or offered in any of the first three delivery months, causes a trading halt of 5 minutes.  (*Id.*)

with Defendants in order to obtain WTI to meet its futures contract obligations.  There is
evidence to establish that Defendants were a proximate cause of the allegedly artificial prices.

Plaintiffs allege that Defendants "falsely signaled to market participants that WTI crude
oil supplies were rapidly being committed to commercial needs and that the available WTI crude
oil supplies were declining rapidly to very low levels."  (Comp. ¶4C)  Seventeen non-party
traders and corporate representatives were deposed in this case, most of whom were aware of
Defendants' large purchases in 2008.  (DSF, ¶¶179-180)  Not one witness testified that he or she
observed Defendants' purchases and read them as signals that demand for WTI had increased
and deliverable supply might be inadequate.  Nor did any witness testify that he or she changed a
trading strategy or paid more for WTI contracts out of a concern that the market was tightening.
In fact, witness testimony contradicts Plaintiffs' theory.  For example, one non-party trader
testified that his company did not change its approach to trading WTI based on its observations
of Defendants' purchases, but rather relied on its own independent assessment of market
fundamentals.  (DSF, ¶181)  Even Mason admitted that he had not seen any testimony suggesting
that any market participant changed its activity as a consequence of Defendants' trading of
February 2008 WTI forward contracts.  (DSF, ¶192)

Moreover, Matthew Evans examined the evidence regarding intraday prices for bids, asks
and reported trades on January 25 to compare the timing of Defendants' sales of cash forward
"rolls"[16] to movements in the spread over the course of that day.  (Ex. 3, Evans Report at ¶¶160-
167)  The undisputed intraday pricing evidence establishes that the majority of the drop in the
March/April spread on January 25 (from $0.42 to $0.24) occurred *before* Defendants rolled any
significant portion of their February/March forward contract position.  (*Id.*)  This objective data

---

[16] "Roll" is a term commonly used to describe a WTI spread in forward contracts.  (DSF, ¶50)

contradicts Plaintiffs' unsupported theory that Defendants' "dumping" of their position caused

the decrease on the prompt futures spread on January 25.

Because Plaintiffs cannot support their theory of manipulation with factual evidence, they

rely instead on Mason's regression analysis – which even he concedes is incapable on its own of

establishing causation.  All Mason's model can do is show a correlation.  As Evans explained:

> Mason's model attempts to attribute WTI spread price changes to various correlated variables, but it does not show causation. …[T]he daily change in Defendants' positions is simply lined up with a daily spread price change. The model does not determine whether there is a causal relationship, and if so, which variable causes which to move (i.e., are Defendants' trades causing changes in market prices, or are changes in market prices causing Defendants to trade?).

(Ex. 8, Evans Response Report ("Evans Response"), ¶8)  ***Mason does not disagree***: "[T]he

statistical model that I present … would not in and of itself prove causation.  No statistical model

can do that."  (DSF, ¶193)  Yet Mason offers nothing to prove causation other than his model.

(*Id.*, ¶195)

Mason claims he can offer an opinion on causation at trial by relying on a combination of

statistical evidence derived from his model and an assumption that Defendants traded with

manipulative intent.  (Ex. 7, Mason Rebuttal, ¶¶ 21-23, 36)  But Mason concedes, "[F]or

purposes of my work, I need to assume that the allegations in the complaint are true… If they

turn out not to be true, then, my model could merely show correlation…."  (DSF, ¶193)  As with

Mason's opinion that prices were artificial, his opinion that Defendants caused those artificial

prices is meaningless without his unquestioning acceptance of Plaintiffs' allegations.

Mason's analysis also fails to consider and rule out other potential causes of the price

movements at issue.  In *Cox*, the Commission observed that "there can be multiple causes of an

artificial price."  *Cox*, WL 106879, at *12.  Accordingly, "it was not appropriate for the ALJ to

sustain the charge of completed price manipulation without first sorting out the multiple causes,"

20

and "[i]f the multiple causes cannot be sorted out, or if the respondents are not one of the proximate causes, then the charge of manipulation cannot be sustained." *Id.* at 34,068.

Here, one obvious potential cause of the alleged price movements is the contemporaneous trading of other market participants.  With one exception, however, Mason never analyzed whether trading by others in the market might have caused the impacts he attributes to Defendants.  The sole exception was Mason's modeling of █████ forward contract activity.  When Mason did isolate █████ trading and "allow it to enter the specification in the same manner as [Defendants]" (Ex. 1, Mason Report at 37, n.116), the alleged impact attributable to Defendants decreased by more than half.  *See* discussion *supra* at 16.  As Exhibit 2 to the Bradshaw Declaration demonstrates, the cash forward positions and activity of other market participants often dwarfed Defendants' positions and activity.

Mason purports to establish that Defendants' sale of WTI rolls on January 25 and March 25 caused the March/April and May/June WTI futures spreads to weaken, *i.e.* decrease.  As Ellis confirmed, however, the buyers of those rolls, not Defendants, were driving the price at which they sold.  (DSF, ¶159)  For example, between January 18 and 23, ████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████ activity caused any of the changes in value of the February/March forward contract spread, the March/April futures spread, or any other price.  Mason's failure to address these other potential causes, and to prove that Defendants' trades were a proximate cause of artificiality despite these other influences, is fatal under *Cox.*

For all of these reasons, Plaintiffs cannot establish that Defendants caused artificial WTI futures prices or spread values during 2008 and Defendants are entitled to summary judgment.

**D.    Based On Undisputed Facts, Plaintiffs Cannot Establish That Defendants Had Manipulative Intent**

There is no credible evidence in this case that Defendants intended to dominate and control or otherwise manipulate the WTI market in order to cause prices/spreads to rise and then fall to artificial levels.  As the Commission stated in *Indiana Farm Bureau*, "It is the intent of the parties which separates otherwise lawful business conduct from unlawful manipulative activity. This being so, a clear line between lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation."  1982 WL 30249, at *6 (finding insufficient evidence of intent).  Accordingly, "[i]n order to prove the intent element of a manipulation or attempted manipulation of a futures contract price…it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity."  *Id.* at *7.

**1.    Plaintiffs Cannot Establish Manipulative Intent By Misinterpreting Defendants' Communications**

Plaintiffs seek to prove intent by misinterpreting select email communications and ignoring all contrary evidence establishing the benign intentions behind those documents.  When Defendants' communications are read in full and in context, it is clear that they carry no suggestion of an intent to manipulate WTI prices.

### a.   September 2007 Email/"money to be made"

On September 26, 2007, more than three months before the period at issue in this case, before Defendants bought a single WTI forward contract, and before Wildgoose began consulting for the defendant companies, Dyer wrote a daily recap to an internal distribution list:

> Combo of Iranian worries, cushing draws, fear of fts being delivered receding and oct/nov roofing results in nov/dec going ballistic.  The front fly at historically very high levels, ti/brent widened nicely…the trade has missed this move up and won't go long here…hence all abt trying to find bbls to get into cushing…if u can turn the cushing balance into a surplus there is a shitload of money to be made shorting nov/dec…Hence please advise of any prompt cheap sweet that appears.

