```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
                                                            :
IN RE: CRUDE OIL COMMODITY FUTURES                          :     Master File No.
LITIGATION                                                  :     11-cv-3600 (KBF)
                                                            :
                                                            :     ORDER
                                                            :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 11, 2015

KATHERINE B. FORREST, District Judge:

In connection with the class certification evidentiary hearing and oral argument on Friday, February 13, 2015, the parties should be prepared to address the following questions. This list of questions is not meant to limit the parties' arguments or alter the manner of presentation, but to suggest several areas of interest to the Court:

1. What are the parties' respective views of how the Second Circuit's two recent cases discussing Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013) – Roach v. T.L. Cannon Corp., No. 13-3070-cv, and Sykes v. Mel Harris and Associates, LLC, No. 13-2742-cv – support, undercut, or are inapposite to their arguments?

2. Do the parties agree that, as a matter of law, inquiry notice (once triggered) requires only that "inquiry" be made within two years (e.g. and does not require that a claim be brought during that period)?

3. Were trading positions (or numbers of contracts) transparent during the relevant time period in "real time" (e.g. the "Market Reports / Commitments of Traders)?

- If so, what was the evidence in real-time as to how many contracts the defendants had acquired over the class period?
- If trading positions (or numbers of contracts) were transparent, is it probable that some potential plaintiffs anticipated defendants' alleged moves, and "got on the (same) bandwagon" and profited? Did some see what might be happening and get out prior to sustaining losses? Are there specific examples of either?

4. What precise information would a fact finder need to determine a plaintiff's actual net loss?
5. What is the role of a plaintiff's actual net trading position with respect to class certification?
- How easy or complicated is it to determine any particular plaintiff's net trading position?
- If a trade was itself hedged against loss, and a plaintiff thus sustained no loss, is that plaintiff in/out of the proposed class?
6. Can the parties provide the Court with examples or documents which might constitute various plaintiffs' net trading positions (from simplest to most complicated)?
7. What is the smallest known loss of a class member?
- What is the largest? Provide documents, if available, so that the Court can better understand how this all comes together.

8. Who are the different "groups" of plaintiffs?  Refiners, producers, users, individual traders, banks with trading arms, etc?  Do they have different interests?

- Explain the steps different groups of plaintiffs have taken in connection with establishing a net trading position (and does determining actual net trading position vary by plaintiff group?).  Provide documents, if available.

9. In the context of a CEA claim, is the "manipulation" tied to the size of a position that <u>could</u> in fact manipulate price, was intended to be part of a manipulative scheme (whether the positions could or could not in fact achieve that), or both?  Put otherwise, can a small initial position that could not itself "manipulate" price nonetheless constitute a statutory violation if requisite intent exists?

10. Do plaintiffs concede that the CEA claims of any single prospective class member are outside the statute of limitations?

11. The Court notes plaintiffs' memo in support at p. 22 regarding antitrust injury.  However, the Court is unclear as to whether plaintiffs take the position that any price effect <u>ipso facto</u> constitutes "antitrust injury" as to any plaintiff from any of the plaintiff groups.  Please explain.

- In order to prove antitrust injury, don't plaintiffs need to make a showing as to how plaintiffs themselves sustained loss and whether a plaintiff's injury constitutes antitrust injury, and whether that question is susceptible to common proof?  Do differences in plaintiff group (see Question 8 above) have implications for plaintiffs' ability to have common proof of antitrust injury?

3

- If different plaintiffs have different (and more or less complicated) trading profiles for a trade which sustained a net loss, does that fact have implications for class-wide determinations of antitrust injury?

12. If different plaintiffs pursuing § 2 claims are at different market levels or play different roles in the competitive process, would a grant of damages to all class members result in an award of duplicative or "double-damages" assessed against defendants?

- In other words, if loss is sustained by all plaintiffs due to monopolization – and assume some traders occupy positions lower down than (or derivative of) others – could there effectively be double recovery for the same loss? Does this matter?

13. Are all prospective class members equally "efficient enforcers" of the antitrust laws? Do they need to be?

14. Provide documentation and steps involved in the ICE WTI crude oil swaps.

- Is there potential overlap in the 15,000 swap contracts alleged in ¶ 94 of the Second Am. Compl.? If so, is it necessary to deal with that for damages purposes?

SO ORDERED.

Dated:   New York, New York
         February 11, 2015

_____
KATHERINE B. FORREST
United States District Judge

4