**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: CRUDE OIL COMMODITY
FUTURES LITIGATION

ECF CASE

Master File No.
11 cv 3600 (KBF)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' MANIPULATION CLAIMS UNDER THE CEA ............................................. 1

    A.  As A Matter Of Law, Plaintiffs Cannot Prove Price Artificiality ................................... 2

        1.  Plaintiffs Do Not Have Evidence That Prices Increased Artificially Across January 8-22 And March 4-19 ............................................................... 2

        2.  Plaintiffs Do Not Have Evidence That Prices Decreased Artificially On January 23-25 And March 20-25 ...................................................... 4

    B.  As A Matter Of Law, Plaintiffs Cannot Prove Ability To Manipulate ........................... 5

        1.  Defendants Did Not Have The Ability To Increase WTI Prices Across January 8-22 And March 4-19 ............................................................... 5

        2.  Defendants Did Not Have The Ability To Depress WTI Prices Across January 23-25 And March 20-25 .................................................... 10

    C.  As A Matter Of Law, Plaintiffs Cannot Prove Causation ............................................. 11

    D.  As A Matter Of Law, Plaintiffs Cannot Prove Manipulative Intent ............................ 12

        1.  Plaintiffs Have No Evidence That Defendants Intended To Manipulate WTI Prices Upward January 8-22 And March 4-19 ........................................... 12

        2.  Plaintiffs' Theory That Defendants Intended To Manipulate WTI Prices Downward On January 25 And March 25 Is Wrong ................................. 13

II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' MONOPOLIZATION CLAIMS UNDER THE SHERMAN ACT ................ 15

    A.  Plaintiffs' Market Share Calculations Make No Mathematical Sense .......................... 15

    B.  The WTI Forward Market Is Not Constrained By NYMEX Rule 200 ......................... 16

    C.  Lower Prices Are Contraindicative Of Monopoly Power ............................................. 17

    D.  Plaintiffs' Remaining Sherman Act Claims Are Without Factual Support.................... 18

III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS AGAINST ARCADIA PETROLEUM LTD.................... 18

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AD/SAT v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ............................................................................................ 17

*Cargill, Inc. v. Hardin,*
452 F.2d 1154 (8th Cir. 1971) ........................................................................................ 6, 8

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................................................... 1

*CFTC v. Moncada,*
2014 WL 2945793 (S.D.N.Y. 2014) ................................................................................ 14

*CFTC v. Parnon Energy Inc.,*
875 F. Supp. 2d 233 (S.D.N.Y. 2012) ............................................................................. 10

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984) ......................................................................................................... 18

*G.H. Miller & Co. v. United States,*
260 F.2d 286 (7th Cir. 1958) ............................................................................................ 6

*General Foods Corp. v. Brannan,*
170 F.2d 220 (7th Cir. 1948) ............................................................................................ 8

*Great Western Food Distributors, Inc. v. Brannan,*
201 F.2d 476 (7th Cir. 1953) ............................................................................................ 6

*In re Aluminum Warehousing Antitrust Litig.,*
No.13-md-2481-KBF, 54 (S.D.N.Y. March 26, 2015) ................................................... 15

*In re Amaranth,*
711 F. Supp. 2d 301 (S.D.N.Y. 2010) ............................................................................. 20

*In re Amaranth Natural Gas Commodities Litig.,*
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ....................................................................... 19, 20

*In re Amaranth Natural Gas Commodities Litig.,*
612 F. Supp. 2d 376 (S.D.N.Y. 2009) ......................................................................... 6, 19

*In re Cox,*
[1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786, 1987 WL 106789
(CFTC July 15, 1987) ........................................................................................................ 8

*In re DiPlacido,*
2008 WL 4831204 (CFTC 2008), *aff'd, DiPlacido v. CFTC,* 2009 WL 3326624 (2d Cir.
2009) .................................................................................................................................. 3

*In re Hohenberg Bros. Co.,*
   [1975-1977 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,271 (CFTC 1977) .............. 3, 13

*In re Indiana Farm Bureau Cooperative Ass'n, Inc.,*
   [1982-84 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,796, 1982 WL 30249 (CFTC
   December 17, 1982) ..................................................................................................... 8

*In re MF Global Holdings Ltd. Inv. Litig.,*
   998 F. Supp. 2d 157 (S.D.N.Y. 2014).......................................................................... 20

*In re Natural Gas Commodity Litig.,*
   337 F. Supp. 2d 498 (S.D.N.Y. 2004).......................................................................... 20

*In re Puda Coal Securities Litig.,*
   2013 WL 5493007 (S.D.N.Y. 2013) ............................................................................... 1

*In re Soybean Futures Litig.,*
   892 F. Supp. 1025 (N.D. Ill. 1995) ........................................................................ 6, 15

*Johnson v. Nextel Commc'ns Inc.,*
   --- F.3d ---, 2015 WL 897653 (2d Cir. Mar. 4, 2015) .................................................. 9

*Kohen v. PIMCO,*
   244 F.R.D. 469 (N.D. Ill. 2007) ..................................................................................... 6

*Linkco, Inc. v. Fujitsu Ltd.,*
   2002 WL 1585551 (S.D.N.Y. 2002) ............................................................................ 14

*Pepsico, Inc. v. The Coca-Cola Co.,*
   315 F.3d 101 (2d Cir. 2002).......................................................................................... 17

*Trugman-Nash, Inc. v. New Zealand Dairy Bd.,*
   942 F. Supp. 905 (S.D.N.Y. 1996) ............................................................................... 18

*U.S. v. E.I. DuPont de Nemours & Co.,*
   351 U.S. 377 (1956) ...................................................................................................... 17

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) ...................................................................................................... 18

**STATUTES**

7 U.S.C. §13 ....................................................................................................................... 20

7 U.S.C. §25(a)(1) ............................................................................................................. 20

Sherman Act §2 .................................................................................................................. 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 30 .............................................................................................................. 18

Fed. R. Civ. P. 56 ..................................................................................................................... 20

NYMEX Rule 200........................................................................................................................ 16

Once the moving party on summary judgment has asserted facts showing that the non-movant's claims cannot be sustained,

> the opposing party must cite to 'particular parts of materials in the record' that establish a 'genuine dispute,' and cannot rely merely on allegations or denials contained in the pleadings. '[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment,' as '[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist.'

*In re Puda Coal Securities Litig.*, 2013 WL 5493007, *5 (S.D.N.Y. 2013) (citations omitted). Defendants must prevail if Plaintiffs are unable to establish any single element of their claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Plaintiffs here repeat unsupported allegations and rely on facts already proven false, but cite no evidence demonstrating a genuine dispute of material fact. Plainly stated, Plaintiffs have patently failed to meet their burden necessary to avoid summary judgment in this case.

