UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————

IN RE: CRUDE OIL COMMODITY FUTURES
LITIGATION

Master File No.
11-cv-3600

**ECF Case**

Hon. Katherine B. Forrest

——————————————————————————

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**BURNS CHAREST LLP**
Warren T. Burns
500 North Akard
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile:  (469) 444-5002
Email: wburns@burnscharest.com

**LOVELL STEWART HALEBIAN
JACOBSON LLP**
Christopher Lovell
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
Email: clovell@lshllp.com

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 2

    A.   Summary of the Allegations ................................................................. 2

    B.   The Procedural History of the Action ................................................... 4

    C.   The Settlement Has Been Preliminarily Approved ............................... 4

    D.   The Settlement Agreement has been Preliminary Certified ................... 4

        E.   If Finally Approved, this Settlement Will Provide $16,500,000 in Cash Benefits to the Class With No Reversion to Defendants for those Settlement Class Members Who Fail to Make a Claim .................................... 5

        F.   Defendants' Position During the Settlement Negotiation ................................ 5

        G.   Plaintiffs' Position at the Time of the Settlement Agreement ........................ 6

        H.   The Terms of the Settlement Agreement in Addition to the Cash Payment ......................................................................... 7

        1.   Right to Opt-Out ................................................................... 7

        2.   The Release and Covenant Not To Sue ........................................ 8

        3.   Notice ................................................................................ 8

        4.   Termination Rights ............................................................... 9

III.  ARGUMENT ................................................................................................. 10

    A.   Final Approval Should Be Granted Because the Settlement is Fair, Reasonable, and Adequate ...................................................................... 10

        1.   The Legal Standards Governing Final Approval ............................. 10

        2.   The Settlement Agreement is Procedurally Fair and is Entitled to a Presumption of Fairness .................................................... 11

        3.   The Settlement Agreement is Substantively Fair, Reasonable, and Adequate Under Each of the Nine *Grinnell* Factors .......................... 12

i

**TABLE OF CONTENTS**
**(Continued)**

Page

        a.    Factor 1: The Complexity, Expense And Likely Duration Of The Litigation If the Claims Were Not Settled Strongly Favors Final Approval of the Settlement .................................................................... 12

        b.    Factor 2: The Reaction of the Settlement Class to the Settlement Agreement Favors Approval ................................................... 14

        c.    Factor 3: The Stage of the Proceedings and the Amount of Discovery Completed Favors Approval ................................................ 14

        d.    Factors 4, 5 and 6: The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial Strongly Favor Final Approval of the Proposed Settlement ........................................... 14

        e.    Factor 7: The Ability of the Defendants to Withstand a Greater Judgment .............................................................................. 15

        f.    Factors 8 and 9: The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Final Approval of the Proposed Settlement .................................................................................. 16

B.    Final Approval Should Be Granted because The Notice Plan Satisfies the Requirements of Rule 23 and Due Process and The Proposed Program of Notice Provides "The Best Notice Practicable Under the Circumstances" ............... 21

    1.    The Legal Standards Governing Notice ........................................... 21

C.    The Class has been Preliminarily Certified and Satisfies the Prerequisites of Rule 23(a) and Rule 23(b)(3) Such that it Should Be Certified for Purposes of Final Approval ......................................................................................... 22

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bano v. Union Carbide Corp.*, 273 F.3d 120 (2d Cir. 2001) ........................................................ 10

*Blessing v. Sirius Xm Radio, Inc.*, 507 Fed. Appx. 1(2d Cir. 2012) ........................................... 10

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 488 (1980).................................................................. 5

*Chatelain v.Prudential-Bache Securities, Inc.,* 805 F. Supp. 209 (S.D.N.Y. 1992).................... 12

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974).................................................................................... 12, 13

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ............................................................ 10

*In re Crude Oil Commodity Litig.*, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)...................... 13

*In re Global Crossing Sec. and ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... 13, 15, 23

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................... 14

*In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................... 24

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ....................................................................... 10

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)........................................................................... 17

*Strougo v. Bassini*,
    258 F.Supp.2d 254 (S.D.N.Y. 2003)................................................................................ 14

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ................................................................. 12

## Other Authorities

James D. Cox & Randall S. Thomas,
    *Letting Billions Slip Through Your Fingers:  Empirical Evidence and Legal
    Implications of the Failure of Financial Institutions to Participate in Securities Class
    Action Settlements*,
    58 Stan. L. Rev. 411 (2005) ............................................................................................ 20

Jerry W. Markham,
    Manipulation of Commodity Futures Prices – The Unprosecutable Crime,
    8 Yale J. on Reg. 281 (1991) ............................................................................................ 16

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

John C. Coffee, Jr.,
   *Litigation Governance:  Taking Accountability Seriously*,
   110 Colum. L. Rev. 288 (Mar. 2010) ...................................................................... 20

*Newberg on Class Actions,* §11.41 (4th ed.)................................................................. 1

**Rules**

FED. R. CIV. P.  23……………………………………………………………………….…
   *passim.*

## I.    INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's June 8, 2015 Preliminary Approval Order,[1] Plaintiffs,[2] on behalf of themselves and the Class, respectfully submit this memorandum in support of their motion for final approval of the Stipulation and Agreement of Settlement ("Settlement Agreement").[3] The settlement is fair and reasonable, the notice plan implemented by the Class Administrator adequately informed the members of the settlement class of the settlement, and all of the remaining requirements of Rule 23(e) are met. Thus, Plaintiffs respectfully request that this Court grant final approval to this settlement and enter the attached Proposed Order.