(DSF, ¶147)  Grasping on the language "if u can turn the cushing balance into a surplus there is a shitload of money to be made shorting nov/dec," Plaintiffs and their experts repeatedly mischaracterize this email by claiming that it "outlined" Defendants' manipulative plan for their trading during January and March 2008.  (*See* Ex. 1, Mason Report, ¶¶36, 46, 55; Ex. 10, Mason Response Report ("Mason Response"), ¶3); Ex. 10, Mason Response Report ("Mason Response"))  Mason never actually saw Dyer's email until confronted with it during his Deposition, making clear that he is merely parroting Plaintiffs' own characterization of the document.  (DSF, ¶148)  When asked about the email, Mason testified he was "not sure" what Dyer meant and deferred to Dyer's own deposition testimony to explain the document.  (*Id.*)

Defendants agree that the best person to explain the meaning of the email is Dyer, not Mason or any other person.  Dyer's testimony regarding the email has been clear and undisputed.  The sentence on which Plaintiffs found their entire case simply means:

> If November/December is backwardated, which I think it is in this context, if a significant volume of oil moves up the Seaway pipeline, then there is potentially incremental oil, extra oil, that will need to be stored and therefore you might expect November/December to go to storage economics.

23

(DSF, ¶¶149, 151)  Thus, Dyer was talking about the possibility of *physical* barrels of crude

being moved to Cushing to create an actual surplus.  When asked to explain the meaning of

"Hence please advise of any prompt cheap sweet that appears," Dyer was again clear:

> Even though the arbitrage is open, you've still got to find the right barrels
> to get there in time. The arb may be open on paper but that doesn't mean
> anything if the physical oil doesn't move. So Arcadia at this stage had no
> ability to move oil up Seaway. So what I'm asking there is for the traders
> to keep an eye out to see that if prompt cheap sweet is on offer, and then to
> look for people that are going to buy it, and if those people that buy it, are
> they the kind of counterparty that are going to move it up Seaway?

(*Id.*)  Dyer's consistent, unrebutted testimony regarding this email is collected in Exhibit 11 to

the Bradshaw Declaration.  (*Id.*, ¶149)  The full sequence of contemporaneous Arcadia

communications wholly supports Dyer's explanations.  (*Id.*, ¶153)  Likewise, contemporaneous

emails relating to other market participants contain similar observations.  (*Id.*, ¶154)

In short, the September 26, 2007 "money to be made" email simply *reflects Dyer's*

*observations about the market on that date*.  Nothing more can be read into it.

### b.      January 27, 2008 Email/"inevitable puking"

In an email recapping market activity on Friday, January 25, Wildgoose wrote:

> Friday was the last day of cash trading for feb wti.  Up until that point the
> activity level had been extremely low and Friday proved to be no
> exception.  We had anticipated this might be the case (despite all
> circumstantial evidence pointing to the contrary) and sold mar/april in
> advance of the inevitable puking of feb/mar that we wud have to do.
> Mar/april started the day around 40cts/bbl and traded down as low as
> 14cts/bbl whilst feb/mar traded down to -35cts/bbl where it found the
> expected support from first tier storage. … [W]e calculate about 5mil bbls
> total surplus at the end of February.  Obviously this was not expected with
> lls trading positively all month and decent cuts in syn crude, but the
> explanation can only come down to refiners who are content to run below
> boilerplate in this margin environment.  The market did not anticipate this
> either….

(DSF, ¶155)  Plaintiffs highlight the "inevitable puking" language from this email as evidence

that Defendants had always intended to sell their cash forward position at a loss on January 25 as

part of an alleged manipulative scheme.  Wildgoose's testimony refutes that interpretation:

> Q.     Let me just say, "inevitable puking." What does that mean?
>
> A.     Well, the puking of something is not a pleasant experience. It's selling something lower than you wanted to in this case.
>
> Q.     And the inevitable. How long had that been inevitable?
>
> A.     I don't think that's – the reason it says inevitable is if the Feb/March ends up trading – getting sold down to storage economics which I think it says later on, that would be inevitable puking.
>
> *               *               *
>
> Q.     And it goes on and says, "inevitable puking of Feb/March that we would have to do." "Would have to do" and "inevitable" don't sound like unexpected. Agreed?
>
> A.     I believe the parentheses very much sounds like it was unexpected. I think further on in the piece as well, it says a few sentences down "obviously this was not expected." There are several references in here as to why that is not what we expected to have happen. I also think in here it references the selling of the March/April to hedge the potential puking of any Feb/March.
>
> Q.     It doesn't say the word hedge, does it?
>
> A.     I don't think it needs to.
>
> Q.     But if you sold March/April, and you inevitably puked out the positions at low prices, that could profit the March/April, correct?
>
> A.     We have no way of knowing what prices we were going to sell the Feb/March out at, as I think this document represents.

(*Id.*, ¶¶156-157)  Wildgoose's testimony regarding this document is collected in Ex. 12 to the

Bradshaw Declaration.  (*Id.*, ¶156)

More importantly, multiple market participants, and Plaintiffs' own expert, confirm that

the term "puking" describes something a trader does *not* want to do and a situation in which a

seller is *not* in control of the price.  A non-party broker defined puking as a trader "aggressively"

selling out a position at lower numbers when the price has gone against him; it is considered a

"bad" thing and something nobody wants to do.  (DSF, ¶161)  Another non-party trader defined

"puking" as selling out of a position and agreed, "I don't think anyone enjoys puking."  (*Id.*,

¶162)  Plaintiffs' proposed expert, Ellis, testified:

> Q.      Okay.  You would agree with me that when someone is puking, it's
> because the market is running away from a position that they're holding
> and they have to get – they have to, for one reason or another, unwind the
> position?
>
> *              *              *
>
> A.      For one reason or another, it means they are selling into a market
> where the buyers are backing away and they have to sell at whatever price
> they can get.
>
> Q.      And the buyers at that point are dictating the price at which you
> can sell, correct?
>
> A.      Yes.

(*Id.*, ¶159)  In other words, Defendants' "puking of feb/mar" left them at the mercy of the buyers

of those barrels, who could and did demand lower and lower prices.  As reflected in Wildgoose's

note, those buyers drove the spread value down to storage economics (*i.e.*, from backwardation

to contango) on January 25.  In that process, Defendants lost approximately $3.9 million on the

sale of their February/March WTI rolls and recouped only a small fraction of that amount on

their short March/April WTI futures position put on to hedge against that possibility.[17]  (*Id.*,

¶129)  Unplanned, unwelcome, and loss-making sales of WTI forward contracts – puking – are

not evidence of manipulative intent.  Rather, they demonstrate that Defendants misread the

fundamentals and/or other market participants' intentions, and paid the price.

### c.      January 28, 2008 Email/"desired effect"

Plaintiffs also cite a Wildgoose email from the next trading day, further discussing the

January 25 events:

_____

[17] March was similar.  (*See* DSF, ¶¶133-138)

> … Our activity on Friday was apparent to the market although there
> appears to be plenty of speculation as to what precipitated it, for some
> reason the straight forward truth that we had way too much oil isn't
> enough for most people! nevertheless it has had the desired effect on
> mar/april wti….