## I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' MANIPULATION CLAIMS UNDER THE CEA

Plaintiffs allege in the Complaint that Defendants manipulated NYMEX crude oil futures prices upward before and on expiration day of the prompt NYMEX contract (January 8-22 and March 4-19, 2008), and then downward thereafter during the three days known as the cash trading period (January 23-25 and March 20-25, 2008). (Comp, ¶¶ 96, 105)[1] According to Plaintiffs now, the cause of the artificially high prices was Defendants' purchasing of large WTI forward contract positions[2] and holding of them through expiration of the prompt NYMEX contracts. (*Id.*, ¶¶50, 58) The alleged cause of the artificially low prices was Defendants' liquidation of their large WTI forward contract positions on the last day of the relevant cash trading periods. (*Id.*, ¶¶52,59)

---

[1]   Plaintiffs do not allege in the Complaint that Defendants caused WTI prices to be artificial on January 25 or March 25. They allege price moves due to Defendants' trading, but not that the resulting prices were artificial. (Comp, ¶¶52, 59)  Because Plaintiffs now assert that the trading on January 25 and March 25 did cause artificially low prices (*e.g.*, Plfs' Opp. at 31), Defendants include those dates here.

[2]   Plaintiffs actually allege in the Complaint that Defendants' "physical oil" purchases and sales were the vehicle of manipulation.  As discussed at length in Defendants' opening memorandum, Defendants bought and sold forward contracts which, like futures, are derivative contracts. (DSF, ¶¶33-41)

Plaintiffs seek to divert attention from the lack of any evidence for each of the 28 different trading days on which they claim damages. Thus, the centerpiece of Plaintiffs' argument on every element of manipulation is that Defendants' single day liquidation of forward contracts on January 25 and March 25 coincided with a move in the WTI pricing structure from backwardation to contango. That activity, however, could have affected prices only on those two dates. It provides no evidence of manipulation across January 8-24 or March 4-24.

### A.    As A Matter Of Law, Plaintiffs Cannot Prove Price Artificiality

In order to prevail on the artificiality element, Plaintiffs must prove that WTI prices were artificial on each specific day for which they seek damages. Appendix A compares (a) the price effect alleged in the Complaint; (b) Defendants' daily net forward contract activity; and (c) actual WTI price and spread changes for each day on which Plaintiffs allege artificiality. As the table reflects, outright prices fell overall between January 8-22, the spread decreased on 3 out of 10 days across January 8-22 and on 4 out of 12 days across March 4-19, and Defendants sold forward contracts on 50% of the days in March when Plaintiffs claim their purchases were driving spreads up. Because WTI price action was inconsistent with Plaintiffs' allegations, they now argue that actual price moves are irrelevant, and that they must prove only that prices were higher or lower "than they otherwise would have been." (Plfs' Opp. at 39-40) But Plaintiffs' expert Mason has testified that he is unable to determine where market prices would have been but for Defendants' activities. (*See* Defs' Motion to Strike Mason ("MTS Mason") at 11-12) Plaintiffs now reiterate that it is impossible to say what prices otherwise would have been. (Plfs' Opp. MTS Mason at 8) By their own admission, Plaintiffs offer no empirical evidence that prices were artificial.

### 1.    Plaintiffs Do Not Have Evidence That Prices Increased Artificially Across January 8-22 And March 4-19

Although Plaintiffs acknowledge that courts look to factors such as historical comparisons of prices and spreads (Plfs' Opp. at 31), they offer no such evidence themselves for any dates prior to

January 25 or March 25. Instead, Plaintiffs argue that because Defendants allegedly traded with manipulative intent, all of their activity was "illegitimate," and all prices impacted by their trading were necessarily "artificial." (*Id.* at 29-31) Even though Mason acknowledges that as a matter of economic principle all trading creates some price effect (McGrath Ex. 42, 2/13/15 Transcript at 78:18-20), Plaintiffs ask the Court to "assume" proof of intent is enough to meet their burden and to ignore decades of precedent requiring objective proof of artificiality as a separate element of a CEA manipulation claim.[3] (*See* cases cited at 11-12, 16-17 of Defs' Mem. in Supp. of their Motion for Summary Judgment ("SJ Mem")) Plaintiffs' approach also would render superfluous the separate offense of *attempted* manipulation, where a defendant would be liable for perfected manipulation any time a plaintiff established trading with manipulative intent. *See In re Hohenberg Bros. Co.,* [1975-1977 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,271 at 21,477 (CFTC 1977) (the elements of an attempted manipulation claim are: (1) the defendant intended to affect market prices; and (2) took some overt act in furtherance of that intent).

Plaintiffs generally assert that Defendants' trading caused spreads "to move into greater backwardation." (Plfs' Opp. at 29) The only supporting "evidence" is Mason's Report (¶¶43, 55) and three instant messages between WTI traders January 16-17, 2008. The paragraphs of Mason's Report merely reflect that the market was consistently backwardated during January and March 2008. Mason did not compare the backwardation in those months to backwardation in WTI spreads during any other period, or to backwardation in any other commodity during the same months. Consistent backwardation across a trading month is not on its own an indication of artificiality – and Plaintiffs cite no authority for their implication that it is. Consistent, even increasing, backwardation was not unusual in early 2008, since the market had seen similar spread activity in

---

[3]    Plaintiffs' reliance on *In re DiPlacido*, 2008 WL 4831204 (CFTC 2008), *aff'd, DiPlacido v. CFTC,* 2009 WL 3326624 (2d Cir. 2009), is misplaced. The ALJ in *DiPlacido* merely concluded that because there was evidence that in trading futures contracts on the NYMEX floor DiPlacido had violated bids and offers (*i.e.,* had offered to sell at a price below a prevailing bid, and bid at a price higher than a prevailing offer), the prices could not have been determined by the free forces of supply and demand. None of the allegations here relate to any misconduct on the NYMEX trading floor.

prior months. Appendix B compares spreads in January and March 2008 to those in September through December 2007. The side-by-side comparison demonstrates that the spread moves at issue here were not unusual or remarkable.

As for the non-party IMs, McGrath Exhibit 39 never mentions prices. ███████████ testified that what she meant by the comment quoted from McGrath Exhibit 36 was that "[t]he markets were just quoted very tight," meaning "[b]id offers were very narrow." (Ex. 72, ████████ Dep. at 127:6-128:2)[4] This does not suggest, much less provide reliable evidence, that prices were artificial. To the contrary, a narrow bid/offer spread is a hallmark of a liquid market, not artificiality. (*See* Ex. 73, Walter Bagehot, *The Only Game in Town*, Financial Analysts Journal, March/April 1971) Nor is ███████████ comment in McGrath Exhibit 37 that on January 17 fundamentals did not "seem to support" the strong spread evidence that prices were artificial. ███████████ colleague at ███████ testified that prior to expiration of the NYMEX contract, activity in the futures market (rather than market fundamentals) drives the spread value. (DSF, ¶24) None of these documents creates a disputed issue of material fact, and Plaintiffs' claim that prices were artificially high across January 8-22 and March 4-19 must fail.