Plaintiffs brought this class action against Defendants for market manipulation in violation of the Commodity Exchange Act ("CEA") and monopolization in violation of the Sherman Antitrust Act. Because CEA manipulation claims are recognized as exceedingly complex and "notoriously difficult to prove," Plaintiffs faced "extremely high" risks. *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 395, 398 (S.D.N.Y. 1999) (Pollack, J.) (comparing the level of complexity and risk of CEA manipulation claims to, for example, less risky securities fraud cases). After four years of extensive and hard-fought litigation, and two years of intensive and adversarial negotiation, the parties confected a settlement. Given the risks involved, the settlement ultimately reached is manifestly fair, reasonable, and adequate. This is especially true in light of the unique complexity and substantial risks in litigating the merits of the case, in addition to the other pertinent factors under *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ["*Grinnell*"].

---

[1] Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval Thereof, and Approving the Proposed Form and Program of Notice to the Settlement Class. *See* ECF No. 290.

[2] "Plaintiffs" refer to Plaintiffs John Losordo, Jr., Todd Kramer, FTC Capital GmbH, and Adams Affiliates, Inc.

[3] A copy of the Settlement Agreement and its exhibits are attached as Exhibit 1 to the Declaration of Warren Burns. Capitalized terms herein that are defined in the Settlement Agreement have the same meaning as in the Settlement Agreement.

In accordance with the terms of the Settlement Agreement executed by Plaintiffs and the Defendants[4] on June 3, 2015, Defendants transferred $16,500,000 into an escrow account currently earning interest for the benefit of the Class. Multiple forms of notice were provided to the Class, including targeted direct mail notice, notice by publication in national news outlets specifically targeted to potential members of the Class, and the creation of a dedicated website. If approved, the Settlement Agreement provides a cash benefit to the Class members of $16,500,000 with the balance of any non-claimed money reverting back to the Class. Approval also resolves all claims in this Action that Defendants manipulated prices and caused losses in the trading of New York Mercantile Exchange ("NYMEX") and Intercontinental Exchange ("ICE") Western Texas Intermediate ("WTI") crude oil futures contracts, and that Defendants monopolized the market for WTI crude oil during the Class Period. *See* ECF No. 66 at ¶ 46.

Based on the information contained below, Plaintiffs respectfully request that the Court find that the Settlement is fair, reasonable, and adequate and, accordingly, grant final approval of the Settlement.

## II.    STATEMENT OF FACTS

### A.    Summary of the Allegations

Plaintiffs allege that each Defendant, between January 1, 2008 and May 15, 2008 (the "Class Period"), caused and aided and abetted the causation of artificial prices in NYMEX and ICE WTI futures contracts and options contracts on such futures contracts (the "Class Contracts and Options").   Plaintiffs allege that Defendants violated the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, and the Sherman Antitrust Act, 15 U.S.C. § 2, by amassing

---

[4] "Defendants" refers to Parnon Energy Inc., Arcadia Petroleum Ltd., Arcadia Energy (Suisse) SA, James T. Dyer, and Nicholas Wildgoose.

dominant physical WTI crude oil positions in a scheme to drive the price of WTI futures to artificial highs and then back down. (*See*, *e.g.*, ECF No. 66 at ¶¶46–55).

Defendants were allegedly aware that physical WTI crude oil was in tight supply at Cushing. Acting on this information, Defendants intentionally purchased "long spread positions" (as defined in ¶4.A of the Consolidated Amended Class Action Complaint) in WTI. In order to create a shortage of the physical crude oil, thereby driving the price of WTI up, Defendants intentionally began to purchase large amounts of physical WTI crude oil. Defendants' possession of a dominant amount of the market's available WTI physical crude oil falsely signaled to the market that WTI crude oil was rapidly being purchased, which caused WTI crude oil prices and Class Contracts and Options prices to become artificially inflated. Defendants then sold out their long spread positions and purchased new "short positions" (as defined in ¶4.D of the Consolidated Amended Class Action Complaint), reaping the benefits of the artificially high prices. As a final step in their scheme, Defendants dumped their physical holdings of WTI back into the market on the last day of the "cash window" to drive prices down, producing a large profit on Defendants' short positions, enabling them to begin the manipulation once again.

Plaintiffs allege that at no time during this scheme did Defendants have a commercial need for the large amounts of WTI crude oil supplies they amassed and that the physical WTI crude oil purchased by Defendants during the Class Period artificially inflated the price for Class Contracts and Options. Plaintiffs allege that when Defendants sold their physical WTI crude oil, it caused the price for NYMEX and ICE WTI to drop drastically. Plaintiffs allege that Defendants' conduct caused Plaintiffs and others similarly situated to transact in an artificial and

manipulated market at manipulated and artificial prices during the Class Period.  (*See e.g.,* ECF No. 66 at ¶4C).

Plaintiffs further allege that Plaintiffs and Settlement Class Members who held positions in Class Contracts and Options at the times that Defendants allegedly manipulated the prices of those contracts and thereafter liquidated their positions in such contracts at artificial prices suffered damages even if such liquidations occurred after the Class Period.  (*Id*. at ¶ 64). Plaintiffs also allege that Defendants' manipulation constituted a contract, combination or conspiracy in restraint of trade and an attempt to monopolize and monopolization of the market for the Class Contracts and Options.  (*Id*. at ¶¶ 66-69).  Finally, Plaintiffs allege that Defendants attempted to and did manipulate the markets for Class Contracts and Options.  (*Id*.).