(DSF, ¶163)  Plaintiffs highlight the "desired effect" comment regarding the March/April spread

as evidence of manipulative intent.  As the prior e-mail and Wildgoose's testimony quoted above

made clear, however, Defendants had attempted to mitigate the risk of loss on the

February/March WTI forward position by increasing the size of their March/April WTI futures

position.  As Wildgoose explained:

> Well, as we discussed yesterday and earlier this morning, the March/April
> TI position was established at this time to act as a hedge against the
> Feb/March position that we had on. This simply says that March/April did
> have -- did produce the desired effect of acting as that hedge against
> Feb/March.

(*Id.*, ¶¶164-165)  Explaining why the March/April WTI futures acted as a hedge, Wildgoose

stated:

> Because if I look at the price action which you've just asked me about …
> the March/April did move down and therefore the March/April did act in
> the form that it was put on in the first place, which was to act as a hedge
> mitigation, risk mitigation against Feb/March. So it absolutely had the
> desired effect that it needed to act as a hedge.

(*Id.*, ¶¶164-165)  Wildgoose's testimony regarding this email is collected in Ex. 13 to the

Bradshaw Declaration.  (*Id.*, ¶164)

Ironically, Plaintiffs' reliance on the "desired effect" email to show manipulative intent

flies in the face of Mason's purported analysis demonstrating the alleged benefit Defendants

derived from the artificial prices they caused.  In his Report, Mason opines that the benefit

derived from the alleged "puking of feb/mar" was actually a loss of $338,125.  (Ex. 1, Mason

Report, ¶80)  Although Defendants reject the validity, professionalism, or accuracy of Masons'

various reports and analyses, those reports and analyses nevertheless contradict any claim that

the "desired effect" of Defendants' sales of March/April WTI futures spreads on January 25 was to garner a manipulative profit.  Indeed, between the loss of $3.9 million on the roll of the forwards and the loss Mason attributes to the futures, Defendants' lost more than $4.2 million.

### 2.   Defendants Relied Upon The Advice of Counsel Regarding The Legality Of Their Trading

"Good faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter…." *In re Reserve Fund Sec. and Deriv. Litig.*, 2012 WL 4774834, at *2 (S.D.N.Y. 2012) (denying CFTC motion to preclude advice-of-counsel defense) (citation omitted)).  The defense requires Defendants to show that they (a) made a complete disclosure of the relevant facts to counsel; (b) received advice from counsel that the conduct in question was legal; and (c) relied on that advice in good faith.  *Bath & Body Works Brand Mgmt. v. Summit Ent'mt*, 2013 WL 3479418, at *2 (S.D.N.Y. 2013) (citations omitted)).  In addition, "[t]he counsel consulted must be disinterested and independent." *Summit*, 2013 WL 3479418, at *2 (citation omitted).  Good faith reliance on advice of counsel is "not a complete defense," but "a factor for consideration." *Id.* (citation omitted).

First, before establishing the WTI forward contract positions at issue, Defendants engaged counsel, Timothy Carey, and made complete disclosures of the relevant facts to him, including: their trading strategy for both WTI futures and WTI forward contracts; their existing and planned WTI futures and forward contract positions; their evaluation of market fundamentals to support those positions; their intended exposure during the cash trading periods in both January and March; and their exit strategy for each position.  (DSF, ¶¶166-167, 172)

Second, Carey advised Defendants regarding the legality of their WTI trading prior to, and throughout, execution of their strategies.  Carey generally instructed Defendants to always be truthful, and he admonished them against trading WTI forward contracts with the purpose of

affecting a futures price, unwinding positions in a disorderly manner, taking positions that were too large, or withholding barrels from willing buyers.  (DSF, ¶171)  Subject to the foregoing admonitions, Carey advised Defendants that the forward contract positions they held were appropriate to take into the cash trading period in both January and March 2008, and that they could "take a significant volume of [cash] up until the last day [of the cash trading period] and sell it all on the last day."  (*Id.*, ¶¶127, 168)  Carey also advised Defendants, subject to the above admonitions, that their proposed strategies should not be interpreted as manipulative.  (*Id.*, ¶169)

Third, Defendants relied on Carey's advice in good faith.  They "rel[ied] on Mr. Carey's advice … [by] carry[ing] out the proposed course[s] of action that [they] had discussed with Mr. Carey" with the goal of complying with "all existing and potential future rules … by the NYMEX, the CFTC, and the DOJ."  (DSF, ¶173)  Defendants counted on Carey to make them aware of legal issues, if any, during their discussions of positions and strategy, and would have changed any planned positions had Carey not agreed.  (*Id.*, ¶174)  Defendants never took or suggested taking a position that Carey said was unreasonable, and never took a position greater than what Carey had approved (sometimes less).  (*Id.*, ¶175)  Per Carey's advice, during the cash period, Defendants were "always on offer [and], if the spread achieved fair value, … would have happily sold the whole position out on the first day [of the cash trading period]."  (*Id.*, ¶176) Carey believed that Defendants were following his advice throughout the relevant period, recalling no reason to believe that they were not.  (*Id.*, ¶177)

Fourth, Carey provided disinterested and independent counsel to Defendants.  Neither his advice nor compensation had any relation to Defendants' profitability.  (DSF, ¶178)  No evidence to the contrary has been presented.  *See*, *e.g.*, *In re Reserve Fund Sec. and Deriv. Litig.*, 2012 WL 4774834, at *4-6 (denying CFTC motion to preclude advice-of-counsel defense at trial

where the CFTC "present[ed] no facts or argument as to why [one attorney] [could] not be regarded as disinterested").  Nor has any of Carey's testimony regarding Defendants' solicitation of advice from him, Defendants' provision of information to him, or his advice to Defendants regarding the legality of their WTI forward and futures spread trading been rebutted.

### 3. Defendants' Decision To Hold Out Until The Last Day For Higher Prices Appears "Uneconomic" Only In Hindsight

Plaintiffs also seek to show manipulative intent by asserting that Defendants had no legitimate reason to hold forward contracts into the cash trading period and knew they would lose money if they did so.  Plaintiffs allege: "Defendants' refusal to sell their large physical WTI position prior to expiry of the near month futures contract was uneconomic….. Defendants knew that selling such a large position during the cash window would result in substantial losses (absent a manipulation)."  (Comp. ¶50(e))  But as reflected in Exhibit 8 to the Bradshaw Declaration, during the period February 2000 through January 2012, the value of the front spread *increased* between expiry of the prompt WTI futures contract and the last day of the cash trading period more than 50 percent of the time.  (DSF, ¶146)  Therefore, waiting until the last day to liquidate a long forward contract spread position can result in a meaningful profit opportunity.

Where, as here, the totality of the circumstances establish that a defendant was motivated by self interest in seeking the best price for its commodity, such self-interest alone does not constitute intent to manipulate prices. *Indiana Farm Bureau*, 1982 WL 30249, at *6 ("[M]arket participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose creation of an 'artificial' or 'distorted' price...  Moreover, since the self-interest of every market participant plays a legitimate part in the price setting process, it is not enough to prove simply that the accused

intended to influence price."); *see also In re Hohenberg Brothers*, [1975-77 Transfer binder] Comm. Fut. L. Rep. (CCH) ¶10,271, at ¶21,478, 1977 WL 13562, *9 (CFTC Feb. 18, 1977).