## 2. Plaintiffs Do Not Have Evidence That Prices Decreased Artificially On January 23-25 And March 20-25

The remainder of Plaintiffs' argument regarding artificiality relies on the move from backwardation to contango on the last day of the cash trading period, and therefore relates solely to January 25 and March 25. The price moves on January 25 and March 25 are not, and cannot be, evidence of artificiality on January 23-24 or March 20-24. They are also insufficient to establish artificiality on January 25 and March 25 because when the prompt NYMEX spreads on those dates are compared to spreads in prior months, it is clear they are not unusual. On January 25, the prompt NYMEX spread – the spread on which Plaintiffs' damages claim is based – was March/April. On

---

[4]   Exhibits referenced herein correspond to exhibits to the Decl. of Elizabeth Bradshaw (filed 1/30/15, Exs. 1-71) and the Supp. Decl. of Elizabeth Bradshaw filed contemporaneously herewith (4/1/15, Exs. 72-84).

March 25, the prompt NYMEX spread was May/June.  Comparatively, the spreads were not unusual when compared to the preceding four months:

| NYMEX Trading Day | Sept 2007 NYMEX Spread (Nov/Dec) | Oct 2007 NYMEX Spread (Dec/Jan) | Nov 2007 NYMEX Spread (Jan/Feb) | Dec 2007 NYMEX Spread (Feb/Mar) | Jan 2008 NYMEX Spread (Mar/Apr) | March 2008 NYMEX Spread (May/Jun) |
|---|---|---|---|---|---|---|
| Cash Day 1 | .98 | .81 | 1.14 | 0.10 | .37 | .78 |
| Cash Day 2 | .80 | .97 | 1.11 | 0.31 | .42 | .62 |
| Cash Day 3 | .92 | 1.22 | 1.05 | 0.39 | .24 | .39 |

(*See* Appendix B)  Plaintiffs offer no analysis comparing NYMEX futures spread moves during the cash periods in January and March to historical futures spread moves in prior cash periods. Plaintiffs rely solely on Mason's econometric model, flawed in the many ways identified by Defendants, because all of the more conventional and transparent methods used to analyze artificiality lead to one conclusion: Plaintiffs' tale of manipulation is a fabrication.

**B.      As A Matter Of Law, Plaintiffs Cannot Prove Ability To Manipulate**

**1.      Defendants Did Not Have The Ability To Increase WTI Prices Across January 8-22 And March 4-19**

With respect to Defendants' alleged ability to manipulate prices upward across January 8-22 and March 4-19, Plaintiffs alternately claim that Defendants' cash forward positions (a) gave them market power and dominance, which they exploited to increase prices[5]; *or* (b) sent "false" signals of increased demand to the market, leading other market participants to push up prices.[6]  Despite Plaintiffs' commingling of the two manipulation theories in their argument, they are in fact very

---

[5]   *See* Comp., ¶¶54, 61 (Defendants had market power), ¶4(B) (Defendants controlled WTI supplies); ¶¶4(C), 46, 50, 50(d), 52, 57, 66, 67 (Defendants' positions were dominant); and Plfs' Opp. at 26 (Defendants' forward contracts "provided them with great power to move prices up"), 30 (Defendants kept purchasing forward contracts "in order to obtain the power to move, and Defendants did move, NYMEX futures spread prices"), and 31 (holding forward contracts into cash period "gave Defendants more power to inflate NYMEX futures spread prices when Defendants wanted those prices higher")

[6]   *See* Comp., ¶4(C) (Defendants' trading activity "falsely signaled to market participants" that WTI supplies were declining and sent "false price signals"), ¶5(b) (Defendants "sent false signals to and greatly misled market participants"); and Plfs' Opp. at 18 (asserting that Defendants' purchases "sent false signals to market participants" and "falsely communicated to the market").

different.[7]  Manipulation via market power involves the accused actually controlling a sufficiently

large share of the commodity market to control prices itself.  *See, e.g., Great Western Food*

*Distributors, Inc. v. Brannan*, 201 F.2d 476 (7th Cir. 1953); *G.H. Miller & Co. v. United States*, 260

F.2d 286 (7th Cir. 1958); *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971).[8]  In contrast,

sending *false* price signals assumes that Defendants did not control the actual barrels of oil

commensurate with their forward contract position and did not intend to take delivery of those

barrels; otherwise, the alleged impression created – that the position represented actual demand –

would not have been "false."  Plaintiffs pursue both theories without acknowledging that they are

contradictory, and unsuccessfully attempt to use the same proof to establish them.  Both efforts fail.

    **Defendants Did Not Have Market Power**  Although Plaintiffs refuse on specious grounds to

admit the facts recited in Paragraphs 82-83 of Defendants Rule 56.1 Statement of Facts, they do not

otherwise dispute the factual basis of Defendants' showing that their WTI forward contract

positions during January and March 2008 were not dominant because other traders in the market

contemporaneously held positions that were as large or larger than Defendants'.  (Defs' SJ Mem. at

3-4)  The simple fact that at least one other market participant had a larger position than Defendants

on every day but one during the two months at issue unequivocally demonstrates this fact.  But

Plaintiffs continue to assert that Defendants held "enormous" positions that represented huge

percentages of the "deliverable supply," and therefore had market power and the ability to

manipulate prices upward.  (Plfs' Opp. at 26, 30, 31)  The assertion is wrong.

    Plaintiffs' calculations of alleged WTI market share "percentages" controlled by Defendants

are inaccurate, misleading, and contradicted by undisputed factual evidence.  On March 19, 2008,

---

[7]    The contradictory nature of Plaintiffs' two theories prevents them from being considered in combination, as the district court did in *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1047 (N.D. Ill. 1995) (recognizing possibility that ability might arise "through a combination of market power and false reports").

[8]    Plaintiffs here allege use of physical contract positions to manipulate futures prices.  The majority of cases on which Plaintiffs rely allege use of futures positions to manipulate futures prices.  *See, e.g., In re Soybean Futures Litig.*, 892 F. Supp. 1025; *Kohen v. PIMCO*, 244 F.R.D. 469 (N.D. Ill. 2007); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376 (S.D.N.Y. 2009).

when Defendants' forward contract position reached its maximum size of 6,268,000 barrels, ███

position was 8,569,000, ████████████████████ position was 2,970,000, and

█████████ position was 4,098,000.  (DSF, ¶83)  Therefore if, as Plaintiffs allege, Defendants

controlled over 90% of the deliverable supply (Plfs' Opp. at 23) as calculated by EnSys (6,901,286

barrels), then █ would have controlled 124.2%, ██████ would have controlled 43.0%, and

█████ would have controlled 59.4%.  In other words, using Plaintiffs' misleading calculation,

these four market participants alone allegedly held *317.4%* of the deliverable supply.  Looked at

another way, on March 19, Defendants' holdings represented 28.6% of the combined positions of

just four market participants, but Plaintiffs repeatedly claim it represented 90% of the *entire*

*market*.[9]  The market share "percentages" cited by Plaintiffs and Mason plainly do not represent "a

part of a whole expressed in hundredths"[10] and therefore are misrepresentations of the facts.