**B.    The Procedural History of the Action**

The procedural history of the Action is set forth at length in the Burns Declaration ("Burns Decl."), attached hereto as Exhibit A.

**C.    The Settlement Has Been Preliminarily Approved**

This Court granted preliminary approval of the Settlement on June 8, 2015. (ECF No. 290). As recognized by this Court, the Settlement Agreement was entered into after arm's-length negotiations by experienced counsel. (*See id*. at ¶10).

A final approval hearing before the Court is scheduled for October 9, 2015 to consider the fairness, reasonableness, and adequacy of the Settlement Agreement (the "Fairness Hearing"). (*See id*. at ¶4).

**D.    The Settlement Agreement has been Preliminary Certified**

Under the Preliminary Approval Order, the Court preliminarily certified the Settlement Class for purposes of the Settlement, finding that the applicable provisions of Rule 23 of the Federal Rules of Civil Procedure were satisfied. (*See id.* at ¶ 1). The Settlement Class is

defined as:

> All persons or entities that purchased, sold, or otherwise traded, during the period from January 1, 2008 through May 15, 2008 ("Class Period") a light sweet crude oil (WTI) futures contract or an option on such light sweet crude oil (WTI) futures contract traded on the New York Mercantile Exchange ("NYMEX")(Contract Codes CL, LC or LO only) and/or the Intercontinental Exchange ("ICE")(Contract Code T only). Excluded from the Settlement Class are (i) Defendants and any parent, subsidiary, affiliate, or agent of any Defendant; and (ii) Opt Outs.

*(Id.).*[5]

### E.    If Finally Approved, this Settlement Will Provide $16,500,000 in Cash Benefits to the Class With No Reversion to Defendants for those Settlement Class Members Who Fail to Make a Claim

The Settlement Agreement provides two benefits to Settlement Class members.  First, the Defendants will provide Class Members total compensation in the amount of $16,500,000. (Burns Decl. at ¶30).  Second, the shares of these monies due to Settlement Class Members who fail to submit a claim will not revert to Defendants, but instead will be included in the calculation of the payment to the Class Members who submit claims. In contrast to the Settlement, if the claims were to move forward and Plaintiffs were to prevail at trial, Defendants would be able to argue that the claims of those class members who did not submit claims should revert to Defendants. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 488 (1980).

### F.    Defendants' Position During the Settlement Negotiation

Throughout this litigation, a critical issue has been whether Defendants' trading strategy was, in fact, manipulative. Defendants maintain that they did not have the ability to influence NYMEX and ICE WTI futures prices or spread values because they never possessed physical WTI crude oil in the amounts alleged by Plaintiffs and that their WTI forward contract positions

---

[5] Plaintiffs' Motion for Class Certification expanded the class as it was defined in Plaintiffs' Consolidated Amended Complaint to add WTI futures contracts traded on ICE and options on WTI futures contracts traded on NYMEX and ICE.

were in fact smaller than other market participants. Defendants also contend that Plaintiffs cannot provide adequate proof of artificiality – a crucial element of a manipulation claim, and that price action in the WTI market is inconsistent with Plaintiffs' theory of artificiality. While Plaintiffs disagree with these assertions, these issues were at the heart of Defendants' Motion for Summary Judgment filed on January 30, 2015, (ECF No. 231), the outcome of which cannot be predicted with any certainty.

In addition, in opposing Plaintiffs' September 27, 2013 motion for Class Certification, Defendants argued that the predominance requirement was not met because their statute of limitations defense cannot generate common answers, and that the evidence adduced during discovery undermines Plaintiffs' CEA claims because it establishes actual knowledge of CEA claims by class members in 2008. In Defendants' view, depositions of individual traders and their employees have confirmed that these individuals had actual notice sufficient to trigger the statute of limitations more than two years before filing of the first class action.

## G.    Plaintiffs' Position at the Time of the Settlement Agreement

Prior to entering into the Settlement Agreement, Class Counsel reviewed and analyzed all of the documents Defendants had produced to the CFTC and the Defendants' relevant transactions recorded in the NYMEX and ICE street books.  Based on extensive discovery and intensive factual investigation, analyses and research, as well as significant experience with CEA manipulation and antitrust claims, and more than two years of arguments/negotiations with Defendants' counsel about the application of CEA manipulation and antitrust to the facts here, Class Counsel was well informed of the prospective risks, rewards, arguments, rejoinders, and other issues that would be involved with continued prosecution of Plaintiffs' claims.

Class Counsel's position prior to entering into the Settlement Agreement was that Defendants' repeated use of physical forward contracts caused artificial movement in WTI

futures contract prices and Defendants lacked rational motives for holding their positions. Defendants' manipulative intent is further evidenced by their own e-mails. Further, the documents reviewed to date indicate that Defendants had the ability to influence prices and in fact did influence prices. With respect to Defendants' statute of limitations defense articulated in their opposition to class certification, it is Plaintiffs' position that that defense is inapplicable to the Section 2 monopolization claim, and that inquiry notice of the CEA claim is a class-wide issue that does not present individual inquiries sufficient to defeat Plaintiffs' showing of predominance.