As Defendants Dyer and Wildgoose explained in their depositions, during both January and March, they first estimated that demand would modestly exceed supply, and then built their WTI futures position and WTI forward contract positions accordingly.  They were willing to hold their position after expiration of the NYMEX contract if they believed that the spread had not reached its fair value and would do so during the cash window.  (DSF, ¶25)  The spread value did not move as Defendants hoped, however, and they were forced to "puke" their prompt forward contract spread positions in both January and March – experiencing substantial losses as a result.  As Zito testified, even when a trader makes a "reasonable and rational decision," no trader can know on the day he enters into a forward contract whether he will make money or lose money when he closes out that position.  (DSF, ¶105)

#### 4. There Is No Evidence That Defendants Assembled Their Long Cash Forward Positions With The Intent To Be Dominant

Plaintiffs allege that Defendants intended to, and did, amass a physical WTI position that was a dominant portion of "deliverable supply."  Not only are these allegations wrong for the reasons stated above, they are equally wrong with respect to intent.  The Commission has noted:

> [I]t is the deliverable supply ***known to the accused*** which must be looked to in determining whether respondent's purchase of contracts is susceptible to an inference of manipulative intent…. [N]o such unlawful intent may be presumed where a long purchases contracts in quantity generally consistent with published reports to available stocks.

*Indiana Farm Bureau*, 1982 WL 30249, at *13 (emphasis added).

Even assuming that EnSys's estimates of deliverable supply are correct, they cannot be used to show that Defendants had manipulative intent because they were unknown and unknowable to Defendants (or anyone else) in 2008.  EnSys spent nearly 3 years, from 2011 to

31

2014, and more than one million dollars completing its deliverable supply analysis.[18]  (DSF, ¶89; Ex. 5, EnSys Report at 9)  The "vast majority" of the data on which EnSys relied were non-public, confidential responses to subpoenas served by the CFTC.  (DSF, ¶103)  Defendants had no access to that data and could not have calculated the volumes contained in the EnSys Report.

Importantly, information available to Defendants both before and during early 2008 indicated that the deliverable supply of WTI was much larger than EnSys now opines.  For example, the NYMEX speculative position limit for trading WTI futures contracts was 3,000 contracts.  (DSF, ¶15)  All market participants who traded WTI futures had to be aware of this limit in order to ensure their regulatory compliance.  Also, under CFTC guidelines at the time, exchanges were to set position limits at no greater than 25 percent of the deliverable supply of the underlying commodity.  (*Id.*)  At a minimum, therefore, the 3,000 contract limit indicated that deliverable supply was at least 12 million barrels.[19]

NYMEX's estimates of deliverable supply underlying the position limit were actually larger than 12 million barrels.  In 2006, NYMEX estimated the deliverable supply of WTI at Cushing to be between 16,000 and 21,000 contracts (16-21 million barrels) per month.  (DSF, ¶87)  In 2009, NYMEX estimated the deliverable supply to be 16,500 contracts (16.5 million barrels).  (*Id.*, ¶88)  Dyer testified that Defendants viewed the supply of WTI during 2008 to be approximately 40 million barrels per month on average.  (*Id.*, ¶106)  Luckner of EnSys testified similarly that WTI production was approximately 40 million barrels per month.  (*Id.*, ¶95)

---

[18] During the Rule 30(b)(6) deposition of the CFTC in this case, a representative from the Division of Market Oversight conceded that the CFTC itself had not analyzed the volume of deliverable supply since NYMEX applied for a rule amendment changing the speculative position limit on WTI futures from 2,000 to 3,000 contracts.  (DSF, ¶86)  That rule change went into effect in October 2006.  (*Id.*)

[19] Notably, EnSys was unaware of the NYMEX position limit when conducting its analysis.  (DSF, ¶104)

> **5.     Defendants Did Not Close Out Their Short Futures Spread Positions When Prices Allegedly Were Artificially Low**

Defendants' futures trading activity is inconsistent with the intent to profit from a manipulation.  Plaintiffs allege that Defendants built large long forward contract positions during January and March in order to dump the positions on the last day of trading and profit from the declining spread's effect on their short futures position in the new prompt spread.  (*E.g.*, Comp., ¶¶ 4(e))  But the undisputed facts prove that Defendants did *not* time the liquidation of their short futures positions so as to realize profits from allegedly artificial spreads.  As Evans observed from his analysis of Defendants' trading activity during January, Defendants did not offset most of their short March/April futures position on January 25.  (Evans Report, ¶208; DSF, ¶¶129-131)  In fact, Defendants were still short 10,200 March/April spreads as of the close of trading on January 30 and 31, 2008, and stayed net short March/April until February 12.  (*Id.*)  Evans similarly observed that Defendants did not offset the majority of their short May/June futures position on March 25.  (Evans Report, ¶212, DSF, ¶¶136-138)  Rather, from March 25-27, Defendants' short May/June futures position remained essentially unchanged at almost 16,000 contracts.  Significantly, Mason found no artificiality after January 25 or March 25, 2008.  (*Id.*)

For all of these reasons, Plaintiffs cannot establish that Defendants specifically intended to cause artificial WTI futures prices or spread values during 2008, and Defendants are entitled to summary judgment.

> **E.     Plaintiffs Cannot Succeed On Their Secondary CEA Claims**

Defendants are also entitled to summary judgment on Plaintiffs' alleged claims for principal-agent liability under CEA Section 2(a)(1)(B), 7 U.S.C. §2(a)(1)(B)), and aiding and abetting liability under CEA Section 13c(a), 7 U.S.C. §13.  Since Plaintiffs have failed to

establish a primary violation of the CEA, they cannot prevail on their secondary claims.  *See*

*Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).

## II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR MONOPOLIZATION UNDER THE SHERMAN ACT

Plaintiffs' Complaint asserts claims under Section 2 of the Sherman Act based on

theories of monopolization, attempted monopolization, and conspiracy to monopolize on various

days in January and March 2008.  To succeed on their monopolization claim, Plaintiffs must

prove that Defendants possessed monopoly power and willfully acquired or maintained that

power in a properly defined relevant market.  *See United States v. Grinnell Corp.*, 384 U.S. 563,

570-71, 86 S.Ct. 1698 (1966).  "Monopoly power is the power to control prices or exclude

competition."  *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994,

1005 (1956).  Monopoly power exists only where the alleged monopolist charges prices

substantially above the competitive level and "persist[s] in doing so for a significant period

without erosion by new entry or expansion."  *AD/SAT v. Associated Press*, 181 F.3d 216, 226-

227 (2d Cir. 1999).  Monopoly power can be proven directly through evidence of control over

prices or the exclusion of competition, or it may be inferred from a firm's large percentage share

of the relevant market and other market characteristics contributing to the alleged monopolist's

ability to sustain control over prices.  *Tops Mkts, Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 98 (2d

Cir. 1998).  Plaintiffs cannot establish monopoly power under either method.