Mason has testified that as the market approaches delivery, the volume of WTI forward

contracts and "deliverable supply" are equal.  (McGrath Ex. 42, 2/13/15 Transcript at 19:18-19

("[A]t the end there can only be as many contracts as there is oil."))  This is demonstrably false.  At

the end of the day on March 24, 2008, immediately before scheduling day for physical WTI, the

combined forward contract positions of only Defendants, █████ and █████ were 9,739,000

barrels – almost 3 million barrels more than EnSys's estimate of deliverable supply.  (DSF, ¶83)

Mason bases his entire regression model on these demonstrably false market share

"percentages" attributed to Defendants, rendering his results a nullity.  (*See* discussion in Defs'

Reply on MTS Mason at 1-2, being contemporaneously filed and incorporated herein by reference)

Mason touts his qualifications as a "financial economist," but what kind of financial economist

---

[9]     Likewise, on January 17, when Defendants' forward contract position reached 4,611,000 barrels, ███
position was 7,492,000, ██████ position was 4,510,000, and █████ position was 2,821,000.  (DSF,
¶83)  Using Plaintiffs' calculation, when Defendants allegedly controlled 57.5% of EnSys's deliverable
supply (8,012,962 barrels) (Plfs' Opp. at 23), █ controlled 93.5%, ██████ controlled 56.3%, and
█████ controlled 35.2% – by Plaintiffs' calculation these four alone allegedly held *242.5%* of the
"deliverable supply."  On January 17, Defendants' holdings represented 23.7% of the combined positions of
just these four, *not* 57% of the *entire market*.
[10]    Merriam Webster defines "percentage" as "a part of a whole expressed in hundredths."

grounds his model on a market share analysis in which just 4 (of over 80 active) traders represent

300% of the market and in which *only* Defendants' forward contract holdings reduce the remaining

deliverable supply? These errors may originally have been born of Mason's lack of understanding

of the U.S. crude market, but now that the calculations have been categorically discredited,

Plaintiffs' continued reliance on his market share analysis is an attempt to mislead.

Plaintiffs' responses to Defendants' arguments challenging the market power theory are

wholly unpersuasive and further illustrate why Plaintiffs' analysis of Defendants' ability is wrong:

- Plaintiffs have no substantive response to Defendants' arguments that they did not have market power because they (a) held no physical WTI and (b) held small WTI futures positions. Plaintiffs merely argue that neither control of the physical supply of a commodity, nor control of the futures market for a commodity, on its own, is a prerequisite to manipulation. (Plfs' Opp. at 26, 28-28)  But no case has ever held that a trader could be found liable for market power manipulation when it controlled *neither* the physical *nor* the futures market.[11]

- Defendants correctly pointed out in their Opening Memo that given how EnSys calculates deliverable supply, Defendants held zero percent of it.[12]  (Defs' SJ Mem. at 8) Plaintiffs ironically respond that this argument suffers from "hindsight bias." But the "retrospective" EnSys analysis is also based on hindsight, prepared years after the fact. (DSF, ¶103)  Thus, while Defendants urge an apples-to-apples comparison, Plaintiffs' market share analysis compares apples to pears – as EnSys's Tallett readily conceded. (DSF, ¶93)

- Plaintiffs also argue "hindsight bias" in response to Defendants' argument regarding the adequacy of WTI to satisfy demand during the months at issue. Courts in the seminal market power manipulation cases considered the adequacy of supply to be a relevant consideration, and by necessity were evaluating it in hindsight.[13]  The backward-looking perspective does not diminish the value of the analysis; nor does it excuse Plaintiffs' continuing attempts to wholly ignore the demand side of the supply/demand balance in analyzing Defendants' market power and ability to manipulate.

**Defendants Did Not Send False Price Signals**  The theory that Defendants manipulated WTI

prices upward by purchasing and holding WTI forward contracts, thereby sending "false" price

---

[11]  Plaintiffs attempt to dismiss Defendants' evidence regarding intratank transfers at TEPPCO by claiming it improperly compares positions to trading volume is without merit.  All of the intratank transfers represent forward contract positions held by the traders on whose behalf the transfers are done. (DSF, ¶46)

[12]  Even EnSys's Zito agreed that if Defendants never took delivery of a molecule of oil, they could not have impacted deliverable supply. (DSF, ¶94)

[13]  *See Cargill*, 452 F.2d at 1164-65; *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786 at 34,061, 1987 WL 106789, *4-8 (CFTC July 15, 1987); *In re Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982-84 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,796, 1982 WL 30249, *12 (CFTC December 17, 1982); *General Foods Corp. v. Brannan*, 170 F.2d 220, 223 (7th Cir. 1948).

signals to the market, is no more viable than their market power theory.[14]  Plaintiffs' false signaling

theory is not only unsupported by the evidence in this case, it is directly contradicted by it:

- Plaintiffs cite no evidentiary support for their theory that market participants who saw Defendants' forward contract purchases in January or March 2008 viewed them as signals that demand had increased and changed their WTI trading behavior as a result. In fact, the undisputed evidence is to the contrary. (Defs' SJ Mem. at 19)  For example, Plaintiffs highlight communications by ▉ traders discussing Defendants' accumulation of large forward positions and their liquidation of those positions on January 25 and March 25. (Plfs' Opp. at 22)  But every ▉ witness who actually traded WTI was asked during his deposition if ▉ changed its trading behavior based on Parnon's activities – and not one said it did. (*See* DSF, ¶181, ▉ Dep. at 112:3-18 ("Q. … Do you know whether anyone at ▉ adjusted their trading strategies based on … Parnon's conduct at the time? A. I don't think so."); Ex. 74, ▉ Dep. at 101:5-13, 120:4-7 ("Q. Do you recall anything in the markets that caused ▉ to alter how it traded during this time period? A. No."); Ex. 75, ▉ Dep. at 68:21-24, 91:23-92:1, 97:6-10 (repeatedly stating that he did not recall adjusting his trading strategy based on his observations of Parnon's trading).