Class Counsel believed that proof of unlawful manipulation could support and prove damages under the CEA as well as the antitrust laws, which would be trebled if Plaintiffs were successful in prosecuting their antitrust claims.  However, Class Counsel could not disregard or ignore Defendants' substantial legal and factual arguments.

Class Counsel's analysis was and is that cash payment of $16,500,000 under the Settlement Agreement will provide fair, reasonable and adequate compensation to claiming Class Members.

### H.    The Terms of the Settlement Agreement in Addition to the Cash Payment

The material terms of the Settlement and the attached exhibits, in addition to the non-reverting cash benefit of $16,500,000 and class definition noted in the prior sections, are summarized below.

### 1.    Right to Opt-Out

Under the terms of the Settlement Agreement, any Class members have the right to opt out of the Settlement Agreement, provided the Court has not entered or withdrawn its Final Order and Judgment. (Burns Decl., Ex. 1 ¶11(b)). As of September 9, 2015, the Settlement Administrator has received only one opt-out. (Burns Decl. at ¶35; *id.*, Ex. 2).

### 2. The Release and Covenant Not To Sue

In exchange for the $16,500,000, Plaintiffs and the Settlement Class agreed to release and discharge Defendants from any and all claims against Defendants for losses on their transactions in Class Contracts and Options during the Class Period as fully set forth in Paragraph 9 of the Settlement Agreement.  (Burns Decl., Ex. 1 at ¶¶8–9).

### 3. Notice

As noted by the Court in the Preliminary Order, the proposed notice plan is comprehensive, is the best notice practicable, and constituted due and sufficient notice. (ECF. No. 290 at ¶9).  Indeed, the notice plan was calculated to reach – by direct mail alone -- potentially  all persons who are members of the Settlement Class.  In addition, publication by notice was provided by advertisements in Futures Magazine, Stock and Commodities Magazine, and The Wall Street Journal.  Notice was also provided by a settlement website that is searchable on the internet.  *See* http://crudeoilfuturessettlement.com/.

**Direct Mail Notice.** On July 13, the Settlement Administrator mailed notice of the Settlement to approximately 1,083 large traders identified by NYMEX and 44 clearing firms identified by the NYMEX. (*See* September 2, 2015 Status Report, ECF No. 294, p.3). On July 23, 2015, mail notice to the 44 clearing firms identified by LCH Clearnet was completed by the Settlement Administrator. (*See id*.). By July 30, 2015, the Settlement Administrator completed mail notice to the top 250 energy companies in the world. (*See id.*, p.4).

Additionally, the Settlement administrator mailed notice to another 672 potential Class members based on information received from the clearing firms, and another 40 potential class

members based on information received from the Trustee for the estate of MF Global, Inc. (*See id.*, p. 5).[6]

**Publishing Notice**. Notice of the proposed Settlement has been or will be published (a) in the August and September 2015 editions of Futures Magazine; (b) on the Futures Magazine website from August 10 through September 8, 2015; (c) in the August and September 2015 editions of Stock and Commodities Magazine; (d) on the Stock and Commodities Magazine website from August 12 through September 10, 2015; and (e) in the July 27, 2015 edition of The Wall Street Journal.

### 4. Termination Rights

The Settlement Agreement gives Defendants limited rights to terminate the settlement prior to entry of final judgment.  (Burns Decl., Ex. 1 ¶20).  Defendants may terminate the Settlement Agreement after 21 days' notice, if any of the following occur: (i) the Court denies Plaintiffs' motion for approval of the Scheduling Order; (ii) the Court declines to enter the Final Order and Judgment, including, without limitation, incorporating the release and covenant not to sue; (iii) the Final Order and Judgment is withdrawn, rescinded, reversed, vacated, or modified by the Court or on appeal; or (iv) the Opt Out Threshold has been reached.  Pursuant to the Settlement Agreement, if Defendants exercise their termination rights, Plaintiffs' claims will not be dismissed, or, if Plaintiffs' claims have already been dismissed, they will be reinstated. (*Id.*).

### 5. No Reversion Rights

There will be no reversion rights to Defendants under the Settlement Agreement.

---

[6] More detailed information on the scope of the mail notice can be found at ECF No. 294.

## III.   ARGUMENT

### A.   Final Approval Should Be Granted Because the Settlement is Fair, Reasonable, and Adequate

#### 1.   The Legal Standards Governing Final Approval

The settlement of class action claims must be court-approved. Fed. R. Civ. P. 23(e). Approval is contingent upon a district court's finding that the settlement is fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2); *see also Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). To make this determination, courts generally consider: (1) procedural fairness (the "negotiating process leading up to the settlement"); and (2) substantive fairness ("the settlement's substantive terms."). *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).

With regard to procedural fairness, a proposed class action settlement enjoys a strong presumption that it is fair, reasonable, and adequate if it was reached through "'arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Blessing v. Sirius Xm Radio, Inc.*, 507 Fed. Appx. 1, 3 (2d Cir. 2012) (*quoting McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009)). "A proposed settlement is substantively fair if the nine factors outlined in *City of Detroit v. Grinnell Corp.*, weigh in favor of that conclusion." *Id.* (*citing Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005)). It is well established in the Second Circuit that there is a strong public interest in favor of settling litigation, particularly class action litigation. *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001); *see also In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) ("The arm's-length compromise of a disputed claim has long been favored by the courts . . . This is particularly true of class actions."); *see also Newberg on Class Actions*, §11.41, at 87 (4th ed.) ("[t]he compromise of complex litigation is encouraged by courts and favored by public policy").