### A.     Defendants' Share of the Relevant Market Defined By Plaintiffs Was Zero

In order to survive summary judgment, Plaintiffs must define a proper relevant market

that is supported by substantial evidence.  *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F .3d 101,

105-06 (2d Cir. 2002).  As explained below, they do not.  Even if the Court deems the relevant

market defined by Plaintiffs to be proper, Defendants are entitled to summary judgment because

they did not participate in, and therefore, could not have monopolized, that market.  Plaintiffs

define the relevant market to be:

> the market for: (a) January 2008 WTI crude oil readily available for
> delivery at Cushing, Oklahoma; (b) March 2008 WTI crude oil readily
> available for delivery at Cushing, Oklahoma; and/or (c) April 2008 WTI
> crude oil readily available for delivery at Cushing, Oklahoma.  The
> relevant geographical market is in or around Cushing, Oklahoma.

(Comp. ¶70 (emphasis added))  In contrast, Plaintiffs' proposed expert on monopolization,

Mason, refers to the relevant market as the "deliverable supply of physical crude oil available at

Cushing."  (DSF, ¶196)  Regardless of which definition governs, the relevant market as defined

by Plaintiffs includes *only physical barrels of WTI crude oil*.  Plaintiffs have expressly excluded

the "WTI derivatives contract market" from the relevant market:  "The references to a 'WTI

Derivatives contract market' in paragraphs 73(F) and (G) are scrivener's errors and should be

ignored."  (Plfs' Memo. of Law in Opposition to Defs' Motion to Dismiss [Dkt 72] at 7)

At all times relevant to this action, Defendants bought and sold only WTI derivatives –

WTI futures contracts and WTI forward contracts.  *See* discussion *supra* at 2-3.  Defendants

never possessed a barrel of physical WTI crude oil other than tank bottoms.  (DSF, ¶80)  Since

Plaintiffs have excluded WTI derivatives from the relevant market, and Defendants only traded

WTI derivatives, Defendants' share of the relevant market must be zero.

### B.   Plaintiffs Have Not Properly Defined The Relevant Market Or Established Defendants' Dominance Of That Market

Even if the relevant market were the "deliverable supply" of WTI crude oil at Cushing, as

Mason asserts in contradiction to the allegations of the Complaint, Plaintiffs grossly

underestimate the size of the relevant market and overestimate Defendants' share of it.

### 1.   The Term "Deliverable Supply" Does Not Define An Actual Market For Antitrust Purposes

"Deliverable supply" is a concept developed primarily in CFTC case law that connotes "[t]he total supply of a commodity that meets the delivery specifications *of a futures contract*." (DSF, ¶85)  Used as an analytical input in cases of alleged manipulative squeezes or corners under the CEA, "deliverable supply" is constrained by the specifications of a futures contract set by an exchange.  ***It is irrelevant to any monopolization analysis.***

Plaintiffs allege monopoly power in connection with physical barrels of WTI, not WTI derivatives contracts.  Thus, Plaintiffs' reliance on a NYMEX rule to identify a physical commodity market is illogical.  This is particularly true where, as here, few WTI futures contracts are ever taken to delivery (DSF, ¶12) and the purpose of conducting a deliverable supply analysis is to "assess the level of supply that is available for delivery that can be used to satisfy [futures] contracts under the relevant market."  (*Id.*, ¶107)

As multiple witnesses, including EnSys, have testified: (1) the volume of WTI (including domestic sweet grades that are acceptable substitutes for WTI) produced on a monthly basis is multiple times larger than EnSys's estimate of deliverable supply (compare DSF, ¶95 with Ex. 5, EnSys Report at 14-17); (2) refining volumes of WTI on a monthly basis are multiple times larger than EnSys's estimates of deliverable supply (Ex. 5, EnSys Report at 105, Ex. 13); and (3) in any given month, some of those volumes flow through Cushing and some by-pass Cushing, as refiners move barrels through different pipelines to meet their specific needs.  (DSF, ¶96)  According to EnSys, however, only barrels that actually pass through designated terminals in Cushing are a part of deliverable supply.  (*Id.*)  EnSys also claims that a significant portion of WTI production is not part of deliverable supply due to various exclusions under NYMEX Rule

200.  (Ex. 5, EnSys Report at 32-33; DSF, ¶9)  These exclusions are not supported by legal authority on the proper definition of a relevant market for purposes of the Sherman Act.

EnSys offers no opinion that deliverable supply is the relevant market.  (DSF, ¶102) EnSys offers no opinion regarding monopolization at all.  (*Id.*)  Mason, meanwhile, testified that "it is fairly straightforward that the relevant market is the market for crude oil deliverable to satisfy this contract" (*id.*, ¶196), but this is inconsistent with the plain language of the Complaint and, of course, established antitrust case law.  (*See* Comp. ¶70)  Mason makes no attempt in his reports or testimony to reconcile that discrepancy.  The lack of any expert testimony in the record to support Plaintiffs' theory is indicative of a simple fact: there is no relevant market for physical WTI crude oil limited to the deliverable supply at Cushing as defined according to NYMEX Rule 200.

### 2.    The Relevant Market Must Include Other Grades of Crude Oil Utilized by Domestic Refiners

"In determining the [relevant] market under the Sherman Act, it is the use or uses to which the commodity is put that control."  *duPont*, 351 U.S. at 396.  The relevant market must include all products "reasonably interchangeable by consumers for the same purposes."  *Id.* at 404.  Products will be considered to be reasonably interchangeable if consumers treat them as acceptable substitutes.  *Id.* at 377; *Grinnell*, 384 U.S. at 572 ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.").  Plaintiffs' attempt to define a hyper-narrow relevant market fails to account for any interchangeability.

Crude oil has one use: to be refined into other petroleum products such as gasoline or heating oil.  Domestic refiners located throughout the U.S. are the ultimate consumers of WTI. Per *duPont*, therefore, domestic refiners are the proper focus of any antitrust market definition

for physical supplies of crude oil.  Unequivocal and unchallenged testimony in this case establishes that domestic refineries could, and did, run many different grades and types of crude oil during 2008.  (DSF, ¶117)  They ran both sweet and sour crude, of domestic and foreign origin.  They also bought and refined blended crudes.  (*Id.*)  Some of these other grades and blends were deliverable under the NYMEX contract, but most were not.  (*Id.*)  Refineries decided what types of crude, and how much, to run based upon the slate that would provide them the best refining margins (*i.e.*, the economic value received by the refiner from running a barrel of crude).  (*Id.*, ¶118)  Refineries would also switch the grades of crude oil they would run (*e.g.*, from WTI to LLS or WTI to WTS), should refining margins for the relevant grades change.  (*Id.*, ¶119)  Switching could occur at any time, including into the delivery month (*i.e.*, oil could be purchased in February for delivery in February), and could be sourced from any location, subject to the ability to transport the crude to the refinery within the necessary time frame.  (*Id.*, ¶120)  From an engineering perspective, switching from one grade of sweet crude to another, or from sweet crude oil to a sour grade, was relatively simple and "almost instantaneous."  (*Id.*, ¶121)

As defense expert Ramsey Shehadeh, Ph.D, explained, "The existing substitution between sweet crudes, such as WTI, and other crudes by refineries, including those directly connected to Cushing, demonstrates that such other crudes are part of the relevant market…." (Ex. 14, Shehadeh Expert Report ("Shehadeh Report"), ¶27)  He further noted:

> Such substitution creates the ability to arbitrage across crudes in response to relative price changes.…  [I]mportantly, refiners need not substitute away from WTI completely to constrain prices....  [R]efiners need to substitute only in sufficient volume to render a price increase unprofitable (a relatively small amount given the incremental profitability of crude production).