- Mason's opinions are insufficient support for Plaintiffs' false signaling theory. Mason has no experience trading physical crude oil (*see* Defs' MTS Mason at 3-5) and is not qualified to opine on, much less to contradict the testimony of participants actually active in the market at that time. In fact, Mason has repeatedly testified contrary to the false signaling theory. During his deposition, Mason conceded that he had not seen any testimony suggesting that any trader changed its activity as a consequence of Defendants' activities in connection with February 2008 WTI forward contracts. (DSF, ¶192)  During the class certification hearing on February 13, 2015, Mason responded: "*I haven't seen any evidence that anyone outside of defendants knew of defendants' activities*. I don't have evidence that anyone … saw them trading and said I better put on a position to protect myself from that." (McGrath Ex. 42 at 32:19-24 (emphasis added))

- Plaintiffs improperly assign market impact to all of Defendants' trading activity but pretend other traders operated in a vacuum. Plaintiffs' manipulation theory suggests that *only* Defendants sent price signals by holding WTI forward contracts. Of course, if Defendants' purchases sent signals about demand, then so did other traders' purchases; if Defendants' purchases sent "false" signals about demand because they did not intend to take delivery, then so did every other speculative trader's purchases. If Defendants' forward contracts represented a "threat" to take delivery and thus represented "control" over the volume of barrels represented by their paper contracts, then so did other traders' contracts. Plaintiffs cannot assign market share to Defendants based on their right to demand delivery without doing the same for every other forward contract trader in the market. If they did so, Mason's model, and Plaintiffs' entire theory, would crumble.

---

[14]  Plaintiffs' argument lacks any evidentiary support and also undermines their case in a more immediate way. Plaintiffs themselves now assert that market participants saw Defendants' purchasing activity and reacted to it, and also saw their liquidation activity and speculated that it had impacted prices. (Plfs' Opp. at 4-9, 18, 21-22, 26)  This dooms Plaintiffs' bid for class certification. If market participants (a/k/a potential class members) saw all of Defendants' trading, then they were on notice of their CEA claims, and individual issues relating to Defendants' statute of limitations defense will predominate. *See Johnson v. Nextel Commc'ns Inc.*, --- F.3d ---, 2015 WL 897653, at *15 (2d Cir. Mar. 4, 2015).

## 2.    Defendants Did Not Have The Ability To Depress WTI Prices Across January 23-25 And March 20-25

To support their argument that Defendants had the ability to manipulate WTI prices downward on January 25 and March 25, Plaintiffs again turn to the move from backwardation to contango, along with certain of Defendants' emails and non-party trader communications. (Plfs' Opp. at 10-13, 22)  Obviously, none of this is evidence of an ability to manipulate at any time before January 25 or March 25.  With respect to January 25 and March 25, the move from backwardation to contango occurred in the forward contract market for Feb/March and April/May, neither of which is the subject of Plaintiffs' alleged damages claim – and neither of which was analyzed by Mason. (DSF, ¶88)  Moreover, Plaintiffs themselves now agree that Defendants were not in control of WTI prices on those dates – the buyers were:

> Defendants … claim[ ] that "puking describes something a trader does *not* want to do and a situation in which a seller is *not* in control of the price." Exactly! … By intentionally waiting until the 13th hour … to unload a large physical position … Defendants created the circumstances under which they were absolutely certain to have to "sell hard" or "puke" *at whatever price they could get*.

(Plfs' Opp. at 12 (citation omitted, emphasis added)).  In other words, Defendants were at the mercy of legitimate market forces on January 25 and March 25.  They were forced to sell "at whatever price they could get" – a price dictated by the buyers, not Defendants, according to Ellis. (DSF, ¶159)  A price reached in this manner is not artificial, but the product of legitimate market forces.

Plaintiffs' attempt to establish Defendants' ability to manipulate WTI prices downward by citing to non-party communications and testimony fails.[15] (Plfs' Opp. at 22)  For example, the ██████ testimony notes that WTI followed Brent crude into contango structure on January 25 – a contraindication of artificiality in WTI pricing, since Brent crude moved similarly, and a contraindication that the cause was Defendants' trading. (McGrath Ex. 25)  The ███ testimony

---

[15]   Plaintiffs' reliance on Judge Pauley's decision in *CFTC v. Parnon Energy Inc.*,  875 F. Supp. 2d 233 (S.D.N.Y. 2012)  claiming that he "found" Defendants had the ability to manipulate (Plfs' Opp. at 19), is misplaced.  The Court was required to accept the CFTC's allegations as true for purposes of Defendants' motion to dismiss and made no "findings."

notes both that it is not unusual for a trader to take a long position past expiration of the NYMEX contract (McGrath Ex. 23 at 204:17-19) and that ███████████ thought Parnon was "long and wrong" – long with no buyers and no economic incentive to store in backwardation. (*Id.*, 203:19-205:14) In other words, ██████ thought Parnon had made a poor trading decision rather than manipulated. The ██████ email and testimony note that Parnon was selling on March 25 and the April/May forward contract spread had moved into contango; nowhere does it suggest the price was artificial. (McGrath Exs. 24, 65) In the ██████ IM, the "freak show" description plainly refers to the level of trading activity on January 25, not the prices. (McGrath Ex. 38) Despite Plaintiffs' repeated assertions to the contrary, Defendants' own emails are not evidence of ability to manipulate WTI prices. (*See* Defs' SJ Mem. at 23-27)

### C.    As A Matter Of Law, Plaintiffs Cannot Prove Causation

Plaintiffs devote little over one page of their fifty page Opposition Memo to causation, half of which to the undisputed proposition that they need only prove Defendants were "a" proximate cause of artificial prices. Plaintiffs' substantive argument simply refers back to their argument on ability. In the end, the only proof of causation Plaintiffs offer is Mason's model. Defendants address the central flaws in Mason's approach *supra* and in their Motion to Strike his reports and testimony.

Undisputed evidence shows that everything Defendants did in January and March 2008, other traders did as well. Defendants acquired a large cash forward position, but so did █, ██████, and ██████ (as just three examples). (DSF, ¶83, Appendix C) Defendants held a large cash forward position past expiration of the NYMEX contract, but so did █, ██████, and ██████. (*Id.*; *see* positions at the close on January 22 and March 19) Defendants liquidated a large volume of forward contracts in a single day during the cash period, coinciding with a narrowing of the spread, but so did █. (*Id.*; *see* ██████ sale of 5,691,000 barrels on January 23 coinciding with a narrowing of the March/April spread by 8 cents, and ██████ sale of 8,589,000 barrels on March 24 coinciding with a narrowing of the spread by 16 cents (using Mason's settlement numbers)) The only difference

11

between Defendants' trading and ███ is that ███ sold more, and did it one or two days before Defendants. Plaintiffs and Mason simply choose not to measure ███ trading in the same way they do Defendants' trading. Plaintiffs assert no misconduct in connection with the sales by other market participants. In other words, acquiring a large forward contract position, holding it past NYMEX expiration, and selling (or rolling) millions of barrels in a single day during the cash period, coinciding with a narrowing of the spread, is insufficient evidence to establish the causation element of a CEA manipulation claim.[16] Plaintiffs have not met their burden.

### D.   As A Matter Of Law, Plaintiffs Cannot Prove Manipulative Intent

All of the evidence Plaintiffs cite to demonstrate Defendants' alleged manipulative intent relates to the liquidation of their forward contract positions on January 25 and March 25 – not to the acquisition of those positions, their size, or their duration past NYMEX expiration.