In this case, the proposed Settlement is a very good result for the Class and amply satisfies the criteria for approval.

### 2. The Settlement Agreement is Procedurally Fair and is Entitled to a Presumption of Fairness

A class action settlement is entitled to a presumption of fairness, adequacy and reasonableness when "there were arm's length negotiations between experienced counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005) ("*Wal-Mart*"). As previously found by this Court, "the Settlement Agreement was entered into at arm's-length by experienced counsel." (ECF. No. 290, ¶ 10). Indeed, the proposed Settlement Agreement is the product of hard-fought extensive negotiations, which involved multiple in-person meetings and telephone conferences, hundreds of e-mails, and an extensive review of the discovery obtained to date.

In light of their considerable prior experience in complex class action litigation involving CEA and antitrust claims, their knowledge of the strengths and weaknesses of Plaintiffs' claims, and their assessment of the Settlement Class's likely recovery following trial and appeal, Class Counsel concluded that the Settlement Agreement is fair, reasonable and adequate. This creates a strong presumption that the Settlement is fair, reasonable, and adequate. *In re Paine Webber Ltd. Partnerships. Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y.1997) ("'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."); *see also Chatelain v.Prudential-Bache Securities, Inc.,* 805 F. Supp. 209, 212 (S.D.N.Y. 1992) ("[a] substantial factor in determining the fairness of the settlement is the opinion of counsel involved in the settlement").

### 3.   The Settlement Agreement is Substantively Fair, Reasonable, and Adequate Under Each of the Nine *Grinnell* Factors

"The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982).  At the final approval stage, courts in the Second Circuit typically consider the following nine *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 at 463.[7]  "[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  As set forth below, the *Grinnell* factors strongly support preliminary approval of the Settlement Agreement.

### a.   Factor 1: The Complexity, Expense And Likely Duration Of The Litigation If the Claims Were Not Settled Strongly Favors Final Approval of the Settlement

As noted in the Introduction, there is a consensus that claims for manipulation in violation of the CEA are complex and difficult to prove.  *See In re Sumitomo*, 74 F. Supp. 2d at 397 ("[G]enerally, price manipulation cases are notoriously risky and are more difficult and risky than securities fraud cases[.]").  Unlike with federal securities law class actions, in which more

---

[7] *See also Aguilera v. Cookie Panache by Between the Bread, Ltd.,* 2014 U.S. Dist. LEXIS 69716 (S.D.N.Y. May 20, 2014) (Forrest, J.) (in a Fair Labor Standards Act case, this court performed a similar analysis to determine the reasonableness of a settlement).

than one hundred cases per year are often filed, CEA commodity futures manipulation class actions are relatively rare, averaging approximately one commodity manipulation class action filed every two years.[8]  This lack of precedent makes evaluating the strength of a CEA case more difficult and more unpredictable than, for example, securities class actions.

For example, there have been differing decisions involving whether the heightened pleading standard under Rule 9(b) applies.  *See e.g., In re Crude Oil Commodity Litig.*, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) (recognizing a split of authority). Thus, CEA manipulation law—unlike federal securities law or federal antitrust law—is somewhat of an "open field" for Defendants to argue for what Plaintiffs view as restrictive application of the limited precedent. There is potentially a wide divergence of outcomes that could result from continued litigation in many fact scenarios, including those here.

In the absence of this Settlement Agreement, the litigation of this complex case would likely consume many more years of judicial resources.  *Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class"). The Settlement Agreement allows the Parties and the Court system to avoid the significant expense of continued and protracted litigation.  The costs of experts, the costs of preparing the voluminous pre-trial order, and the costs of trial and appeals would be substantial.

The Settlement Agreement eliminates the foregoing complexities, substantial expenses, and the potential for additional years of continued litigation from appeals and provides a prompt recovery to the Settlement Class.  *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D.

---

[8] A LEXIS search for commodity manipulation class actions yielded only forty-nine entries, going back to 1974. (The search of the ALLFEDS database specified the following terms: "class /3 action /p commodity! /s manip!".) When duplicate entries and non-commodity cases were culled from the list, only twenty-three cases remained, averaging one commodity manipulation class action filed every two years.

200, 210 (S.D.N.Y. 1995) ("it may be preferable to take the bird in the hand instead of the prospective flock in the bush").

### b. <u>Factor 2</u>: The Reaction of the Settlement Class to the Settlement Agreement Favors Approval

The reaction of the Class has been overwhelmingly positive because there has been only one opt out and no objections that resulted from the extensive notice program. Furthermore, this lone opt-out is not opting out because he plans to file his own case, believing that he can do better. Rather, he is opting out because he wants no part of this suit. (*See* Burns Decl., Ex. 2). This lone opt-out, coupled with the lack of objections to date, indicate that an overwhelming majority of the Class members approve of the proposed Settlement. Accordingly, this strongly favors final approval of the Settlement.

### c. <u>Factor 3</u>: The Stage of the Proceedings and the Amount of Discovery Completed Favors Approval

This factor is designed to "assure the Court that counsel for the plaintiffs have weighed their position based on a full consideration of the possibilities facing them." *In re Global Crossing Securities* 225 F.R.D. at 458. Extensive factual and expert discovery and investigation were completed before the Settlement Agreement was concluded. (Burns Decl. at ¶27). Thus, at the time the Settlement Agreement was reached, Class Counsel were well-informed of the factual landscape of the Action and the uncertainties and risks confronting them. *Id*. This factor, therefore, weighs in favor of approval.