(*Id.*, ¶35)  In other words, from a refining and antitrust perspective, these substitutable grades are integral parts of the relevant market.  *See AD/SAT*, 181 F.3d at 27 ("Cross-elasticity of demand

exists if consumers would respond to a slight increase in the price of one product by switching to another product.").

When the relevant market is defined to include all substitutes for WTI physical oil that refineries could and did use, "Defendants' largest positions in forward contracts during the Class Period (even if considered as physical holdings) represented less than two percent of the relevant antitrust market, a level too small to be associated with monopoly power." (Ex. 14, Shehadeh Report, ¶¶45-46)  EnSys does not challenge Dr. Shehadeh's conclusions from an antitrust perspective.  EnSys merely argues that Dr. Shehadeh's market description is too broad to meet the definition of deliverable supply pursuant to NYMEX Rule 200.  (Ex. 15, EnSys Response Report at 16-17)  While perhaps true, the point is irrelevant.  The relevant market is not the narrow set of grades, types, and volumes meeting NYMEX's specifications.  Plaintiffs' deliverable supply analysis does not comport with how the physical market actually functions.

### 3. Defendants Never Possessed A Dominant Market Share Of, Or Otherwise Controlled, the WTI Crude Oil Market

A market share of less than 30 percent is virtually always insufficient to support an inference of monopoly power.  *Times-Picayune v. United States*, 345 U.S. 594 (1953) (one-third to 40 percent market share in newspaper advertising market was not indicative of market dominance); *Broadway Delivery Corp. v. United Parcel Serv. of America,* 651 F.2d 122, 129 (2d Cir. 1981) (market share below 50 percent is rarely evidence of monopoly power).  Whether Defendants' market share is measured by comparing their physical supplies of WTI (tank bottoms only) to Plaintiffs' deliverable supply estimates, or Defendants' forward contract positions to the aggregate volume of forward contracts traded in the market, Defendants' market share never breached 30 percent.  At most times it was substantially less.  In short, Defendants did not have a dominant market share.

In addition, other considerations for evaluating monopoly power, such as the strength of competition, barriers to entry, the probable development of the market, and consumer demand, all confirm that Defendants did not have monopoly power.  *See Tops Markets*, 142 F.3d at 98-99; *Broadway Delivery Corp.*, 651 F.2d at 128.  No evidence has been adduced that any market participant was barred from transacting in WTI forward contracts or physical oil.  Indeed, the participation of more than 85 entities in that market is testimony enough to the absence of barriers to entry, and indicates that the cash forward market was highly liquid, both in volume traded and number of participants.  (DSF, ¶74)  Testimony from Ensys and Mason confirms that no demand for WTI was unsatisfied.  (*Id.*, ¶¶114, 122)  They and others testified that the supply/demand balance for WTI was balanced to modestly oversupplied in both February and April 2008.  (*Id.*, ¶¶114-116)

Therefore, summary judgment is proper unless Plaintiffs can present direct evidence that Defendants controlled WTI prices or excluded competition.  As discussed below, they cannot.

### C.   Plaintiffs Have Adduced No Direct Evidence of Defendants' Control Over NYMEX Futures Prices

In the absence of market share data, monopoly power may be established directly through evidence of control over prices or the exclusion of competition; such evidence, however, must be unambiguous.  *United States Football League v. National Football League*, 842 F.2d 1335, 1362 (2d Cir. 1988); *Broadway Delivery Corp.,* 651 F.2d at 130.  While ordinarily stated as an either/or proposition, "[p]rice and competition are so intimately entwined that … [i]t is inconceivable that price could be controlled without power over competition or vice versa." *duPont.*, 351 U.S. at 392.  "The more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share.…  Conversely, a company that can exclude competition can sustain its ability to control prices and thereby maintain its

market power." *Pepsico*, 315 F.3d at 107-108 (citing 2A Phillip E. Areeda, *et al.*, *Areeda &*
*Hovenkamp's Antitrust Law*, ¶501, at 85-86 (2002)).  Thus, higher prices in and of themselves
are not indicative of monopoly power; rather, it is the power "to charge a price higher than the
competitive price without inducing so rapid and great an expansion of output from competing
firms as to make the super-competitive price untenable." *Xerox Corp. v. Media Sciences, Inc.*,
660 F. Supp. 2d 535 (S.D.N.Y. 2009) (quoting *Am. Academic Suppliers, Inc. v. Beckley-Cardy,*
*Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991)).  Plaintiffs have no unambiguous evidence that
Defendants controlled prices or excluded competition.

## 1.   Defendants' Trading Activity Had No Effect On Competition

Defendants' "competitors" are other market participants wishing to buy and sell WTI in
either the forward market or on NYMEX.  While Plaintiffs make the conclusory allegation in
their Complaint that Defendants "restricted competitors" (Comp. ¶68), none of their experts
opine on this issue.  More importantly, the allegation is contrary to undisputed evidence.  As
discussed above, WTI forward contracts were bought and sold by more than 80 different entities
in the period at issue.  The number of purchasers of WTI futures contracts and options on futures
contracts is even greater.   Large Trader Reporting data produced by the CFTC establishes that
there were more than 200 large traders of WTI futures required to report positions to the CFTC.
(Ex. 6; DSF, ¶¶16, 111-112)  Plainly, there were no restrictions on competitors.  Still further,
there is no evidence that Defendants controlled or otherwise barred anyone from trading WTI
futures contracts or forward contracts, either directly or indirectly.  It is inconceivable how that
could be accomplished.  Nor is there evidence that the ultimate consumers of crude oil – the
refineries – were unable to meet their needs.  (DSF, ¶122)

41

## 2. Defendants Did Not Control Prices

There is also no evidence that Defendants controlled prices. Plaintiffs' cause of action distinguishes, however incorrectly, between physical supplies of WTI crude oil and WTI derivatives, alleging that Defendants leveraged their monopoly power over the former to raise prices in the latter. To establish a claim based upon the purported leveraging of monopoly power in one market to influence another, Plaintiffs must first demonstrate Defendants' monopoly power over the relevant market by establishing their ability to control the price of *physical* WTI crude oil. *See AD/SAT*, 181 F.3d at 231; *Rome Ambulatory Surgical Center v. Rome Memorial Hospital, Inc.*, 349 F. Supp. 2d 389, 415 (N.D.N.Y. 2004). Yet Plaintiffs have not introduced any evidence that the price of WTI physical barrels or WTI forward contracts increased due to Defendants' trading activity, or that Defendants were able to sustain those price levels. In fact, Mason readily admits that he did not analyze WTI forward prices (DSF, ¶188), and Defendants did not own physical.