### 1.   Plaintiffs Have No Evidence That Defendants Intended To Manipulate WTI Prices Upward January 8-22 And March 4-19

Plaintiffs cite no evidence demonstrating that Defendants intended to cause WTI prices to increase artificially across January 8-24 or March 4-23. Plaintiffs' intent argument regarding the alleged manipulation upward is limited to asserting that Defendants had a financial motive to benefit their larger NYMEX futures spread positions.[17] (Plfs' Opp. at 9-10) But the CFTC has said, "Even though respondents' activities may have involved a 'profit motive,' absent a finding of

---

[16] Plaintiffs do not respond to Defendants' undisputed intraday pricing evidence showing that the majority of the drop in the March/April spread on January 25 occurred before Defendants rolled any significant portion of their February/March forward contract position. (Defs' SJ Mem. at 19-20)

[17] Plaintiffs persistently mischaracterize Defendants' meaning of the term "balances" or "Cushing balances" to be coextensive with "deliverable supply." (Plfs' Opp. at 24) The "balances" to which Defendants refer is simply the amount by which Cushing storage will build (*i.e.*, increase) or draw (*i.e.*, decrease) after *all* demand for *light sweet crude* has been satisfied. (Ex. 76, Dyer 9/18/13 Dep. at 88:4-89:11, 117:7-12, 264:21-265:8; 10/23/13 Dep. at 139:11-140:22) That Defendants' positions in January and March were large relative to their estimates of how much Cushing storage would build or draw by the end of February and April, respectively, is not evidence of intent. The Wildgoose email Plaintiffs cite does not support their interpretation: "We estimate there to be around 7 mil bls of wti left at the end of feb at this point...." – "left" as in a surplus, NOT a measure of the entire supply. Other market participants defined "balance" in the same way. (*See* Ex. 77, ███ Dep. at 123:18-124:4 (defining "balance" as "[t]he balance of whether there's a surplus or deficit of domestic sweet oil in Cushing."))

manipulative intent, trading with the purpose of obtaining the best price for one's [commodity] does not constitute, in itself, a violation of the Commodity Exchange Act."[18] *See Hohenberg Bros.*, ¶20,271 at 21,478 (finding insufficient evidence of manipulative intent).

Significantly, there is undisputed evidence that Defendants' counsel had approved both the size of Defendants' position and holding that position into the cash period. As Plaintiffs highlighted during the class certification hearing (Ex. 79, Plfs' slide submitted 2/13/15), Defendants were told by their counsel on or around January 18, 2008, that he was comfortable with them taking a position of up to 6 million barrels of "cash" (*i.e.*, WTI forward contracts (DSF, ¶37)) past expiration of the NYMEX contract. This shows that Defendants sought the advice of counsel regarding taking a position of up to 6 million barrels of forward contracts past expiration, were advised that it was permissible, and followed that advice. There can be no question that Defendants lacked manipulative intent with respect to their trading through January 22 and March 19.

### 2. Plaintiffs' Theory That Defendants Intended To Manipulate WTI Prices Downward On January 25 And March 25 Is Wrong

Defendants' sales of large forward contract positions during the cash periods in January and March 2008 were not unique. (*See* Section C, *supra*) Moreover, despite Plaintiffs' repeated assertions that the goal of Defendants' alleged manipulative scheme was to drive prices down on January 25 and March 25 to collect artificiality and profit on larger short NYMEX futures spread positions, according to Plaintiffs' own exhibit ***Defendants did not close out any of their short March/April NYMEX spreads on January 25 at the allegedly artificial prices***. (McGrath Ex. 3,

---

[18] Plaintiffs cannot credibly argue that Defendants' carrying a cash forward position past expiration is evidence of manipulative intent. Such an approach is neither unique (*see* Section C, *supra*) nor uneconomic *ex ante*. Defendants recorded daily NYMEX spread values in a spreadsheet they called the "arb calc," which was produced to Plaintiffs. The "Domestic 2" tab of the arb calc (attached to the Bradshaw Decl. as Ex. 78) reflects daily spread values beginning in 2000, and provided Defendants with an historical reference for spread activity between NYMEX expiration and the last day of the cash period. Using NYMEX published spread values, over 2000-2007, the prompt spread increased between NYMEX expiration and the end of the cash period 49% of the time. Increases ranged from one cent to $3.76. Plaintiffs complain that Ex. 62 to the Bradshaw Declaration is a "new" NERA analysis, but Ex. 78 shows that Defendants themselves contemporaneously tracked this data and had every reason to believe the spread might widen between expiration and the last day of the cash period.

Column R, lines 19-20) They actually *increased* their short position on January 25 by 2,376

contracts (*id.*) in an effort to mitigate their losses on sales of their forward contracts if the market

moved against them. By January 26, the artificiality had disappeared according to Mason (DSF,

¶131); therefore, Defendants did not take any action to profit while the spread was allegedly

artificial and collected no profit from the "scheme." On March 25, Defendants rolled 4,554

April/May forward contract spreads at a loss but bought back only 4,330 May/June futures spreads.

(McGrath Ex. 3, Column R, lines 60-61) They held an additional 16,760 short May/June spreads on

NYMEX that they could have closed out at the allegedly artificial spread value, but did not. (*Id.*)

In other words, Defendants' trading activity was wholly inconsistent with the alleged goal of the

manipulative scheme.

Plaintiffs inaccurately frame their discussion of Defendants' allegedly incriminating emails as

"competing interpretations" of the documents. (Plfs' Opp. at 10-11) Defendants Wildgoose and

Dyer, the authors of the documents, have testified consistently about what they meant.[19] (Defs' SJ

Mem. at 22-28; DSF, ¶¶147-165) No fact witness has challenged their explanations, and no record

evidence rebuts it. Although Plaintiffs cite contrary interpretations offered by their experts Mason

and Ellis (*e.g.*, Plfs' Opp. at 12; Plfs' Resp. to Defs' Rule 56.1 Statement[20] ("R56.1 Resp.") at

¶¶149-165), experts may not opine on state of mind or intent. *Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL

1585551, at *2 (S.D.N.Y. 2002); *CFTC v. Moncada*, 2014 WL 2945793, at *5 (S.D.N.Y. 2014).

---

[19]   With respect to the IM between Parnon's Matthew Streeter and ⬛⬛⬛⬛⬛, Plaintiffs misrepresent
the document. *See* Defendants' Response to Plaintiffs' Rule 56.1 Statement of Additional Facts, ¶11.
[20]   Plaintiffs' Responses to Defendants' Rule 56.1 Statement in large part do not respond directly to the
facts identified with admissible evidence that actually disputes the facts identified. Defendants understand
the Court will make its own judgments regarding Plaintiffs responses, but the responses to paragraphs 31, 67-
68, 74, 77, 82-83, 84, and 153-154 are particularly egregious. For example, in response to Paragraph 31,
Plaintiffs claim spreads went as wide as $2.14 during the last minute of trading on March 19, 2008, but that
was a quote for the April outright contract, *not the spread*. (*See* McGrath Ex. 44 (column J, reflecting only
"CL08J" (April 2008) contracts – not spreads)) Defendants' assertion that the data in Paragraph 83 and
Exhibit 2 to the Bradshaw Declaration is not admissible is wholly without merit. They complain that
"Defendants' transaction records" were not identified but use the exact same numbers in their own Rule 56.1
Statement at paragraphs 6 and 22. The remaining data for third parties is tied to Bates numbers or deposition
exhibits, and Plaintiffs offer no specific facts to dispute a single number.