### d. <u>Factors 4, 5, and 6</u>: The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial Strongly Favor Final Approval of the Proposed Settlement

The risks of establishing liability against Defendants on Plaintiffs' CEA manipulation claims and Sherman Act claims are set forth in detail in Sections II.F-G and III.A(3)(a).

While the Complaint sets forth in painstaking detail Plaintiffs' claims against the Defendants, Plaintiffs still face significant risks in: (a) proving the elements of their claims so as to demonstrate that violations of the law occurred; (b) proving that artificial impact occurred; (c) proving the amounts and duration of artificial impact; and (d) proving recoverable damages and other issues at trial.

As other Courts in this District have recognized, "the complexity of Plaintiffs' claims *ipso facto* creates uncertainty." *Currency Conversion*, 263 F.R.D. at 123. Continuing this complex litigation against the Defendants would entail a lengthy and highly expensive legal battle involving complex legal and factual issues. Defendants have vigorously challenged class certification in this case. Establishing damages would have required significant expert testimony. Defendants have significant factual and legal defenses, which creates real risk that Plaintiffs would not establish liability. (*See* Burns Decl. at ¶29). Even if Plaintiffs did establish liability, there is a very real risk that they would not establish entitlement to damages of more than a minuscule fraction of what Plaintiffs asserted. Plaintiffs acknowledge that, if these risks materialized, their impact would be substantial for all parts of the claims and perhaps dispositive for most parts of the claims. Accordingly, these factors weigh in favor of approval.

e.    **Factor 7**: The Ability of the Defendants to Withstand a Greater Judgment

Plaintiffs believe that Defendants could withstand a judgment greater than the $16,500,000 Escrow Account they have agreed to establish as part of the Settlement Agreement. However, this fact does not indicate that the Settlement Agreement is not fair, reasonable or adequate. *In re Tronox*, 2014 U.S. Dist. LEXIS 158767, at *21 (S.D.N.Y. Nov. 10, 2014) (Forrest, J.) ("The law does not require a defendant to completely empty its pockets before a settlement may be approved–indeed, if it did, it is hard to imagine why a defendant would ever settle a case").

15

Instead, a weighing of all the *Grinnell* factors in the context of this Action strongly demonstrates that final approval of the Settlement is appropriate. *See* Sections III.A.(3)(a)-(d), (f) herein; *see also Global Crossing*, 255 F.R.D. at 460 ("[N]ot every factor must weigh in favor of settlement, rather, the court should consider the totality of these factors in light of the particular circumstances.").

     f.     **<u>Factors 8 and 9</u>: The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Final Approval of the Proposed Settlement**

The eighth and ninth *Grinnell* factors together address the reasonableness of the settlement "in light of the best possible recovery" and "the attendant risks of litigation." (internal citations omitted). *Grinnell*, 495 F.2d at 463. "In any case, there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), *cert. denied sub nom.*, 409 U.S. 1039 (1972). The Settlement Agreement satisfies Factors 8 and 9.

Regarding Factor 8, future "recovery" to class members involves at least three components: (1) collection of (2) a damages[9] judgment which (3) is then paid to or "recovered" by individual class members.

The Settlement Agreement provides two substantial benefits to the Settlement Class members relating to the all three components of the recovery. First, total cash compensation of $16.5 million was placed in an escrow fund by Defendants for the benefit of Plaintiffs and the Class, thereby satisfying the collection component and a portion of the damages component. This benefit is significant. Defendants included foreign entities. Collecting a judgment from such

---

[9] Damages, as used in this section, refers to actual damages, not the trebled damages available under antitrust law.

defendants may have necessitated significant expense and actions overseas. Second, as an additional benefit, Plaintiffs also obtained the waiver by Defendants of any potential post-trial reversionary rights. *See* Section II.E, *supra*. As a result, the "recovery" by Settlement Class Members who do submit proofs of claim may be enhanced compared to a post-trial recovery. This is because **all** monies that would otherwise have been due to Settlement Class Members who do not claim and would potentially have reverted to Defendants will be paid and included in the distributions to those Settlement Class Members who **do** claim. This is an important benefit to the Class because, as noted above, if the claims went forward and Plaintiffs prevailed at trial, then Defendants could argue that the claims of those Class members who did not submit claims should instead revert to Defendants. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 488 (1980).

Moreover, frequently, in class actions, the percentage of total class members who submit proofs of claims is less than 50% and, indeed, reportedly is less than 30% among even sophisticated class members (including those who arguably have fiduciary duties to submit claims).[10] Thus, a smaller amount in a settlement in which the defendant has provided the benefit of waiving any claim to reversion rights may amount to the same or a larger "recovery" to claiming Settlement Class members as a larger judgment after trial would produce for such claiming class members subject to reversion.

---

[10] The percentage of claims submitted in opt-out class action settlements varies from below ten percent to less than thirty percent. John C. Coffee, Jr., *Litigation Governance: Taking Accountability Seriously* , 110 Colum. L. Rev. 288, 335, n. 10 (Mar. 2010) (citing discussions on claim participation rates with professional claims administrators, including the largest of these, Garden City Group, Inc., and referring to advice received that "participation rates are highly variable, often falling below ten percent, but can reach much higher percentages when individual class members will receive a cash payment of several hundred dollars or more."); James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements* , 58 Stan. L. Rev. 411, 415 (2005) ("[L]ess than thirty percent of institutional investors with provable losses perfect their claims in [securities class action] settlements).