Plaintiffs also cannot establish the second part of their monopolization theory – that Defendants controlled prices of WTI futures traded on NYMEX during the Class Period. To "control" means to have the ability to dictate or set prices. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464, 112 S. Ct. 2072 (1992) (defining market power as "the ability of a single seller to raise price and restrict output); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, *37 (S.D.N.Y. Aug. 29, 2014) (allegations of complaint did not support theory that defendant *alone* had the ability to raise prices); *see also*, *All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 887 F. Supp. 2d 448, 458 (E.D.N.Y. 2012) (defendant's status as a large market competitor was insufficient to demonstrate its ability to set prices in the relevant market). To establish monopoly power, that ability must be sustainable and impervious to the entry of new competitors or the expansion of existing rivals. *United States v.*

42

*Eastman Kodak Co.,* 63 F.3d 95, 108 (2d Cir. 1995) (loss of sales resulting from price increase demonstrated lack of market power); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 600-601 (S.D.N.Y. 1989); *Kolon Industries Inc. v. E.I. DuPont de Nemours & Co*., 748 F.3d 160, 174-175 (4th Cir. 2014) (steady decline of market share failed to show defendant's durability in the market); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683 (10th Cir. 1989) (defendant had insufficient market power to establish monopolization where only temporary ability to charge monopoly prices existed).  Here, the undisputed pricing data, as reflected in Ex. 8 to the Bradshaw Declaration, demonstrates that Defendants had neither the power to raise NYMEX futures prices nor the power to sustain those prices.  For example:

- Between January 4 and January 22, 2008, while Defendants allegedly acquired a dominant position in physical crude oil, the price of the NYMEX February 2008 WTI futures contract fell from $99.62 to $89.85;

- In the same period, the NYMEX WTI March 2008 and April 2008 futures contracts fell in roughly comparable amounts;

- Between March 3 and March 19, 2008, when Defendants were again allegedly acquiring a dominant position in physical crude oil, the price of NYMEX April 2008 WTI futures fluctuated up and down from a low of $99.52 to a high of $110.21, and back to $104.48 on expiry day[20];

- On March 18, 2008, Defendants bought 960 April WTI forward contracts and the NYMEX April WTI flat price rose $3.75.  The following day, Defendants bought more than 2,000 WTI April forward contracts, yet the NYMEX April WTI flat price fell almost $5.00.  (*See* footnote 20.)

Similarly, NYMEX WTI futures spread values fluctuated up and down during the relevant period – sometimes in tandem with Defendants' purchases of additional WTI forward contracts but sometimes not:

- On January 14, 2008, while the price of the NYMEX February/March futures spread dropped over the course of the day from $0.53 to $0.33,

---

[20] Evans calculated adjusted settlement prices of $0.55 on January 22 and $1.05 on March 19.  (DSF, ¶¶28-33; Ex. 3, Evans Report at 115)

Defendants added to their February/March WTI forward position, ending the day with 1,856 contract equivalents;

- On the following day, the NYMEX February/March spread dropped again from $0.33 to $0.17, the lowest pricing level seen in several weeks, while Defendants continued to buy February/March forward contracts, holding 2,726 contract equivalents by the end of the day;

- From January 17 to the NYMEX expiry on January 22, when Plaintiffs allege that Defendants' buying of February/March forward contracts sent false signals of tightness to the market and caused the February/March spread to widen, the NYMEX February/March spread in fact remained relatively steady, pricing at $0.56 on January 17 and expiring on January 22 one cent lower at $0.55; and

- From March 17, 2008 until the NYMEX expiry of the April 2008 futures contract on March 19, 2008, the price of the NYMEX April/May WTI futures spread decreased overall by $0.42, even though Defendants purchased 3,475 April/May contract equivalents, more than doubling their WTI forward contract position to 6,268.

(*See* Ex. 8 to the Bradshaw Declaration)  These examples demonstrate that  Defendants did not have the ability to raise WTI futures prices to supra-competitive levels.  Likewise, the examples demonstrate that even if Defendants had the ability to raise prices, they could not sustain them at increased levels (*i.e.*, they were not durable).

The evidence does not "unambiguous[ly]" – or otherwise – demonstrate Defendants' ability to control NYMEX prices through their trading strategies.  Even if that were not true, the evidence demonstrates unequivocally that they could not sustain any price increase in NYMEX WTI spreads or futures contracts.  Accordingly, Defendants are entitled to summary judgment. *See Pepsico*, 315 F.3d at 108-109 (granting summary judgment where Coca-Cola could not immunize its prices from PepsiCo's challenges despite alleged control of distribution process).

### D.   There Is No Evidence That Defendants Willfully Obtained or Maintained Monopoly Power

Even if this Court determines that a question of fact exists as to whether Defendants possessed monopoly power, there is no evidence that Defendants obtained or maintained it

44

through anticompetitive conduct.  The possession of monopoly power and the charging of monopoly prices is not unlawful in and of itself.  *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004).  To be actionable under the Sherman Act, it must be "accompanied by an element of anticompetitive *conduct*."  *Id*. at 408 (emphasis in original); *USFL*, 842 F.2d at 1359 ("[E]vidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'….") (citations omitted).  "Anticompetitive conduct" has been defined as "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market" and as "conduct without a legitimate business purpose that makes sense only because it eliminates competition."  *Morris Commc'ns Corp. v. PGA Tour, Inc*., 364 F.3d 1288 (11th Cir. 2004).  Proof of harm to a competitor is insufficient; it is harm to the competitive process itself that matters.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

As discussed above, there is no evidence (a) that Defendants' actions curtailed or excluded anyone's participation in the WTI market or (b) that Defendants refused to sell to anyone who wished to purchase from them.  Nor is there any evidence that NYMEX traders with short positions were unable to cover them, or that refiners were unable to find enough crude oil to meet production needs.  In short, there is no evidence to suggest that the level of competition amongst traders of either physical molecules of WTI crude oil or the related derivative contracts was negatively impacted by any of Defendants' alleged misconduct.

Moreover, the acquisition of large WTI positions in near-month cash forward contracts, and the holding of those positions through NYMEX expiration, is neither unlawful nor anti-competitive.  While Plaintiffs repeatedly complain that Defendants did not have a commercial need for physical oil, the point is irrelevant.  Defendants never took delivery of physical oil at

any relevant time.  Also, many, if not most, market participants trading forward contracts in 2008 were not refiners and, therefore, had no commercial need for physical oil as Plaintiffs seek to define it.  (DSF, ¶76)  In addition, WTI forward contracts were traded – and could be offset – through the cash window and even into the delivery month itself.  (*Id.*, ¶¶52-55)  Other market participants, including refiners and non-refiners engaged in speculation, traded volumes of WTI forward contracts that were as large or larger than Defendants' positions.  (*Id.*, ¶83)  And in any event, there was no limit on the volume of WTI contracts that could trade.  It is inexplicable, therefore, that the size and timing of Defendants' activity could be described as anti-competitive.