Neither Mason nor Ellis should be permitted to offer any opinion on what Defendants meant or

intended when they wrote the emails at issue. And without those improper opinions, there are no

"competing interpretations" of the documents. Regardless of intent, Defendants are entitled to

summary judgment because Plaintiffs cannot establish any of the other elements of their

manipulation claim. *In re Soybean Futures Litig.*, 892 F. Supp. at 1040 ("A defendant moving for

summary judgment must prevail if the plaintiff fails to establish an essential element of its case.").

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' MONOPOLIZATION CLAIMS UNDER THE SHERMAN ACT

Plaintiffs argue that they have shown Defendants' control over WTI futures prices through

direct evidence and thus need not define a relevant market. But "[a] showing of market power is a

substantive element of a monopolization claim, and 'plaintiff cannot escape proving her claims with

reference to a particular market even if she intends to proffer direct evidence of controlling prices or

excluding competition.'" *In re Aluminum Warehousing Antitrust Litig.*, No.13-md-2481-KBF, 54

(S.D.N.Y. March 26, 2015) (order granting in part motion to dismiss) (citation omitted). Plaintiffs'

evidence is again based on Mason's fundamentally flawed model. Mason's analysis measures the

effect of Parnon's activity for each day by comparing Defendants' forward position to EnSys's

deliverable supply estimates and "account[s] for the non-linear effects of Defendants' buys and sells

of physicals as Parnon's percent of the deliverable supply market increased." (Ex. 1, Mason Rep.

¶68) In other words, Plaintiffs' "direct evidence" relies on Defendants' purported dominance of the

relevant market wrongly defined as deliverable supply. Because Mason's model results are flawed

for the reasons discussed *supra* and in Defendants' Motion to Strike, and because Plaintiffs cite no

other evidence, Defendants are entitled to summary judgment on Plaintiffs' monopolization claims.

### A.   Plaintiffs' Market Share Calculations Make No Mathematical Sense

Plaintiffs point to no authority other than Mason to justify equating Defendants' derivative

WTI forward position (the numerator) to physical barrels counted as deliverable supply (the

15

denominator) to establish Defendants' purported share of the relevant market. Mason has testified

that as the delivery month approaches, there is a one-to-one correlation between forward contract

volume and deliverable supply. (McGrath Ex. 42, at 44:18-45:3) But Mason later conceded that on

March 17, 2008, the forward positions of just four market participants totaled more than 21 million

barrels, more than 300% of EnSys's base April deliverable supply (6,901,286 barrels) and 170% of

hypothetical deliverable supply. (*Id.* at 52:15-54:9) These percentages do not even account for the

positions of dozens of other market participants. Plainly, there was no one-to-one correlation. In

fact, review of the position data utilized by Mason in his model (*see* Ex. 2(B)) shows not only that

there is no one-to-one correlation between forward positions and "deliverable supply," but also that

non-party market participants held equivalent or greater shares of the so-called relevant market.

The demonstrated invalidity of this one-to-one correlation nullifies Mason's model.

### B.    The WTI Forward Market Is Not Constrained By NYMEX Rule 200

Reasons there is no one-to-one correlation between WTI forward contracts and deliverable

supply include: 1) a single barrel of crude may be traded multiple times via forward contracts, even

through the delivery month (DSF & Plfs' R56.1 Resp. ¶¶49, 53-55, 73); and 2) oil deliverable under

a WTI forward contract is not limited to NYMEX-qualified barrels that are stored at or pass through

Cushing. (*See* Plfs' R56.1 Resp., ¶12 (admitting that due in part to delivery requirements, NYMEX

futures are not suited to allocate the physical commodity)) Indeed, EnSys's estimates exclude:

- 29,351,661 barrels of NYMEX Qualified, Light Sweet NYMEX Equivalent, and Light Sweet Similar crudes "at non-Cushing locations that were either not economic to divert to Cushing or not capable of being available at Cushing by the first of February;" and
- 30,486,529 barrels of oil from its April deliverable supply estimate for similar reasons.

(Ex. 6, EnSys Report at 12; *see also* Ex. 80, Luckner Dep. at 89:11-93:10, 107:11-113:21)

Significantly, EnSys excluded some types of crude that were not "NYMEX Qualified" but could

have been substituted by refineries for NYMEX Qualified Light Sweet without a significant impact

on operations and for a "small, quality based price difference." (Ex. 6, EnSys Report at 36-37, ¶¶5-

6) EnSys also noted "instances of switching between West Texas Sour crude oil and WTI." (*Id.* at 38, ¶11) These products are exactly the type that are "reasonably interchangeable by consumers," *i.e.*, refiners, and should have been included in the relevant market of oil deliverable under a WTI forward contract. *U.S. v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 404 (1956). To the extent Defendants' forward contracts did not comply with NYMEX delivery specifications, they should not have been included in the market share calculation. This point is not just theoretical. Had Plaintiffs actually reviewed Defendants' contracts, they would have realized that some called for delivery at Midland, Texas (Ex. 56); some called for delivery of "domestic sweet" or for delivery at a non-specified terminal at Cushing, which may or may not meet NYMEX specifications (Exs. 57, 58); and some called for delivery via in-tank transfer (Ex. 57), a delivery method excluded by EnSys from deliverable supply. (Plfs' R56.1 Resp, ¶73)

## C.     Lower Prices Are Contraindicative Of Monopoly Power

Defendants identified multiple days when WTI outright futures prices and spread values decreased notwithstanding Defendants' purchases of forward contracts. (Defs' SJ Mem. at 43-44 (Defendants inadvertently cited to Ex. 8, but support for the pricing data is set forth in DSF ¶¶83, 139-142) Plaintiffs' assertion that lower prices do not preclude a finding of antitrust injury is a misstatement of the law. Monopoly power is the ability to raise price by restricting output. *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002). Lower prices benefit consumers and do not harm competition; thus they do not establish antitrust injury. *AD/SAT v. Associated Press*, 181 F.3d 216, 232 (2d Cir. 1999). Indeed, the fact that prices decreased despite Defendants' purchases shows that other market forces were at work and that Defendants did not control them. Plaintiffs' reliance on the *Strobl, Transnor (Bermuda)*, and *Sanner* decisions is

17

misplaced, as they all involved conspiracies to depress prices under Section 1 of the Sherman Act rather than Section 2 monopolization claims.[21]

### D.     Plaintiffs' Remaining Sherman Act Claims Are Without Factual Support

Plaintiffs contend that they may recover under an attempted monopolization theory for damages they allegedly incurred in the *futures* market by establishing a dangerous probability that Defendants would monopolize the WTI *physical* market.  (Plfs' Opp. at 48)  Such a theory, which would provide relief without proof of standing, causation, antitrust injury, or damages, is wholly without merit.  To prove attempted monopolization of the futures market via a monopoly leveraging theory, Plaintiffs must first establish Defendants' monopoly power in the physical market and then prove that there was a dangerous probability of success in monopolizing the futures market. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004).