### (a) Best Possible Damages

Plaintiffs' expert currently estimates that, using his full artificiality numbers, the highest possible amount of artificial impact the class could prove at trial, assuming the jury finds in favor of the Plaintiffs on all issues, is approximately $711.7 million for NYMEX and ICE futures and $340.9 million for NYMEX options. For purposes of this settlement, however, the amount of equitable recovery to each Settlement Class Member should be adjusted to take account of two factors.

First, an individual Settlement Class Member could have benefits from price artificiality that would have reduced the damages; (it could be that the profile of the Settlement Class resulted in lower aggregate damages than those estimated above). Second, the method of assessing price artificiality here did not separate the degree of futures price artificiality from the cash market price artificiality, as some methods of assessing artificiality have done in prior CEA manipulation cases. In order equitably to account for the risk of deductions in damages to Settlement Class Members who held cash market positions that benefited from price artificiality, Plaintiffs have included a potential fifty percent (50%) hedging discount in the Plan of Allocation.

Of course, these estimates must also be viewed under the lens of the possible results at class certification, summary judgment, trial, and beyond. As noted above, there are substantial hurdles that have not yet been cleared by Plaintiffs, including class certification and summary judgment, which are pending. Assuming Plaintiffs prevail on both of those motions, Plaintiffs face significant risks at trial, including both establishing liability and damages, and the battle of the experts that would pervade the entire trial process, as discussed below. Of course, even if Plaintiffs were to prevail at trial, there is significant further risk in the appellate process. *See,*

*e.g.*, *Glickenhaus & Co. v. Household Financial*, 2015 U.S. App. LEXIS 8424, at *59 (7th Cir. Ill., May 21, 2015) (reversing and remanding $2.46 billion judgment for new trial).  And even if the judgment was upheld, there is the additional risk that the Class Members will not claim their recovery.[11]

### (b)   Collection

Class Counsel believes that Defendants could pay a substantial judgment. However, recovering the theoretical maximum nominal damages, while possible, is, in Class Counsel's judgment, much more questionable in light of the Defendants' colorable defenses. Further, collection in this case might entail complicated efforts to enforce a judgment overseas or to seize assets. Settlement removes this uncertainty.

### (c)   Recovery

As discussed above, each claiming Settlement Class Member's actual recovery from their proof of claim will be significantly enhanced by the absence of any reversion with respect to Settlement Class Members who opt out or Settlement Class Members who fail to submit proofs of claim.

### (d)   Litigation Risk

Under *Grinnell* Factor 9, it is Class Counsel's best judgment that there are significant risks of establishing liability and proving damages on Plaintiffs' claims. Litigation is inherently risky and even a meritorious case can be lost at trial. *See, e.g., In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW (EDL), 2007 WL 4788556, at *1 (N.D. Cal. Nov. 27, 2007) (after a lengthy trial, jury returned a verdict against plaintiffs and the action was dismissed). Indeed, even a

---

[11] If the Class did obtain a larger nominal verdict and sustained it on appeal, there was the further risk of the failure by Class Members to claim.  For example, in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980), the defendant owed a specified judgment but the entitlement to portions of that judgment by class members who failed to claim was forfeited (except for the attorneys' fee) back to the defendants because the class members did not file a proof of claim.  The Settlement Agreement accounts for this risk by prohibiting any reversion to Defendants.

successful jury verdict does not eliminate litigation risks to a class. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict); *Anixter v. Home-Stake Prod Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig*., No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608, at *4 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

Despite these risks, Class Counsel believes that Plaintiffs have more than sufficient evidence to ultimately establish Defendants' violation of the manipulation provisions of the CEA. However, continuing this complex litigation would entail a lengthy and highly expensive legal battle involving complex legal and factual issues. Defendants have significant defenses which create real risk that the Plaintiffs will not establish liability. Establishing damages will require significant expert testimony. In addition to the foregoing risks, during the course of the parties' settlement negotiations, Defendants and their experts have vigorously disputed Plaintiffs' methodology for estimating artificiality and damages. *See* Response Report of Ramsey Shehadeh, Ph.D., dated September 8, 2014 and Responsive Report of Matthew A. Evans, dated September 8, 2014, both filed under seal.

Indeed, Defendants' well-credentialed experts opined that Plaintiffs could not establish, *inter alia*, artificiality, causation, or domination. Defendants presented expert analysis tending to show that, even assuming, *arguendo*, that multiple risks could be overcome and any liability could be established, then any alleged damages caused by the alleged manipulation were either non-existent or vastly overstated. Absent a settlement, these attacks would have been further developed and pursued in Court.

In the foregoing context, Class Counsel's analysis was and is that the consideration under the proposed settlement will provide fair, reasonable, and adequate compensation to claiming Class members in light of the attendant risks of litigating the case. In sum, the *Grinnell* factors all weigh in favor of the Court finding that this is "compromise is fair, reasonable, and adequate." *Weinberger*, 698 F.2d at 73

**B.      Final Approval Should Be Granted because The Notice Plan Satisfies the Requirements of Rule 23 and Due Process and The Proposed Program of Notice Provides "The Best Notice Practicable Under the Circumstances"**

**1.      The Legal Standards Governing Notice**

Before a class action settlement can be finally approved, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). When, as here, a class is certified under Rule 23(b)(3) "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice regarding a proposed settlement is adequate under both Rule 23 and the Due Process Clause if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and it can "be understood by the average class member." *Wal-Mart*, 396 F.3d at 114-15.