Defendants are traders; therefore, their business objective is to identify and profit from changes in market prices.  "[A] monopolist … is free to set as its legitimate goal the maximization of its own profits so long as it does not exercise its power to maintain that power." *USFL*, 842 F.2d at 1361; *see also Aluminum Warehousing*, 2014 WL 4277510, at *30 (accumulation of ownership positions in aluminum and holding of aluminum in expectation of higher prices and thus higher profits was consistent with lawful, competitive behavior).

There being no credible evidence in the record upon which one could fairly characterize Defendants' trading as exclusionary or anticompetitive, Plaintiffs fail to establish a genuine issue of material fact as to this second element of a monopolization claim.

### E.  Plaintiffs Cannot Demonstrate That They Suffered Antitrust Injury

To pursue a private right of action under the Sherman Act, Plaintiffs must show that their injury is of the type the antitrust laws were intended to prevent, and that it flows from that which makes Defendants' acts unlawful.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  As a preliminary step, Plaintiffs must be able to identify an anticompetitive practice. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (employing a three-step analysis to assess whether antitrust injury was sufficiently alleged in complaint).  As

46

demonstrated above, there is no evidence that Defendants engaged in anticompetitive conduct by refusing to sell to a particular market participant or that competition in the WTI market, including derivatives such as forward contracts and exchange-traded futures, was reduced or constricted. Indeed, neither Plaintiffs nor their experts identify a specific date when Defendants supposedly possessed and exercised monopoly power. In the absence of such proof, Plaintiffs cannot demonstrate that their purported losses in the futures and options markets flowed from Defendants' allegedly anticompetitive conduct.

**F.    The Record Is Devoid Of Evidentiary Support For An Attempted Monopolization Claim**

An attempted monopolization claim requires proof that: (i) the defendant engaged in predatory or anticompetitive conduct with (ii) specific intent to monopolize and (3) a dangerous probability that defendants would monopolize a particular market. *Spectrum Sports*, 506 U.S. at 459. Here, the undisputed facts do not support any of the three required elements.

As discussed, none of Defendants' trading activities can be described as predatory or anticompetitive. Nor is there any evidence to suggest that Defendants intended to destroy competition in, or monopolize, the WTI market. Lastly, there is no evidence from which to infer a dangerous probability that Defendants would monopolize the "relevant market." To assess whether such a dangerous probability exists, courts must inquire into the relevant product and geographic market and the defendant's economic power in that market. *Spectrum Sports*, 506 U.S. at 459. Whether one uses Plaintiffs' definition of the "relevant market" or defines it as Defendants argue (to include all interchangeable products including other grades of crude oil and WTI derivatives), Defendants' market share never exceeded 30 percent. Given the number of market participants, the existence of other market participants trading volumes similar to or greater than Defendants, and the absence of any evidence that demand for physical WTI or WTI

47

derivatives went unsatisfied, Plaintiffs cannot support an inference that Defendants had "the ability to propel [themselves] to monopolistic control over the market." *Colorado Interstate Gas Co.*, 885 F.2d at 694; *see also Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795 (2d Cir. 1987) (17 percent market share in intensely competitive market was insufficient as a matter of law to establish dangerous probability of monopolization) (collecting cases); *All Star Carts and Vehicles, Inc.*, 887 F. Supp. 2d at 458-59 (39 percent market share insufficient).

     **G.**    **Defendants Are Unable To Conspire With Each Other As A Matter of Law**

While the Complaint summarily references the Defendants' supposed conspiracy to monopolize, there are no facts to support such a claim. A successful conspiracy claim requires (1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly and (2) the commission of an overt act in furtherance of the conspiracy. *Walsh Trucking,* 812 F.2d at 795. As explained above, Plaintiffs cannot establish Defendants' specific intent to monopolize. Moreover, each of the Defendants are incapable of conspiring with one another as a matter of law.

Concerted action does not exist simply because more than one legally distinct entity is involved. *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 192 (2010). Indeed, under Section 1 of the Sherman Act, the relevant inquiry is whether there is a contract, combination, or conspiracy amongst separate decision makers or separate economic actors pursuing separate economic interests, thereby depriving the marketplace of diverse entrepreneurial interests. *Id.* at 195. Coordinated activity between a company and its employees and agents or a parent and its wholly-owned subsidiary is generally *not* the type of concerted action the Sherman Act is intended to cover because of the complete "unity of interest" that exists between those entities. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-771 (1984); *Walsh Trucking,* 812 F.2d at 793. Likewise, sister corporations wholly owned

by the same parent are ordinarily considered unable to conspire with one another.  *In re Term Commodities Cotton Futures Litig.*, 2014 WL 5014235, at *7 (S.D.N.Y. Sept. 30, 2014); *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 196-197 (S.D.N.Y. 1986).  While all of these precedents focus on Section 1 of the Sherman Act, the principles they espouse are equally applicable to claims of conspiracies to monopolize under Section 2.  *See*, *e.g.*, *Advanced Health-Care Services, Inc. v. Radford Community Hospital*, 910 F.2d 139, 150 (4th Cir. 1990).

Each of the corporate defendants in this case is wholly owned by Farahead Holdings. (DSF, ¶4)  Defendants Dyer and Wildgoose at all times acted as consultants to the corporate Defendants.  (*Id.*)  In the absence of any evidence to suggest that the several Defendants pursued disparate interests, they are incapable of conspiring with one another as a matter of law.

For all of these reasons, Defendants are entitled to summary judgment on Plaintiffs' claim for monopolization under Section 2 of the Sherman Act.  (Comp., ¶¶124-129).

## III.    DEFENDANT ARCADIA PETROLEUM LTD IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS AGAINST IT

Arcadia Petroleum Ltd. ("APL") is entitled to summary judgment on all of Plaintiffs' claims against it.  APL is a sister company of Defendants Parnon Energy Inc. and Arcadia Energy (Suisse) SA; it holds no position of authority over either of them.  (DSF, ¶¶3-4) Plaintiffs have neither alleged nor adduced any evidence that APL ever recommended, directed, or held any of the WTI cash forward or futures contracts alleged in the Complaint to be the means of the manipulation and monopolization; therefore, it cannot be liable for a primary violation of the CEA or Sherman Act.  Nor have Plaintiffs adduced any evidence that APL or any of its employees "willfully aid[ed], abet[ted], counsel[ed], induce[d], or procure[d] the commission of a violation of the CEA.  *See* CEA Section 22, 7 U.S.C. § 25(a)(1).  Nor have

Plaintiffs adduced evidence that any other defendant was acting as APL's agent at any time during the relevant period.

## CONCLUSION

For all of the foregoing reasons, Defendants are entitled to summary judgment under Fed. R. Civ. P. 56.

Dated: January 30, 2015                          Respectfully submitted,

By: /s/ Timothy J. Carey
Timothy J. Carey
Elizabeth M. Bradshaw
Brigitte T. Kocheny
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Thomas J. Quigley
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

Fred F. Fielding
Mark R. Haskell
Levi McAllister
MORGAN LEWIS
1111 Pennsylvania Ave., NW
Washington, DC 20004
(202) 739-3000

*Attorneys for Defendants*