Plaintiffs' conspiracy theory fares no better.  Their claim that Defendants were capable of conspiring notwithstanding the unity of interest they share is contrary to the very decision they cite. *Trugman-Nash, Inc. v. New Zealand Dairy Bd.*, 942 F. Supp. 905, 916, 919-20 (S.D.N.Y. 1996) (noting in dicta that the plurality of conspirators requirement as expressed in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), applied equally to Section 2 conspiracy claims). Plaintiffs cite no other authority for the proposition that related corporate entities are capable of conspiring with one another under Sherman Act §2 in contravention of *Copperweld.*  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' attempt and conspiracy claims.

### III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS AGAINST ARCADIA PETROLEUM LTD.

Plaintiffs fail to raise issues of material fact regarding their claims against Arcadia Petroleum, Ltd. ("APL"), entitling APL to summary judgment.[22]

---

[21]    Plaintiffs' reliance on Judge Pauley's Motion to Dismiss ruling is likewise wrong.  *See* footnote 15.

[22]    Plaintiffs' Opposition improperly relies on testimony from an administrative investigation where the witness was not given an opportunity to review and correct his transcript pursuant to Fed.R.Civ.P. 30.  To the

**No Vicarious Liability Under CEA Section 2(a)(1)**  Plaintiffs first claim that APL is

vicariously liable for Parnon's alleged CEA violations because Parnon was an agent of APL and

acted on its behalf. (Plfs' Opp. at 33-34)  To state such a claim, "plaintiffs must allege that the

principal manifested an intent to grant the agent authority, the agent agreed, and the principal

'maintain[ed] control over key aspects of the undertaking.'" *In re Amaranth Natural Gas*

*Commodities Litig.*, 587 F. Supp. 2d 513, 546 (S.D.N.Y. 2008) (citation omitted).  Plaintiffs offer

no evidence that APL manifested an intent to grant Parnon authority or that Parnon agreed.  Their

claim that "Parnon was set up to act for [APL] and enable [APL] to take advantage of relationships

in the [US]" (Plfs' Opp. at 34) is not only factually wrong,[23] but is also unsupported by its citation.

(*See* McGrath Ex. 69)  APL and Parnon are distinct affiliates under Farahead, and Parnon never

agreed to act on APL's behalf. (*See* DSF, ¶4; Ex. 82, Bosworth Dep. at 209:6-18; Ex. 83, Bosworth

Dep. Ex. 8, at 3, 5 (organigram of Farahead Group; Parnon business plan))  In the absence of any

evidence of an agency agreement, this claim fails. *In re Amaranth*, 587 F. Supp. 2d at 546.

Plaintiffs also fail to establish that APL controlled Parnon.  They cite Bosworth's supervision,

but Bosworth supervised on behalf of Farahead, not APL. (Ex. 82, Bosworth Dep. at 45:15-46:8,

57:2-4)  Further, mere supervision would not establish control. *See, e.g., In re Amaranth*, 612 F.

Supp. 2d 376, 388-89, 394 (S.D.N.Y. 2009) (no agency despite supervision and "constant

communication" regarding strategies, trades, and P&L).  Plaintiffs also cite APL's financing

services[24] as evidence of agency, which suggests instead that if any agency existed, Parnon would

have been the principal. (Ex. 82, Bosworth Dep. at 177:6-182:8 (outlining APL services); Ex. 84,

Gardiner Dep. at 24:4-25:10, 27:19-28:13 (trades financed at Parnon's direction))  Plaintiffs claim

---

extent the Court accepts that testimony, Defendants provide similar evidence in reply solely to ensure the
record is complete.  Defendants reserve their right to object to use of such material by Plaintiffs at trial.

[23]  *See* Ex. 81, Ford Dep. at 177:19-183:16 (discussing Parnon's adherence to corporate formalities under
Farahead and the compliance-based reasons for establishing Parnon in the US); Ex. 83, Bosworth Dep. Ex. 8,
at 5.

[24]  Parnon's financing was secured under a guarantee from Farahead. (*See* Ex. 82, Bosworth Dep. at 175:5-
176:2, 177:2-4; Ex. 81, Ford Dep. at 72:17-25, 246:24-247:8, 275:24-276:17)

control is not necessary if Parnon traded on APL's behalf,[25] but they have provided no evidence of an agreement, a prerequisite to any such authorization, or that Parnon ever did so. *Cf. In re Amaranth*, 711 F. Supp. 2d 301, 307-08, 311 (S.D.N.Y. 2010) (finding principal liable where it "expressly authorized [agent] to trade on its behalf"). Parnon traded for its own P&L, which flowed to Farahead, not APL. (Ex. 82, Bosworth Dep. at 135:6-20; Ex. 83, Bosworth Dep. Ex. 8 at 3, 5)[26]

**No Aiding And Abetting Liability Under CEA Section 13** Plaintiffs' aiding and abetting claim, as stated in the Complaint, is brought under CEA Section 13(a), 7 U.S.C. §13. (Comp, ¶122) The claim is barred because "private plaintiffs can bring claims only under Section 22, and cannot bring claims under Section 13." *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 177, n.12 (S.D.N.Y. 2014). Plaintiffs cannot use their Summary Judgment Response to assert a new aiding and abetting claim under CEA Section 22(a)(1), 7 U.S.C. §25(a)(1). (Plfs' Opp. at 34) Even if this improper claim is permitted, Plaintiffs fail to meet the required elements.

## CONCLUSION

For all of the reasons stated above, in Defendants' opening memorandum, and in all related filings, Defendants respectfully request that the Court grant them summary judgment under Fed. R. Civ. P. 56 on all of Plaintiffs' claims against them.

---

[25] *But see In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004) (requiring "actual domination ... rather than mere ownership" to pierce corporate veil).
[26] There is a high bar for disregarding corporate forms among related entities, and Plaintiffs fail to meet it. *See In re Amaranth*, 587 F. Supp. 2d at 538 (denying common enterprise theory of liability).

Dated: April 1, 2015

Respectfully submitted,

By: /s/ Timothy J. Carey
Timothy J. Carey
Elizabeth M. Bradshaw
Brigitte T. Kocheny
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Thomas J. Quigley
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

Fred F. Fielding
Mark R. Haskell
Levi McAllister
MORGAN LEWIS
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Attorneys for Defendants*