As recognized by the Court in the Preliminary Approval Order, the Class Notice Plan is comprehensive and calculated to reach – by direct mail alone – all persons who are members of the Settlement Class. In addition, notice was provided by in Futures Magazine, Stock and Commodities Magazine, and the Wall Street Journal. Additionally, notice was provided on the websites of Futures Magazine and Stock and Commodities Magazine as well as on a dedicated settlement website searchable on the internet. *See* http://crudeoilfuturessettlement.com/.

The Class Notice also comports with Due Process. It is well organized and written in plain concise language that can easily be understood by the average member of the Class. It also fairly apprises the Class of the existence of the Settlement, their options under the Settlement, the material terms of the Settlement, and how they may obtain a copy of same. *See Wal-Mart*, 396 F.3d at 114-155.

The above four-pronged program of notice is reasonably calculated to reach all Class members, including the largest traders in NYMEX and ICE WTI crude oil futures contracts during the Class Period. Accordingly, the proposed notice plan meets each of the requirements under Rule 23(c)(2)(B), comports with due process, and is the best notice practicable under the circumstances.

### C. The Class has been Preliminarily Certified and Satisfies the Prerequisites of Rule 23(a) and Rule 23(b)(3) Such that it Should Be Certified for Purposes of Final Approval

Rule 23(e) allows for settlement "of a certified class." *Compare* FED. R. CIV. P. 23(e) with *In re Global Crossing Securities* 225 F.R.D. at 451 ("[t]he Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes…"). A court may grant certification for settlement purposes where the proposed settlement class satisfies the four prerequisites of Rule 23(a) (*i.e.*, numerosity, commonality, typicality and adequacy), as well as one of the three subsections of Rule 23(b). *Id.*

Under the June 8, 2015 Preliminary Approval Order, the Court preliminarily certified the Settlement Class for purposes of the Settlement, finding that the applicable provisions of Rule 23 of the Federal Rules of Civil Procedure were satisfied. (ECF No. 290 at ¶ 1).

The Court also reaffirmed its appointment of Lovell Stewart Halebian Jacobson LLP and Burns Charest LLP as class counsel for the Class, finding that the requirements of Rule 23(g) of

the Federal Rules of Civil Procedure were fully satisfied by this appointment. *Id.* ¶ 2. As a result, the Settlement Class should be certified for purposes of final approval.

> **D.     The Proposed Plan of Allocation Has a Reasonable and Rational Basis and Should Be Approved**

In the Second Circuit, the standard for approval of a plan of allocation is the same as the standard for approval of a settlement – "namely, it must be fair and adequate." *Maley*, 186 F. Supp. 2d at 367. In that regard, a plan of allocation "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).

The proposed Plan of Allocation effectively determines each Settlement Class Member's claim as the amount by which each Settlement Class Member was harmed or adversely affected by the alleged manipulation minus the benefits, if any, such Settlement Class Member received from the alleged manipulation for each day of the Class Period. Specifically, the Plan of Allocation provides that each Settlement Class Member's Allowed Claim shall be based on the Adverse Impact such Settlement Class Member suffered, less any applicable benefit.   The Adverse Impact suffered by each claiming Settlement Class Member is defined to mean the amount by which the sum of the Artificiality Paid (as defined in the Plan of Allocation) by a Settlement Class Member on all transactions in Class Contracts and Options exceeds the sum of the Artificiality Received (as defined in the Plan of Allocation) by that Settlement Class Member on all transactions in Class Contracts and Options. (*See* Burns Decl. at ¶32–33).

The Net Settlement Fund (as defined in ¶1(gg) of the Settlement Agreement) shall be distributed as follows: Ninety Percent (90%) of the Net Settlement Fund is to be distributed according to the Claiming Class Members' net artificiality paid, or  "NAP Transactions," (as defined in ¶3(a) of the Plan of Allocation); and ten percent (10%) of the Net Settlement Fund is

to be distributed according to the Claiming Class Members' net loss, or "NL Transactions" (as defined in ¶4 of the Plan of Allocation).  (Plan of Allocation, Burns Decl. Ex. 1-C).

Courts have routinely approved plans of allocation in CEA manipulation cases similar to the instant Plan that includes calculations based on sums artificially paid and received and price artificiality tables.[12] Moreover, the Plan of Allocation is a product of arm's-length negotiations between counsel for the Parties. Therefore, the proposed Plan of Allocation should be approved.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

Dated: September 9, 2015

**BURNS CHAREST LLP**

/s/ Warren T. Burns_____
By:  Warren T. Burns, Esq.
500 North Akard
Suite 2810
Dallas, Texas 75201
Tel:  (469) 904-4550
FAX:  (469) 444-5002

**LOVELL STEWART HALEBIAN
JACOBSON LLP**

/s/ Christopher Lovell_____
By: Christopher Lovell, Esq.
Ian T. Stoll, Esq.
61 Broadway, Suite 501
New York, New York 10006
212-608-1900

---

[12] *Compare, e.g.*, http://www.amaranthcommoditieslitigation.com/ArtificialityTablesandCalculationExamples.aspx and http://www.naturalgascase.com/naturalgas/welcome.htm to www.nymextassettlement.com/FileDownload.aspx?FileID=%202834.